**CASE No. 25-8027**

_____

THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

ASHLEY WILLEY & SEAN WILLEY,

Appellants/Plaintiffs

v.

SWEETWATER COUNTY SCHOOL DISTRICT #1, ET AL.

Appellees/Defendants

_____

On Appeal from the United States District Court for the District of
Wyoming
The Honorable Scott W. Skavdahl

Case No. 23-cv-69-S

_____

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS**

_____

Mary E. McAlister, Esq.   Child &
Parental Rights Campaign  5425
Peachtree Parkway, Suite 110
Norcross, GA 30092
(770) 448-4525
mmcalister@childparentrights.org
Attorney for Appellants/Plaintiffs

**_Oral Argument is Requested_**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES...................................................................iv

STATEMENT OF PRIOR OR RELATED APPEALS............................vi

GLOSSARY ........................................................................................vii

INTRODUCTION..................................................................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..............3

STATEMENT OF THE CASE ...............................................................4

   I.   Statement of Facts ......................................................................4

      Defendants' secret transitioning under the 2021 Policy....................4

      Mrs. Willey inadvertently discovers the secret transitioning ...........6

      Defendants enact mandatory 2022 Policy.......................................10

      District officials publicly attempt to qualify the 2022 Policy ..........13

      District teacher violates student fraternization policy with A.S......15

   II.  Procedural History ........................................................................16

SUMMARY OF THE ARGUMENT ......................................................17

STANDARD OF REVIEW...................................................................19

ARGUMENT .......................................................................................20

   I.   Defendants' actions substantially burdened Mrs. Willey's free exercise right to direct the religious upbringing of her daughter. ......20

      A.   Parents' rights to direct the religious upbringing of their children extends beyond the schoolhouse door. ...............................22

      B.   *Lyng* and *Bowen* have no application to this public school case. 26

      C.  *Smith's* neutral and generally applicable analysis does not apply to the *Yoder*-type interference present in this case. ..........................28

II.  The district court erred in concluding that Defendants did not violate Mrs. Willey's free exercise rights as a teacher. ....................... 29

  A.   The district court improperly granted summary judgment when it acknowledged that there were disputed issues of material fact. ... 30

  B.   The district court erred in concluding that the burden on Mrs. Willey's free exercise rights as a teacher was not a constitutional violation............................................................................................ 31

  C.   The district court erred in applying the *Smith* neutral/generally applicable factor and in its conclusion that the policies were neutral and generally applicable.................................................................... 36

III. The district court erred in awarding summary judgment to Defendants based on an invented concept requiring inquiry before fundamental rights can be infringed. ................................................... 39

  A.    The court unilaterally redefined fundamental parental rights to include an inquiry "contingency" (better termed a requirement) to save the District from the "burden" of having to proactively notify parents. ........................................................................................... 41

    *1.   The district court misconstrued Supreme Court precedent to claim that Mrs. Willey was attempting to impose third party liability on the District.* ................................................................ 43

  *2.   The court misconstrues this Court's precedent in Lee to justify its creation of an inquiry requirement.* ................................................... 45

  B.   The district court improperly dismissed the detrimental effects of its inquiry requirement on fundamental parental rights............ 48

    *1.   The district wrongly asserts that the invented "inquiry contingency" (requirement) is a constitutionally permissible limitation on parental rights.*......................................................... 49

    *2.   The district court impermissibly concluded that Mrs. Willey's parental rights must yield to protect the District from the "burden"*

*of having to notify parents about children's "gender identity"*
*issues*............................................................................................*51*

CONCLUSION ..........................................................................54

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................56

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................57

CERTIFICATE OF DIGITAL SUBMISSION .....................................58

CERTIFICATE OF SERVICE...........................................................59

ADDENDA................................................................................... 1

ECF 80 Order Granting Defendants' Summary Judgment
Motion............................................................. Addenda 2

ECF 81 Judgment in a Civil Action.............................. Addenda 40

# TABLE OF AUTHORITIES

## Cases

*Anspach v. City of Philadelphia, Dep't of Public Health*, 503 F.3d 256 (3d. Cir. 2007) ....................................................................... 45

*Bauchman v. W. High School*, 132 F.3d 542 (10th Cir.1997) ................ 31

*Bowen v. Roy*, 476 U.S. 693 (1986) ............................................. 20, 26, 28

*Carson v. Makin*,596 U.S. 767 (2022). ...................................................... 35

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520 (1993) ..................................................................................... 38

*Cillo v. City of Greenwood Vill.*, 739 F.3d 451 (10th Cir. 2013) ....... 19, 31

*DeShaney v. Winnebago County Dep't of Soc. Servs.*. 489 U.S. 189 (1989). ..................................................................................... 44

*EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184 (10th Cir.2000) ................................................................................. 19

*Employment Division v. Smith*, 494 U.S. 872 (1990) .............28-30, 36-37

*Engel v. Vitale,* 370 U.S. 421 (1962) ........................................................ 23

*Espinoza v. Montana Dept. of Revenue*, 591 U.S. 464 (2020) ................ 22

*Fields v. City of Tulsa*, 753 F.3d 1000 (10th Cir. 2014) ......................... 31

*Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025) ............ 43, 45

*Fowler v. United States*, 647 F.3d 1232 (10th Cir.2011) ....................... 20

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ......................... 33, 37

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) 34, 35, 37, 38

*Koch v. City of Del City*, 660 F.3d 1228, 1237–38 (10th Cir. 2011) ....... 19

*Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924 (10th Cir. 2025) ............ 45-48

*Lee v. Weisman*, 505 U.S. 577 (1992) ....................................................... 23

*Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S 439 (1988) ........................................................................... 20, 26, 28

*Mahmoud v. Taylor,* 145 S.Ct. 2332 (2025) ... 17, 18, 20, 21-24, 26-29, 34, 36, 43, 51-53

*Parham v. J.R.*, 442 U.S. 584 (1979) ....................................................... 48

*Prince v. Massachusetts,* 321 U.S. 158 (1944) ................................... 49-50

*Runyon v. McCrary*, 427 U.S. 160 (1976) .......................................... 49-50

*Shero v. City of Grove*, 510 F.3d 1196 (10th Cir.2007) ........................... 19

*Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694 (10th Cir. 1998) ................................................................................ 49-50

*Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969) .............................................................................. 35

*Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449 (2017). ............................................................................. 53

*Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002 (10th Cir.2008) ......... 19

*West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) .............. 23, 27

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ................................ 22-29, 49-50

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ................................................ 52

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

# GLOSSARY

**2021 Policy:** An unwritten custom, procedure or policy in place in Sweetwater County School District #1 during the 2021-2022 school year which consisted of a Preferred Names Policy and Parent Concealment Policy.

**2022 Policy:** SCSD #1 Special Services Non-Negotiables, August 15, 2022.

**2023 Policy:** SCSD #1 Special Services Non-Negotiables, August 14, 2023.

**Code GBH, Section G:** Sweetwater County School District #1 Policy Manual, Code GBH Section G, Staff and Student Relations.

**District**: Sweetwater County School District #1 in Rock Springs, Wyoming.

**FAC**: Plaintiffs' Proposed First Amended Complaint

**Order**: Order Granting Summary Judgment, ECF 80

**PCNP:** Preferred/Chosen Names Procedure within the District's 2022 and 2023 policies.

**SEC. 504**: Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et. seq.*

## INTRODUCTION

Plaintiff-Appellant Ashley Willey[1] is asking this court to reverse the district court's granting of summary judgment in favor of Defendants and to permit her claims for violation of fundamental constitutional rights to go to trial. Mrs. Willey's case arises from actions taken by the Board of Trustees and individual administrators of Sweetwater County School District #1 (the "District") that violated her fundamental rights to free exercise of religion under the First Amendment and to direct the upbringing of her children under the Fourteenth Amendment. Mrs. Willey, a former teacher in the District and mother of a disabled teenage daughter who was a student in the District, was deprived of her constitutional rights as a parent and a teacher by actions taken by District employees. Those actions included concealing from her that they were affirming her daughter as a boy at school even after her objection on religious and parental rights grounds, and requiring that in her role as a teacher she violate her religious beliefs by addressing children by "preferred names" which were not their given names and by pronouns

---

[1]    Sean Willey was dismissed from the case by the district court. That decision is not being appealed, so Ashley Willey is identified as the Plaintiff-Appellant for purposes of this appeal.

1

inconsistent with their sex and intentionally concealing from parents that their children were being affirmed as something other than their sex.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a) because this is a matter seeking redress of injuries suffered by Plaintiffs from deprivation, under the color of state law, of rights secured by the First and Fourteenth Amendments to the United States Constitution and the laws of the United States.

Defendants, Sweetwater County School District #1 Board of Trustees, Kayci Arnoldi, Bryant Blake, Nicole Bolton, and Kelly McGovern, filed a Motion for Summary Judgment on March 24, 2025. The District Court entered its Order Granting Defendants' Summary Judgment Motion on April 28, 2025. Appellants, Ashley and Sean Willey, filed a Notice of Appeal on May 23, 2025. This appeal is timely pursuant to Fed. R. App. P. 4(a)(1)(A).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal is from a final order disposing of all claims against all parties.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    The district court erred in concluding that school officials did not substantially burden Plaintiff's fundamental right to free exercise of religion when they concealed from her that they were affirming her disabled teenage daughter as a boy at school in contravention of Plaintiff's right to direct the religious upbringing of her child.

2.    The district court erred in concluding that Defendants' statements and actions which burdened Mrs. Willey's religious beliefs as a teacher in the District did not violate her fundamental right to free exercise of religion.

3.    The district court erred in concluding that concealing information from Plaintiff regarding actions taken to change her disabled teenage daughter's identity to a boy at school does not infringe her fundamental parental right to direct the upbringing of her child unless Plaintiff first inquired as to whether her child is assuming a different identity.

3

## STATEMENT OF THE CASE

### I.    Statement of Facts

Mrs. Willey's daughter, A.S., was a 16-year-old student at Black Butte High School during the 2021-2022 and 2022-2023 school years. (FAC ¶¶ 20, 27, 30, 95, App. Vol. I at 0153, 0154, 0155, 0169). Black Butte High School is one of the schools operated by the District.

A.S. experienced childhood sexual trauma and, as a result, had been under the care of physicians and mental health professionals since that time. (FAC, ¶ 20, App. Vol. I at 0153). The District knew about A.S.'s mental health disorders and determined that A.S. was a student with a qualifying disability pursuant to Sec. 504 and developed and implemented a Sec. 504 Accommodation Plan due to A.S.'s diagnosis. (FAC, ¶ 22, App. Vol. I at 0153). A.S. began experiencing discomfort with pubertal changes and began to dislike her body. Peers told her that her discomfort and her stereotypical "male" interests in sports and other pursuits were because she was "trans." (FAC, ¶ 25, App. Vol. I at 0154).

### Defendants' secret transitioning under the 2021 Policy

During the 2021-2022 school year the District had in place an unwritten custom, practice or procedure that required 1) that District

staff abide by children's requests to be treated and affirmed as the opposite sex and addressed by gender non-conforming names and pronouns ("Preferred Names Policy") and 2) that District staff must conceal information from parents regarding their child being affirmed and treated as the opposite sex unless the child consented to the parents being told ("Parent Concealment Policy") (Collectively the "2021 Policy"). (FAC ¶ 49, App. Vol. I at 0158).

At the beginning of the 2021-2022 school year, without Mrs. Willey's knowledge, A.S. told teachers and staff at Black Butte High School that she wanted to be treated as a boy, using the male name "C" and be referred to by male pronouns. (FAC, ¶ 27, App. Vol. I at 0154). She also requested that District personnel conceal the information from Mrs. Willey, which District personnel agreed to and, pursuant to the 2021 Policy, were required to do. (FAC, ¶ 27, App. Vol. I at 0154).

Throughout the school year, in accordance with the 2021 Policy, District personnel purposely and intentionally concealed from Mrs. Willey that A.S. was being treated as a boy with a male name and pronouns while referring to A.S. by her legal name and biologically accurate pronouns in their presence.  (FAC, ¶ 28, App. Vol. I at 0154).

This even occurred during Sec. 504 meetings, which are intended to address issues related to A.S.'s mental health disorder and disability. (FAC, ¶ 28, p. App. Vol. I at 0154).

### Mrs. Willey inadvertently discovers the secret transitioning

Mrs. Willey inadvertently discovered that Defendants had intentionally concealed from her the fact that school personnel were referring to her daughter using a male name and pronouns at school while continuing to use her legal name and biological pronouns when communicating with her parents. (FAC, ¶ 30, App. Vol. I at 0155). On March 29, 2022, during a district-wide training, Mrs. Willey spoke with some teachers from Black Butte High School and asked whether they knew her daughter. (FAC, ¶ 31-33, App. Vol. I at 0155). In response, one of the teachers said to another, "it goes by "C", thereby revealing that school personnel had been using a different name and pronouns for A.S. at school without notifying her parents.  (FAC, ¶ 34, App. Vol. I at 0155.)

Mrs. Willey spoke with A.S. about the "gender identity" issue and confirmed that District staff had been treating A.S. as a boy and using a male name and pronouns since the beginning of the school year. (FAC, ¶ 39, App. Vol. I at 0156). Mrs. Willey talked with A.S. about being treated

as the opposite sex and using an alternate name at school. (FAC, ¶ 39, App. Vol. I at 0156). A.S. informed her mother that she felt pressured by District staff to call herself a boy and was uncomfortable doing so. She also stated she was concerned that District personnel would be angry if she did not continue being treated as a boy. (FAC, ¶ 40, App. Vol. I at 0156).

On March 29, 2022, Mrs. Willey informed teachers and staff at Black Butte that she had recently become aware that teachers and staff were referring to A.S. as "C" and treating her as a male.  (FAC, ¶ 41, App. Vol. I at 0156; Ashley Willey Email 3/29/2022, App. Vol. I at 0197). Mrs. Willey directed staff  to stop calling A.S. "C" and referring to her as male. (FAC, ¶ 41, App. Vol. I at 0156; Ashley Willey Email 3/29/2022, App. Vol. I at 0197).  Mrs. Willey told staff only to refer to A.S. as a female and call her by her given name. (FAC, ¶ 41, App. Vol. I at 0156; Ashley Willey Email 3/29/2022, App. Vol. I at 0197).

During a subsequent conversation in April 2022, Assistant Superintendent Nicole Bolton informed Mrs. Willey that A.S. had asked teachers and staff to call her "A" (her legal name) because "her parents said so." (FAC, ¶ 46, App. Vol. I at 0158). Ms. Bolton also stated they were

7

calling A.S. by her legal name only because A.S. requested it. (FAC, ¶ 46, App. Vol. I at 0158). Ms. Bolton added that regardless of Mrs. Willey's instructions, if A.S. asked to be called by a male name and to use male pronouns, then District staff would honor that request and would not inform Mrs. Willey of the change. (FAC, ¶ 46, App. Vol. I at 0158). Pursuant to the 2021 Policy, teachers at Black Butte were required to accede to the wishes of a minor student who said he or she was transgender, wanted to be treated as the opposite sex with an alternate name and pronoun, and did not want his or her parents told, regardless of the parents' direction or even over their objection. (FAC, ¶ 47, App. Vol. I at 0158).

Mr. and Mrs. Willey met with then District Superintendent Kelly McGovern on April 22, 2022, and informed her that A.S. had suffered childhood sexual trauma and that suppressed memories of the abuse had surfaced in 2021, causing nightmares and distress about her developing female body. (FAC, ¶ 51, App. Vol. I at 0159). Mr. and Mrs. Willey also told Ms. McGovern that there was already an ongoing treatment plan in place with a licensed mental health counselor chosen by Mr. and Mrs.

Willey to help A.S. deal with the effects of the trauma and the symptoms of gender dysphoria. (FAC, ¶ 51, App. Vol. I at 0159).

Mr. and Mrs. Willey met with Ms. McGovern and Black Butte Principal Bryant Blake on April 26, 2022. (FAC ¶ 53, App. Vol. I at 0159). They informed Mr. Blake of A.S.'s history of childhood sexual trauma and its connection to her discomfort with her body, *i.e.*, her symptoms of gender dysphoria that were being treated by the private counselor. (FAC ¶ 53, App. Vol. I at 0159). Mr. Blake said that the parents' direction that A.S. be referred to by her legal name and with female pronouns put Black Butte staff in a "Catch-22," because teachers and staff had been directed (pursuant to the 2021 Policy) that if a child requested to be called by another name and alternate pronouns, then the teachers were required to do so. (FAC ¶ 54, App. Vol. I at 0159).

Ms. McGovern explicitly confirmed the existence of the 2021 Policy by instructing Mrs. Willey that, as a District employee, she was required to respect students' requests to use alternative names and/or pronouns and was prohibited from informing parents of such requests unless the students consented. (FAC ¶ 57, App. Vol. I at 0160). Ms. McGovern explained that a student must be supported regardless of parental

9

consent because the school is required to provide a "safe environment." (FAC ¶ 57, App. Vol. I at 0160).  Mrs. Willey informed Ms. McGovern that the 2021 Policy violated her sincerely held religious beliefs, which included not speaking falsely or being deceitful by concealing information.  (App. Vol. I at 0160).

### Defendants enact mandatory 2022 Policy

Following the district court's partial denial of the motion to dismiss, the District rescinded the 2021 Policy and issued and implemented a policy for the 2022–2023 school year titled "SCSD #1 Special Services Non-Negotiables," (the "2022 Policy") which required that staff use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. The 2022 Policy stated that staff must respect the privacy of all students regarding students' choices and that violations of the 2022 Policy might constitute sex-based discrimination and might result in discipline. (FAC ¶ 61, App. Vol. I at 0161; FAC Exhibit F, App. Vol. I at 0204). Teacher Jennifer Polaski testified that her principal told her that under the 2022 Policy, which they had to sign to keep their jobs, staff must accede to the wishes of students regarding

preferred names and could not contact parents. (Deposition of Jennifer Polaski, pp. 21-23, App. Vol. III at 0521-0523).

On August 15, 2022, Mrs. Willey told District Director of Student Services Kayci Arnoldi and Ms. Bolton that she objected to the 2022 Policy on religious grounds and requested a religious accommodation, which the District denied. (FAC ¶¶ 62-66, App. Vol. I at 0162). In an email response, Ms. Arnoldi told Mrs. Willey that "unfortunately, we don't get to base our decisions on personal and religious beliefs." (FAC ¶ 67, App. Vol. I at 0162; Arnoldi Email, App. Vol. III at 0540). Ms. Arnoldi testified that the email could have been worded differently but affirmed the sentiment that "we don't get to base our decisions on personal beliefs." (Deposition of Kayci Arnoldi, p. 85, App. Vol. III at 0543). Ms. Bolton reviewed the email prior to it being sent and did not change the wording. (*Id.*).

Ms. Arnoldi also informed Mrs. Willey that, pursuant to the 2022 Policy, District staff would be following A.S.'s requests to be treated as the opposite sex over the parents' express objections and would "respect their [the children's] privacy" by not revealing the differential gender

11

affirming treatment [to the parents] unless the children agreed. (FAC ¶ 64, App. Vol. I at 0162).

In response to social media posts alleging that District staff had been instructed not to communicate with parents about their children's gender identity, on September 9, 2022, Ms. Bolton sent a district-wide email regarding staff responses to student requests to be treated as the opposite sex, use alternate names or pronouns, and to conceal that information from their parents.  (FAC ¶¶ 70, 71, App. Vol. I at 0163; Nicole Bolton Email 9/9/2022, App. Vol. I at 0212).  Ms. Bolton claimed that District staff had "never [been] directed not to talk to parents or to lie to parents." (FAC ¶ 71, App. Vol. I at 0163; Nicole Bolton Email 9/9/2022, App. Vol. I at 0212). However, she also stated that decisions regarding support for "transgender and gender nonconforming students *may* involve the student, parents and District administration" (emphasis added), and that such matters should be referred to the principal, who would then "involve central administration." (FAC ¶ 71, App. Vol. I at 0163; Nicole Bolton Email 9/9/2022, App. Vol. I at 0212). Notably, Ms. Bolton did not state that parental involvement was required.  (FAC ¶ 71, App. Vol. I at 0163).

Ms. Bolton further stated that when a student requests confidentiality from their parents, that request must be honored:

> [T]he District will prioritize safeguarding the physical and psychological well-being of a student. When a student indicates that their family is not supportive of their gender identity and/or the District is concerned for the student's safety, the District will honor a student's request for confidentiality until the student consents to the disclosure and/or the District completes an individualized assessment and rules out particularized and substantiated concern of real harm to the student. The expectation is that parents will eventually be involved: the District will support the student in this process and encourage familial involvement whenever possible. For example, the District will offer the opportunity to speak with a school counselor or social worker to facilitate conversations with parents. (FAC ¶ 72, App. Vol. I at 0163; Nicole Bolton Email 9/9/2022, App. Vol. I at 0212).

### District officials publicly attempt to qualify the 2022 Policy

At the Board of Trustees' meeting on September 12, 2022, Ms. McGovern responded to a citizen's question about whether teachers are required to withhold information regarding students' gender identity from parents. She stated:

> "[t]here are some situations that – and, again, it is on a case-by-case basis. But if there is a fear from the student, if there are extenuating circumstances that the school is aware of, we honor the privacy of the students." (FAC ¶ 80, App. Vol. I at 0165; Transcript of Meeting 9/12/2022, p. 30, ln. 12-17, App. Vol. I at 0245).

13

Board Chairwoman Carol Jelaco echoed this approach, stating:

> "[i]f the student expresses a fear of telling – of what might happen if they are – if their parents are told, the district, from my interpretation, is bound to keep the student's – shall we say what – whatever the students want is paramount." (FAC ¶ 81, App. Vol. I at 0165; Transcript of Meeting 9/12/2022, p. 29, ln. 9-14, App. Vol. I at 0244).

Both Ms. Jelaco and Ms. McGovern repeatedly emphasized during the meeting that the District addresses gender identity issues on a "case-by-case basis." (FAC ¶ 82, App. Vol. I at 0166; Transcript of Meeting 9/12/2022, p. 14, ln 19; p. 23, ln. 8; p. 26, ln. 20; p. 27, ln. 10; p. 28, ln. 24-25; p. 30, ln. 12-14; p. 33, ln. 21-25, App. Vol. I at 0229, 0241, 0242, 0243, 0245, 0248). Ms. McGovern claimed that there was no blanket response required by all teachers. (FAC ¶ 82, App. Vol. I at 0166; Transcript of Meeting 9/12/2022, p. 30, ln. 18-20, App. Vol. I at 0245).

However, this position contradicted prior written directives. Ms. McGovern previously instructed Mrs. Willey and other staff that "staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice. Violations of this procedure may constitute discrimination based on sex and may result in discipline." (FAC ¶ 83, App. Vol. I at 0166).

14

Similarly, Ms. Bolton had previously advised District staff that the "District will honor a student's request for confidentiality until the student consents to the disclosure and/or the District completes an individualized assessment and rules out any particularized and substantiated concern of real harm to the student." (FAC ¶ 84, App. Vol. I at 0166).

### District teacher violates student fraternization policy with A.S.

During the 2021-22 and 2022-23 school years, the District policy manual included Code GBH, Section G - Staff and Student Relations, which prohibited SCSD personnel from fraternizing with students by engaging in inappropriate behavior or conversations with students, including conversations regarding sexual intercourse, sexual relations, or sex. (Plaintiffs' Request for Admissions to Kelly McGovern, No. 14, App. Vol. III at 0491-0492; Deposition of Kelly McGovern, pp. 127-132, App. Vol. III at 0501-0505). Code GBH, Section G prohibited staff from communicating, conveying, or providing to SCSD students links to websites, social networking platforms, and other sources of electronic/digital media regarding LGBTQ matters, including resources related to gender transition and/or sexual orientation. (Staff and Student

15

Relations Policy, App. Vol. III at 0506; Deposition of Kelly McGovern, pp. 127-132, App. Vol. III at 0501-0505).

During the 2022-23 school year, Rock Spring Junior High School teacher Ben Audevart communicated on more than one occasion with A.S. electronically using her chosen alternate male names and encouraging her transition. (Audevart emails, App. Vol. III at 0447-0453). Audevart commiserated with, counseled and provided A.S. with information concerning sexual orientation and "gender identity," including links to transgender advocacy groups, such as the Trevor Project and Human Rights Campaign. (App. Vol. III at 0447-0453). Defendants have not and cannot dispute these communications between a District staff member and a minor student.

## II.     Procedural History

Plaintiffs filed their initial complaint on April 20, 2023. (Complaint, App. Vol. I at 0020).  The district court granted a partial preliminary injunction against the 2021 policy.  The district court granted in part and denied in part the Defendants' Motion to Dismiss.  Following that decision, Plaintiffs amended the complaint to eliminate the dismissed causes of action and to address the 2022 Policy. Plaintiffs filed a First

16

Amended Complaint on July 20, 2023, asserting claims under 42 U.S.C § 1983 for: (1) violation of their fundamental parental right to direct the upbringing of their children, including making medical and mental health decisions, (2) violation of their free exercise rights as parents; and (3) violation of Ashley Willey's free exercise right as a teacher in the District.  (FAC, App. Vol. I at 0149).

Following the completion of discovery, Defendants filed a Motion for Summary Judgment, which the district court granted in full. (Order, App. Vol. III at 0567).

## SUMMARY OF THE ARGUMENT

"The right of parents 'to direct the religious upbringing of their children' would be an empty promise if it did not follow those children into the public school classroom." *Mahmoud v. Taylor,* 145 S.Ct. 2332, 2351 (2025). Mrs. Willey received such an empty promise from the district court when it concluded that secretly affirming an alternative "gender identity" for her disabled teenage daughter while at school did not infringe on Mrs. Willey's right to freely exercise her religion because she remains free to "train her child in accordance with her religious beliefs." (Order, p. 28, App. Vol. III at 0594). Also, according to the district

court, Mrs. Willey remained free "to make a different choice regarding the type of education her child receives" (*id.*), a proposition that "is both insulting and legally unsound." *Mahmoud,* 145 S.Ct. at 2360.

Equally unsound is the district court's conclusion that when Defendants concealed from Mrs. Willey that they were affirming her disabled teenage daughter in an alternative "gender identity," they were not infringing Mrs. Willey's fundamental parental right to direct the upbringing of her child because Mrs. Willey had not asked them whether they were doing so. The district court acknowledged that it was adding a contingency to a fundamental constitutional right, but claimed it was "preferred to opening the Pandora's box of requiring proactive disclosure by schools of any circumstance or event that could impact a parent's ability to make decisions regarding their child." (Order, p. 21, App. Vol. III at 0587).

After correctly concluding that Mrs. Willey had sufficiently shown, as a teacher, that Defendants' conduct burdened her religious beliefs, the district court engaged in a strained analysis to conclude that the burden was not a violation of Mrs. Willey's free exercise rights.

18

These significant constitutional errors require reversal by this Court.

## STANDARD OF REVIEW

This Court reviews the district court's summary judgment order *de novo*. *Koch v. City of Del City*, 660 F.3d 1228, 1237–38 (10th Cir. 2011) (citing *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1010 (10th Cir.2008)). Summary judgment must be granted if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). "A fact is material if, under the governing law, it could [affect] the outcome of the lawsuit." *Id.* (citing *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir.2000)). A factual dispute is "genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (citing *id.).*

Judgment as a matter of law is appropriate when "the nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof." *Koch*, 660 F.3d at 1238 (citing *Shero v. City of Grove*, 510 F.3d 1196, 1200

(10th Cir.2007)). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* (citing *Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir.2011)).

When the evidence is reviewed and inferences are drawn in the light most favorable to Mrs. Willey, there are substantial disputes of material facts that should prevent summary judgment under Rule 56. The district court's contrary conclusion should be reversed.

## ARGUMENT

## I. Defendants' actions substantially burdened Mrs. Willey's free exercise right to direct the religious upbringing of her daughter.

The district court's erroneous view of Mrs. Willey's free exercise rights as a parent was soundly rejected by the Supreme Court in *Mahmoud* and should be rejected by this Court. The district Court relied on *Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S 439 (1988), involving construction projects on federal land, and *Bowen v. Roy*, 476 U.S. 693 (1986), involving religious objections to social security numbers, to conclude wrongly that Defendants' actions did not prevent Mrs. Willey from practicing her sincerely held religious beliefs. (Order, p.

20

29, App. Vol. III at 0595). The district court went so far as to say that "[t]o conclude that the District's failure to act in accordance with Plaintiff's religious beliefs is a constitutional violation would turn the First Amendment on its head." (*Id.*). To the contrary, it is the district court which has upended decades of Supreme Court First Amendment free exercise precedent that has "long recognized the rights of parents to direct 'the religious upbringing' of their children," including in the context of public schools. *Mahmoud*, 145 S.Ct. at 2351.

Notably, the district court referenced in a footnote that the Supreme Court was addressing "what constitutes a 'burden' on parents' religious exercise in the context of elementary students being instructed on gender and sexuality, contrary to the parents' religious convictions without notice or opportunity for parents to opt their child out" in *Mahmoud*. (Order, p. 29 n 15, App. Vol. III at 0595). The Court issued that decision and its decision definitively and dispositively disposes of the district court's arguments. That disposition requires reversal.

21

## A. Parents' rights to direct the religious upbringing of their children extends beyond the schoolhouse door.

"The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution." *Mahmoud*, 145 S.Ct. at 2351. "Drawing on 'enduring American tradition,' we have long recognized the rights of parents to direct 'the religious upbringing' of their children." *Id.* (citing *Espinoza v. Montana Dept. of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–214 (1972))). The right of parents to direct the religious upbringing of their children "is not merely a right to teach religion in the confines of one's own home. Rather, it extends to the choices that parents wish to make for their children outside the home." *Id.* Those choices include sending children to private schools for those who can make that choice, but also the choice to send children to public school without the threat of having their religious beliefs infringed. *Id.* Indeed, the right of parents "to direct the religious upbringing of their children would be an empty promise if it did not follow those children into the public school classroom." *Id.* Consequently, the Court has recognized "limits on the government's ability to interfere with a student's religious upbringing in a public school setting." *Id.* Those

22

limits include overturning directly coercive acts such as compelled recitation of the Pledge of Allegiance, *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943), or compelled participation in prayer, *Engel v. Vitale,* 370 U.S. 421 (1962), *Lee v. Weisman*, 505 U.S. 577 (1992). The limitations also include policies that impose more subtle forms of interference with the religious upbringing of children, such as the mandatory high school attendance law in *Yoder,* 406 U.S. at 211, the LGBTQ+ instruction in *Mahmoud,* 145 S.Ct. at 2352, and the 2021 and 2022 policies in this case.

In *Yoder, "*the threat to religious exercise was premised on the fact that high school education would 'expos[e] Amish children to worldly influences in terms of attitudes, goals, and values contrary to [their] beliefs' and would 'substantially interfer[e] with the religious development of the Amish child.'" *Id.* (citing *Yoder,* 406 U.S. at 218). The compulsory-education law in *Yoder* "carrie[d] with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent" because it placed Amish children into "an environment hostile to Amish beliefs," where they would face "pressure to conform" to contrary viewpoints and lifestyles." *Id.* (citing *Yoder,* 460 U.S. at 211). That interference violated the parents' free exercise rights

23

in *Yoder*. *Id.* Likewise in *Mahmoud,* the "Board's introduction of the 'LGBTQ+-inclusive' storybooks—combined with its decision to withhold notice to parents and to forbid opt outs—substantially interferes with the religious development of their children and imposes the kind of burden on religious exercise that *Yoder* found unacceptable." *Id.* at 2353.

The books at issue in *Mahmoud* "carry with them 'a very real threat of undermining' the religious beliefs that the parents wish to instill in their children." *Id.* at 2355 (citing *Yoder*, 406 U.S. at 218). "Like the compulsory high school education considered in *Yoder*, these books impose upon children a set of values and beliefs that are 'hostile' to their parents' religious beliefs." *Id.*, (citing *Yoder,* 406 at 211). "And the books exert upon children a psychological 'pressure to conform' to their specific viewpoints. *Ibid*. The books therefore present the same kind of 'objective danger to the free exercise of religion' that we identified in *Yoder*." *Id.* (citing *Yoder,* 406 U.S. at 218).

The same objective danger is present in the District's Parental Concealment Policy in the 2021 and 2022 policies. The District's actions in concealing that they were acceding to A.S.'s request to identify as a boy did not merely threaten, but actually undermined Mrs. Willey's

24

sincerely held religious beliefs that human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity. (FAC ¶ 103, App. Vol. I at 0171). The District's policies also undermined Mrs. Willey's sincerely held religious beliefs that parents have the non-delegable duty to direct the upbringing, beliefs, and religious training of their children, including concerning human sexuality and identity. (FAC ¶ 104, App. Vol. I at 0171). Defendants created an environment hostile to Mrs. Willey's religious beliefs, which exerted pressure on A.S. to conform to the viewpoint that she could identify as something other than her sex. (FAC, ¶ 40, App. Vol. I at 0156). A.S. informed her mother that she felt pressured by District staff to call herself a boy and was uncomfortable doing so. She also stated she was concerned the District personnel would be angry if she did not continue being treated as a boy. *(Id.)*.

The evidence adduced in discovery and the allegations of the verified Complaint show that Defendants have transgressed the limits on the government's ability to interfere with a student's religious upbringing in a public school setting established in *Yoder* and affirmed

in *Mahmoud*. Mrs. Willey has exceeded the threshold requirement to raise triable issues of material fact, and the motion for summary judgment should have been denied.

### B. *Lyng* and *Bowen* have no application to this public school case.

Contrary to the district court's conclusion, it is *Yoder,* not *Lyng* and *Bowen,* that govern the analysis of Mrs. Willey's claims. The *Mahmoud* Court explicitly rejected *Lyng* and *Bowen,* which were also cited by the school district and dissenting justices in *Mahmoud*. 145 S.Ct. at 2356. The Court explained that it was appropriate in *Lyng* and *Bowen* to conclude that governmental functions such as permitting and issuing social security cards, which incidentally affected certain citizens' religious beliefs, did not substantially burden free exercise rights. *Id.* at 2356-2357. However, those cases "have no application" to the government's operation of public schools which "implicates direct, coercive interactions between the State and its young residents." *Id.* at 2357.

In rejecting *Lyng* and *Bowen,* the *Mahmoud* Court explicitly rejected the district court's conclusion that the District's policies did not coerce or compel Mrs. Willey to violate tenets of her religion, but that

26

"Plaintiff remains completely free to "train [her child] regarding human sexual identity and the unchangeable natural created order of humans as male and female." (Order, p. 28, App. Vol. III at 0594). "The District's failure to proactively inform Plaintiff did not prevent Plaintiff from practicing her sincerely held religious beliefs." (*Id.*). The dissenting justices in *Mahmoud* similarly opined that enforcement of the Board's policy "would not prevent parents from 'teach[ing] their religious beliefs and practices to their children at home.'" 145 S.Ct. at 2360. Carried to its logical conclusion, that argument shared by the district court here would mean that "parents who send their children to public school must endure any instruction that falls short of direct compulsion or coercion and must try to counteract that teaching at home. The Free Exercise Clause is not so feeble." *Id.* As the *Mahmoud* majority said, "[t]he parents in *Barnette* and *Yoder* were similarly capable of teaching their religious values "at home," but that made no difference to the First Amendment analysis in those cases." *Id.* Neither does it make any difference here. As did the majority in *Mahmoud,* this Court should reject the district court's feeble interpretation of the Free Exercise Clause and reverse its decision granting summary judgment.

27

### C. *Smith's* neutral and generally applicable analysis does not apply to the *Yoder*-type interference present in this case.

When, as was true in *Yoder* and *Mahmoud*, and is true here, a district's actions "'substantially interfere with the religious development of the parents' children,'" and "'pose a very real threat of undermining" the religious beliefs and practices that the parents wish to instill in their children,'" the "neutral and generally applicable" analysis in *Employment Division v. Smith*, 494 U.S. 872, 881 (1990), does not apply. *Mahmoud*, 145 S.Ct. at 2361 (citing *Yoder*, 406 U.S. at 218). *Smith*, like *Lyng* and *Bowen*, involved incidental burdens on free exercise in non-school contexts. *Smith*, 494 U.S. at 878-879. The government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable. *Mahmoud*, 145 S.Ct. at 2361 *(*citing *id.).* In those circumstances, courts do as the district court did here and ask first if the burdensome policy is neutral and generally applicable before determining the level of constitutional scrutiny. *Id.*

However, when a school district has substantially interfered with parents' free exercise right, as was true in *Yoder, Mahmoud,* and here,

"the First Amendment bars application of a neutral, generally applicable law to religiously motivated action" and the court goes directly to a strict scrutiny analysis. *Id.* (citing *Smith*, 494 U.S. at 881). The district court wrongly concluded that the 2021 and 2022 policies only incidentally burdened Mrs. Willey's free exercise rights and proceeded with the *Smith* "neutral and generally applicable" analysis. (Order, pp. 30-31, App. Vol. III at 0596-0597). The court incorrectly determined that the policies were neutral and generally applicable because they did not provide for individualized exemptions or distinguish between religious and secular conduct and applied rational basis. (*Id.*).

Under *Smith*, *Yoder,* and *Mahmoud,* the district court erred in addressing the "neutral/generally applicable" question, in its conclusion, and in applying rational basis to the policies. This Court should reverse the district court's decision granting summary judgment to Defendants on Mrs. Willey's parental free exercise claim.

## II. The district court erred in concluding that Defendants did not violate Mrs. Willey's free exercise rights as a teacher.

After correctly finding that Mrs. Willey demonstrated that Defendants burdened her free exercise rights as a teacher, the district court wrongly concluded that the burden was of no consequence because

29

the District's policies satisfied *Smith*'s "neutral/generally applicable" standard. (Order, pp. 34-36, App. Vol. III at 0600-0602). The court's decision to even engage in the analysis after recognizing that there were disputed issues of material fact and the circuitous route it took to reach the conclusion belies any argument that it properly granted summary judgment.

> **A.** **The district court improperly granted summary judgment when it acknowledged that there were disputed issues of material fact.**

The fact that the district court even proceeded to a *Smith* analysis was itself an error. The court acknowledged that there were disputed issues of material fact regarding whether the policy burdened Mrs. Willey's religious beliefs. (Order p. 33, App. Vol. III at 0599). There were a number of disputed issues in the record, but the court specifically acknowledged one. "Plaintiff and Defendants dispute whether or not Plaintiff has faced discipline for refusing to comply with the policy (and whether or not Plaintiff has ever had to comply with the policy). Defendants assert that Plaintiff has never had to use a student's requested preferred pronouns nor had to lie to a parent, so her religious beliefs cannot have been burdened." (*Id.*).

That dispute in material facts related to a key element in Mrs. Willey's free exercise claim, *i.e.,* whether Defendants burdened her free exercise rights, should have been resolved in her favor and summary judgment denied. Fed.R.Civ.P. 56(a). *Cillo,* 739 F.3d at 461. Instead, the district court proceeded down a circuitous analytical path toward its erroneous conclusion that the policies were neutral and generally applicable and readily satisfied rational basis review.

**B.    The district court erred in concluding that the burden on Mrs. Willey's free exercise rights as a teacher was not a constitutional violation.**

To establish a free-exercise claim, Mrs. Willey must show that the government has placed a burden on the exercise of her religious beliefs or practices. *Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014) (citing *Bauchman v. W. High School*, 132 F.3d 542, 557 (10th Cir.1997)). "A plaintiff states a claim [that her] exercise of religion is burdened if the challenged action is coercive or compulsory in nature." *Id.* (citing *id.*). The district court correctly concluded that Mrs. Willey had satisfied the *Fields* threshold but veered off course in error to find no constitutional violation. "Plaintiff has sufficiently shown, as a teacher, that her religious beliefs were burdened" by the District's policies. (Order, p. 34, App. Vol. III at

31

0600). The threat of discipline for failing to comply with the policies, which was established in the record, can be enough "to coerce [Plaintiff] into acting contrary to [her] religious beliefs." (Order, p. 33, App. Vol. III at 0599). "As a teacher in the District, the PNCPs force Plaintiff to either use students' preferred names and pronouns in violation of her religious beliefs or potentially lose her job as a teacher in the District." *(Id.)*.

That sentiment was confirmed by teacher Jessica Polaski who testified that the 2022 Policy, including the PNCP was presented to staff as mandatory. Teachers were told that policies were being updated and they were required to sign if they wanted to keep their jobs. (Deposition of Jessica Polaski, App. Vol. III at 0521-523). Teachers were required to accede to children's requests regarding being identified as something other than their sex, and to refuse to do so would mean they would be fired. (*Id.*). Teachers were told they could not contact parents regarding their children's requests to assume a different identity at school. (*Id.*). Her testimony is consistent with the language in the 2022 Policy and correspondence from Ms. Bolton: "staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding

such choice. Violations of this procedure may constitute discrimination based on sex and may result in discipline." (Arnoldi Email, App. Vol. I at 0209; Nicole Bolton Email, App. Vol. I at 0212-0213). Consequently, teachers, such as Mrs. Willey, whose religious convictions prohibit them from denying biological fact, uttering a false statement or concealing information from parents, had to choose between keeping their jobs or violating the tenets of their religion.

The District left no doubt that Mrs. Willey had to choose between her job and her religious beliefs. Ms. Willey testified that she told Ms. Arnoldi that her religious beliefs prevented her from calling children by something that is not true, and that "God created these children exactly as they are, and it cannot be just changed." (Declaration of Ashley Willey, App. Vol. III at 0476).[2] Ms. Arnoldi responded in writing that "we don't get to base our decisions on personal and religious beliefs. We have to follow the policies and procedures that are set forth by law and recent court cases. As an employee of the district, you will have to abide to the policies that are in place for SCSD#1." (Arnoldi Email, App. Vol. III at

---

[2] Ms. Arnoldi testified in her deposition that Mrs. Willey did not share her religious beliefs. (App. Vol. III at 0542-0543). This creates another disputed issue of material fact that the district court failed to address.

33

0540). Ms. Arnoldi later testified that perhaps the email could have been worded differently, but "we don't get to base decisions based off our personal beliefs. We base them off student safety and policy." (Arnoldi Deposition, App. Vol. III at 0542-0543). The email explicitly prohibiting decision-making based on religious beliefs was approved by Assistant Superintendent Bolton before it was sent. (*Id.*).

The ultimatum of choosing between being a teacher and exercising sincerely held religious beliefs is precisely the type of coercion that the Supreme Court has established is prohibited under the Free Exercise Clause. *Mahmoud,* 145 S.Ct. at 2352; *Fulton v. City of Philadelphia*, 593 U.S. 522, 542-543 (2021); *Kennedy v. Bremerton School District*, 597 U.S. 507, 524 (2022). As was true of the city's actions in *Fulton,* it is plain that the District's actions burdened Mrs. Willey's religious exercise by putting her to the choice of losing her employment or acting inconsistently with her beliefs. 593 U.S. at 532. This strikes at the heart of the Free Exercise Clause, *i.e.*, "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life," including in their roles as educators. *Mahmoud,* 145 S.Ct at 2351 (citing *Kennedy*, 597 U.S. at 524). Living out faith in daily life means being free from indirect coercion or penalties on

34

the free exercise of religion, such as the District's policies, not just outright prohibitions. *Carson v. Makin*, 596 U.S. 767, 778 (2022).

As was true of the district in *Kennedy,* the District here is treating Mrs. Willey's "religious expression as second-class speech and eviscerat[ing] this Court's repeated promise" that teachers retain their constitutional rights when they enter the school building. 597 U.S. at 531. Neither teachers nor students "shed their constitutional rights to freedom of speech or expression [including religious expression] at the schoolhouse gate." *Id.* (citing *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969)). The District compelled Mrs. Willey to shed her free exercise rights when she entered school property to fulfill her obligations as a teacher. As the district court correctly concluded, that was sufficient to show that the District burdened her free exercise rights as a teacher. Had the district court ended its analysis there, it would have correctly denied Defendants' motion for summary judgment. The district court chose instead to continue down a circuitous path of misguided analysis to reach its illogical and erroneous decision that Defendants were entitled to summary judgment.

**C. The district court erred in applying the *Smith* neutral/generally applicable factor and in its conclusion that the policies were neutral and generally applicable.**

Since there were disputed issues of material fact which should have precluded summary judgment and a demonstrated violation of Mrs. Willey's free exercise rights, the district court should not have engaged in the neutral/generally applicable analysis under *Smith. See Mahmoud*, 145 S.Ct. at 2361. Nevertheless, the court undertook the analysis and concluded contrary to precedent that the policies could be categorized as neutral and generally applicable so that they only need to satisfy rational basis analysis. (Order, pp. 36-37, App. Vol. III at 0602-0603).

For purposes of analyzing Mrs. Willey's free exercise claim in her role as a teacher, the district court included the 2023 Policy in which the PCNP provision was revised as well as the 2022 Policy since Mrs. Willey remained employed through the 2023-2024 school year. The pertinent revision was an addition regarding staff concerns. The 2022 Policy contained no language regarding staff accommodations. The 2023 Policy added:

> Staff members who are uncertain as to how to implement this procedure or are for any reason unable to implement the procedure in relation to specific, identified circumstance

36

> should address their concerns with the Human Resources
> Director. The District will make every effort to reasonably
> accommodate staff members where possible.

(SCSD #1 Special Services Non-Negotiables, App. Vol. II at 0374). The

district court concluded that the "for any reason" language in the new

provision meant that the 2023 Policy did not provide for individualized

exemptions and so was neutral and generally applicable under *Smith*.

(Order, pp. 35-36, App. Vol. III at 0601-0602). In fact, the "for any reason"

language reviewed in context with the final sentence of the provision,

"The District will make every effort to reasonably accommodate staff

members where possible," creates the kind of *ad hoc* exemption that

*Smith, Fulton,* and *Kennedy* said trigger strict scrutiny.

As the Court explained in *Fulton*, "[a] law is not generally

applicable if it "invite[s]" the government to consider the particular

reasons for a person's conduct by providing "'a mechanism for

individualized exemptions.'" 593 U.S. at 533 (citing *Smith,* 494 U.S. at

884). In *Smith,* the Court explained that "good cause" language in

unemployment compensation statutes invited the government to

consider the particular reasons for a person being unemployed and

thereby created individualized exemptions depending on the government

actor's evaluation of the reasons. 494 U.S. at 884. *See also, Kennedy,* 597 U.S. at 526 (reiterating that a policy fails First Amendment scrutiny if it (1) burdens religious practice pursuant to a non-neutral rule or (2) permits individualized exemptions). When determining whether a provision is neutral and generally applicable, the court must look beyond facial neutrality. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against government hostility which is masked, as well as overt. "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 534 (1993).

Here, the district court simply adopted the Defendants' argument that "any reason" could not be an "individualized exemption" because it means that accommodations will be offered to all who ask. (Order, p. 35, App. Vol. III at 0601). However, that is not what the provision says. A staff member who is uncertain about how to implement the policy for any reason can address their concerns to Human Resources. (SCSD #1 Special Services Non-Negotiables, App. Vol. II at 0374). However, that

does not mean that all such concerns will be accommodated. Instead, "The District will **make every effort** to **reasonably accommodate** staff members **where possible**. (SCSD #1 Special Services Non-Negotiables, App. Vol. II at 0374) (emphases added). Making every effort to "reasonably accommodate" is necessarily subjective, left to the discretion of the staff member reviewing the request. What does "reasonably accommodated" mean? Who defines it? This is textbook discretionary decision-making, particularly in light of the qualifier "where possible." Human Resources staff are invited to examine the particular circumstances of a staff member's questions and to make their own decision whether any accommodation will be provided. Under *Fulton*, that is an individualized exception that means that the provision is not generally applicable. Consequently, it is subject to strict scrutiny, not rational basis. 593 U.S. at 533. The district court's contrary conclusion is clear error.

### III.  The district court erred in awarding summary judgment to Defendants based on an invented concept requiring inquiry before fundamental rights can be infringed.

The district court did not and could not deny that Mrs. Willey "has a right not to have information regarding her child's gender identity

withheld." Confronted with that reality, the court engaged in linguistic legerdemain to reach the conclusion that the District had not violated that right because no violation could occur unless Mrs. Willey first exercised the right by inquiring into whether the District was affirming a discordant "gender identity" for her disabled teenage daughter. (Order, pp. 19-22, App. Vol. III at 0585-0588). "The Court does not think the information can properly be deemed 'withheld' to infringe on parental rights unless a parent inquired into or sought the information and it was intentionally concealed or they were lied to." (Order, p. 19, App. Vol. III at 0585).

> Plaintiff's parental rights were not infringed as the school never failed to inform or misinformed Plaintiff **after inquiry** into the Student's use of preferred name and pronouns. Any instance where the school did not proactively inform Plaintiff that the Student was using preferred name and pronouns, **when Plaintiff did not inquire**, is not an infringement on Plaintiffs parental rights as it did not prevent Plaintiff from making decisions regarding her child's well-being. Rather, despite the District's use of the Student's preferred name and pronouns Plaintiff "remained free to exercise [her] traditional care, custody, and control over [her] unemancipated child[]. No action taken by the District or its staff members prevented Plaintiff from doing so.

(Order, p. 22, App. Vol. III at 0588) (emphasis added) (citations omitted).

The district court was driven to its linguistic sleight of hand by concerns about "burdening" the District with an affirmative obligation to

notify parents, misinterpretations of precedent, and a misplaced understanding of the nature of parental rights to direct their children's upbringing. To bolster its argument, the district court engaged in hyperbole, claiming that Mrs. Willey was arguing that the parental fundamental right creates an obligation on schools to "proactively share **every event or circumstance that might affect one's child**." (Order, p. 25, n. 13, App. Vol. III at 0591). (emphasis added).

### A. The court unilaterally redefined fundamental parental rights to include an inquiry "contingency" (better termed a requirement) to save the District from the "burden" of having to proactively notify parents.

The district court is concerned that honoring Mrs. Willey's right to not have information regarding her disabled teen daughter's "gender identity" issue withheld would somehow impose an impermissible burden on the District. To assuage those concerns, the district court determined that fundamental parental rights cannot be infringed unless parents first "inquire" about whether their rights are being infringed. (Order, p. 18, App. Vol. III at 0584). According to the court, finding that Mrs. Willey's parental rights were violated without the required "inquiry" would create "an affirmative obligation on the school to inform parents of any

circumstance that occurs in school that might affect a child's 'well-being'."
(*Id.*). Information about a disabled teenage girl being treated as a boy
would be one of a "laundry list of circumstances that could affect a child's
'well-being' even in the slightest that would require constant, detailed
information sharing from the school, with constitutional consequences"
unless the court jumped in and added an "inquiry" requirement. (*Id.*).
"Otherwise, an infinite amount of information would be deemed
"withheld" by schools on a daily basis in violation of parental rights."
(Order p. 20, App. Vol. III at 0586). Even requiring disclosure of
information about A.S.'s "gender identity" during Section 504 meetings,
which are required to address children's mental health and educational
needs, would be too burdensome, the court implied, because "essentially
every meeting between a parent and school staff would implicate this
obligation....to proactively inform parents of every circumstance that
might affect a child's upbringing." (Order, p. 22, App. Vol. III at 0588).

The district court tried to use precedent from this Court and the
Supreme Court to bolster its redefinition of fundamental parental rights.
Its efforts are unavailing, both because it misstates the holdings of the

cited cases and because the *Mahmoud* decision has clarified the obligations of school districts vis-a-vis parental rights.

### 1. The district court misconstrued Supreme Court precedent to claim that Mrs. Willey was attempting to impose third party liability on the District.

The district court likened notifying Mrs. Willey that her disabled teen daughter was being "affirmed" as a boy at school to making the District liable for tortious actions of private actors. (Order p. 18, App. Vol. III at 0584). "[A]ccording to Plaintiff's logic, if a parent is not already aware of their child's use of preferred name or pronouns, then in order to make those decisions [about the child's well-being], the school would have an obligation to proactively inform the parent." (*Id.*). "Within this right as defined by Plaintiff, Plaintiff cannot prevent placing an affirmative obligation on the school to inform parents of any circumstance that occurs in school that might affect a child's 'well-being.'" (*Id.*). "Such a finding would expand parental rights beyond their own decision-making rights to place affirmative obligations on other parties that care for their child." (*Id.*). The district court based that erroneous conclusion on an out of context quote in the First Circuit's decision in *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 354 (1st Cir. 2025), which itself was an out of

43

context quote from *DeShaney v. Winnebago County Dep't of Soc. Servs.*. 489 U.S. 189, 195 (1989). Both the district court and First Circuit misstated the Supreme Court's holding in *DeShaney* in their attempt to substantiate their claims that giving parents information regarding their children's struggles with "gender identity" at school somehow impermissibly expands parental rights.

At issue in *DeShaney* was whether the county could be held liable for injuries inflicted on a child by his father when the county failed to remove the child from his father's custody after receiving allegations of abuse by the father. 489 U.S. at 194-195. The Supreme Court affirmed that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by **private actors**." *Id.* at 195 (emphasis added). "The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* "It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* Read in context, the "through

other means" language, which was quoted in *Foote* and by the district court, relates to expanding the protections of the due process clause to actions by private individuals. That is not what was at issue in *Foote*, or at issue here, *i.e.,* requiring that state actors such as the District notify parents about issues such as "gender identity" that affect their children's health and well-being.

The district court's reliance on *Anspach v. City of Philadelphia, Dep't of Public Health*, 503 F.3d 256, 262 (3d. Cir. 2007), is similarly misplaced since *Anspach* also sought to improperly impose obligations on a public agency for actions by a private party.

> **2.    The court misconstrues this Court's precedent in Lee to justify its creation of an inquiry requirement.**

As well as relying on out of context quotes from the *Foote* decision, the district court used out of context quotes from this Court's decision in *Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924 (10th Cir. 2025) to try to justify its proposition that fundamental rights are contingent on a party's inquiry into whether government is violating her rights.

> In *Lee v. Poudre Sch. Dist.*, when discussing the fundamental right asserted by the parents in that matter, the Court noted that "the parents conceded that their parental rights do not *require* the school to disclose information." 2025 WL 1163920,

45

at *7 n.8 (emphasis in original). And, similarly, in her concurrence, Judge McHugh observed "the district's alleged policy of helping students hide sensitive information from their parents implicates the Supreme Court's prior descriptions of parents' fundamental right to control their children's upbringing." Id. at *11 n.l (McHugh, J., concurring).

(Order, p. 19, n.10, App. Vol. III at 0585). In footnote 8 of *Lee*, this Court

noted that during oral argument "the parents conceded that their

parental rights do not *require* the school to disclose information. In other

words, the parents do not allege they had a right to be told their child

w*as being asked to attend, or was attending, GSA meetings*." *Lee*, 135

F.4th at 934 n.8 (emphasis added). Contrary to the district court's

representation, there was no judicial finding regarding whether the

fundamental right of parents to direct the upbringing of their children

includes a duty to disclose information regarding a child's asserted

"gender identity."  Instead, this court noted that the parents in *Lee* had

said during oral argument that they did not assert that they had a right

to be notified about their children attending group meetings at which

"gender identity" was discussed. Most importantly, the *Lee* Court did not

decide the constitutional question of the nature and scope of parental

rights to information because it determined that the parents "failed to

plausibly allege municipal liability." *Id.* at 934.

Similarly, read in context, Judge McHugh's concurrence in *Lee* does nothing to support the district court's position that parental rights are not violated unless parents first inquire whether the state is infringing their rights. Instead, it actually supports Mrs. Willey's position that the District's actions in concealing information related to her daughter's "gender identity" is contrary to long-standing parental rights precedents. "The parents have plausibly alleged that the district, by policy, requires its employees to help students conceal their gender identities from their parents. This policy implicates a substantive due process right the Supreme Court has frequently enforced: 'the fundamental right of parents to make decisions concerning the care, custody, and control of their children.'" 135 F.4th at 937 (McHugh J., concurring). "The district's policy of helping students keep their parents in the dark about their gender identities turns this presumption on its head. The policy assumes that children of all ages possess sufficient wisdom and maturity to decide their gender identity—and even to transition genders—without parental involvement. But under the Supreme Court's jurisprudence, parents, not children, are presumed to possess the 'maturity, experience, and capacity for judgment required for making life's difficult decisions.'" *Id.* (citing

47

*Parham v. J.R.*, 442 U.S. 584, 602 (1979)). "While the district may disagree with how some parents may react when they learn about their children's gender identities, the district may not seize control of a child's upbringing based on a 'simple disagreement' about what is in the child's best interests." *Id.* Judge McHugh affirmed that the issue in *Lee* was not whether withholding information violated parental rights, but whether the parent plaintiffs had sufficiently alleged that district's actions caused redressable constitutional injury. *Id.* at 938. The district court's reliance on *Lee* to justify its redefinition of fundamental parental rights is misplaced.

The district court offered no authority for its unilateral redefinition of fundamental parental rights to include an inquiry requirement. Its impermissible use of the invented concept to rule in favor of Defendants must be overturned.

**B.  The district court improperly dismissed the detrimental effects of its inquiry requirement on fundamental parental rights.**

The district court acknowledged that requiring an inquiry before finding a parental rights violation would interfere with parents' ability to obtain information regarding issues affecting their children but found

that burden to be inconsequential when compared with lessening the "burden" that notification would have on the District. (Order p. 21, App. Vol. III at 0587). Again, the district court's conclusion is contrary to precedent.

### 1. The district wrongly asserts that the invented "inquiry contingency" (requirement) is a constitutionally permissible limitation on parental rights.

The district court incorrectly claims that its new requirement that parents inquire before they can claim a violation of their fundamental rights is nothing more than a routine limitation on parental rights. "[P]arental rights have never been found to be absolute or unqualified, but, instead, have routinely faced limitations." (*Id.,* citing *Runyon v. McCrary*, 427 U.S. 160, 177 (1976); *Yoder*, 406 U.S. at 239 (White, J., concurring); *Prince v. Massachusetts,* 321 U.S. 158, 166-67 (1944); *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998)). None of the "limitations" cited by the district court involve withholding from parents information needed to make decisions regarding a critical element of their children's well-being, as is the case here.

49

In *Runyon,* the Court said that the parental right to direct education does not include the right to choose a private school that discriminates on the basis of race. 427 U.S. at 178. In *Swanson*, this Court concluded that the parental right to direct education does not include the right to send their children to public school on a part-time basis and to pick and choose which courses their children will take from the public school. 135 F. 3d at 699. *Prince* is a non-education case that found that a parent's right to exercise her religion by having a child solicit funds in public could be limited by child labor laws. 321 U.S. at 167-168. *Yoder*, as explained *supra*, provides that public schools cannot place substantial burdens on parents' religious free exercise. 406 U.S. at 218. The concurring opinion cited by the district court did not contradict the majority's opinion but affirmed that parents do not have the right to replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society. *Id.* at 239. These decisions do nothing to support the district court's argument that its inquiry requirement is merely another constitutionally permissible limitation on fundamental parental rights.

50

### 2. The district court impermissibly concluded that Mrs. Willey's parental rights must yield to protect the District from the "burden" of having to notify parents about children's "gender identity" issues.

Acknowledging the burden that its inquiry requirement places on Mrs. Willey's fundamental parental rights, the district court claimed that "this [inquiry] contingency is preferred to opening the Pandora's box of requiring proactive disclosure by schools of any circumstance or event that could impact a parent's ability to make decisions regarding their child." (Order, p. 21, App. Vol. III at 0587). What the district court called a "Pandora's box," *i.e.*, requiring that school districts notify parents about circumstances that affect parents' ability to make decisions regarding their children, the Supreme Court has determined is a constitutional requirement. *Mahmoud*, 145 S.Ct. at 2353. The *Mahmoud* Court dispatched the district court's argument regarding the inconsequential burden posed by the "inquiry contingency" (requirement) when it rejected similar arguments offered by the Maryland school board and dissenting justices. *Id.* at 2357-2360.

The district court argues that any circumstances in which the District failed to disclose to Mrs. Willey that her disabled teenage

daughter was being identified as a boy at school cannot be an infringement of Mrs. Willey's parental rights because "it did not prevent Plaintiff from making decisions regarding her child's well-being." (Order, p. 23, App. Vol. III at 0589, citing *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978)). *Zablocki* addressed a Wisconsin statute that prohibited non-custodial parents who had minor children whom they were obligated to support from obtaining a marriage license unless they obtained a court order. 434 U.S. at 376. The Court found that the statute unnecessarily impinged on the fundamental right to marry. *Id.* at 388. By citing *Zablocki,* the district court implies that while the Wisconsin statute prevented non-custodial parents from marrying, the District's actions here do not similarly prevent Mrs. Willey from directing the upbringing of her daughter. Mrs. Willey "remained free to exercise her traditional care, custody, and control over [her] unemancipated child." "No action taken by the District or its staff members prevented Plaintiff from doing so." (Order, p. 23, App. Vol. III at 0589). The Supreme Court rejected the virtually identical argument offered in *Mahmoud,* 145 S.Ct. at 2360. "According to the dissent, parents who send their children to public school must endure any instruction that falls short of direct compulsion

or coercion and must try to counteract that teaching at home." *Id.* "The Free Exercise Clause is not so feeble." *Id.* Neither is the Fourteenth Amendment Due Process Clause.

The district court also claimed that when Mrs. Willey learned that her disabled teen daughter was being referred to at school by preferred name and pronouns with which she disagreed, there was no infringement because Mrs. Willey "had the right to make a different choice regarding the type of education her child receives—e.g., public, private or homeschooling." (Order p. 25, App. Vol. III at 0591). The Maryland school board and its amici made the same argument in *Mahmoud,* to which the Supreme Court responded:

> The availability of this option is no answer to the parents' First Amendment objections. As we have previously held, when the government chooses to provide public benefits, it may not "condition the availability of [those] benefits upon a recipient's willingness to surrender his religiously impelled status." *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449, 462, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017).

*Mahmoud,* 145 S.Ct. at 2359. "Public education is a public benefit, and the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise," or in this case, their fundamental right to direct the upbringing and education of their

53

children. *Id.* "It is both insulting and legally unsound to tell parents that they must abstain from public education in order to raise their children in their religious faiths, when alternatives can be prohibitively expensive and they already contribute to financing the public schools." *Id.* at 2360. The same is true here of the district court's argument that Mrs. Willey must abstain from public education in order to direct the upbringing and education of her disabled teen daughter in a way compatible with the family's values and the child's mental health challenges.

The district court acted contrary to precedent when it determined that Mrs. Willey's fundamental parental right to direct the upbringing and education of her children must yield to prevent inordinately "burdening" the District with a parental notification requirement. Its grant of summary judgment to Defendants on Mrs. Willey's parental rights claim must be reversed.

## CONCLUSION

The district court erred in granting summary judgment to Defendants despite the presence of disputed issues of material fact. The district court did not interpret the facts and evidence in favor of Mrs. Willey.

54

The court erred in finding that Defendants' actions which burdened Mrs. Willey's free exercise rights as a parent did not infringe her rights.

The court erred in finding that the burden placed on Mrs. Willey's free exercise rights as a teacher did not constitute infringement.

The district court erred in finding that there was no violation of Mrs. Willey's fundamental parental rights because Mrs. Willey failed to satisfy the court's invented concept of an "inquiry contingency."

For these reasons, the district court's order granting summary judgment to Defendants should be reversed on all counts and Mrs. Willey permitted to proceed to trial on all of her claims.

Dated August 15, 2025.

Respectfully Submitted,

*/s/Mary E. McAlister*
Ernest G. Trakas, Esq.
Mary E. McAlister, Esq.
Vernadette R. Broyles, Esq.
Child & Parental Rights Campaign
5425 Peachtree Parkway, Suite 110
Norcross, GA 30092
(770) 448-4525
etrakas@childparentrights.org
mmcalister@childparentrights.org
vbroyles@childparentrights.org
Attorneys for Appellants/Plaintiffs

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a), Appellants respectfully request that oral argument be permitted in this appeal because it would assist the Court in understanding and deciding the complex constitutional questions raised by this emerging cultural issue.

# CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Type-Volume Limit, Typeface Requirements, And Type-Style
Requirements

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,180 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point or greater proportionally spaced Roman style typeface using Microsoft Office 365.

Dated: August 15, 2025

*s/ Mary E. McAlister*
Mary E. McAlister

## CERTIFICATE OF DIGITAL SUBMISSION

1.    I hereby certify that all required privacy redactions have been made.

2.    I hereby certify that seven (7) hard copies of the Appellants' Opening Brief will be submitted to the Court pursuant to 10th Cir. R. 31.5 and will be an exact copy of the version submitted electronically via the Court's ECF system.

3.    I hereby certify that this document has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender version 102.2506.26002.0 and is free of viruses according to that program.

*s/ Mary E. McAlister*
Mary E. McAlister

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2025, a true and correct copy of this brief and addenda was electronically filed with the Court using the CM/ECF system, which will send notification of such filing to the following:

L. Kathleen Chaney, Esq., CPCU
Eric Hevenor
Lambdin & Chaney, LLP
4949 S. Syracuse Street, Suite 600
Denver, CO  80237
T (303) 799-8889
F (303) 799-3700

kchaney@lclaw.net
ehevenor@lclaw.net

*s/ Mary E. McAlister*
Mary E. McAlister
Attorney for Plaintiffs-Appellants

59

# ADDENDA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

ASHLEY WILLEY and SEAN WILLEY,

      Plaintiffs,

      VS.

SWEETWATER COUNTY SCHOOL
DISTRICT #1 BOARD OF TRUSTEES;
KELLY MCGOVERN, Superintendent of
Sweetwater County School District #1;
NICOLE BOLTON, Assistant
Superintendent & Human Resources
Director of Sweetwater County School
District #1; KAYCI ARNOLDI, Director
of Student Services of Sweetwater County
School District #1; BRYANT BLAKE,
Principal of Black Butte High School,

      Defendants.

Case No.  23-CV-69-SWS

---

## ORDER GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTION

---

      This matter comes before the Court on Defendants Sweetwater County School

District #1 Board of Trustees, Kayci Arnoldi, Bryant Blake, Nicole Bolton, and Kelly

McGovern's Motion for Summary Judgment (ECF 63). Plaintiffs Ashley Willey and Sean

Willey responded in opposition to the motion (ECF 65), and Defendants replied (ECF 69).

Plaintiffs Amended Complaint alleged four causes of action against the Defendants:

Violation of Plaintiffs' Substantive Due Process Fundamental Parental Rights, Violation

of Plaintiffs' Right to Free Exercise of Religion, Violation of Plaintiff Ashley Willey's

1

Right to Free Exercise of Religion, and Violation of Plaintiff Ashley Willey's Right to Free

Speech. (ECF 26). The Court previously dismissed Plaintiff's Free Speech claim. (ECF

42). Defendants seek summary judgment on all remaining causes of action against them.

Having considered the arguments, reviewed the record herein, and being fully advised on

the matter, the Court GRANTS Defendants' summary judgment motion.

## UNDISPUTED FACTS

The undisputed facts are as follows. Plaintiff Ashley Willey is the mother to student,

A.S. (the "Student"), who attended Black Butte High School for the 2021-2022 and 2022-

2023 school years. (ECF 26, ¶ 12). The Student transferred out of Black Butte High School

to a school out of state for the 2023-24 school year. (ECF 35, Ex. B, C). Plaintiff Sean

Willey is the Student's stepfather who has never had legal custody over the Student. (ECF

63, Ex. A, p. 53). At a district-wide training on March 29, 2022, Ms. Willey claims she

first learned from other teachers that the Student was being referred to by names and/or

pronouns other than those assigned at birth. (ECF 26, ¶ 31-35). Following the training, on

March 29, 2022, Ms. Willey sent a direct message to certain Sweetwater County School

District #1 ("District") staff and personnel informing them that the Student should be

referred to by the Student's birth name and female pronouns from that point forward. (ECF

26, ¶ 41, Ex. B).

Prior to August 15, 2022, the District did not have a written policy that governed the

use of students' preferred names or pronouns. (ECF 63, Ex. C, p. 77). However, during the

2021-2022 school year, three staff members—Chelsea Lund, Christopher Clifton, and

2

Jennifer Copeland—testified to referring to the Student by preferred name or pronouns. (ECF 66, Ex. 2, p. 18) (ECF 66, Ex. 3, p. 13, 15) (ECF 66, Ex. 4, p. 19).

On August 15, 2022, the District's Special Services Department adopted the SCSD #1 Special Services Non-Negotiables (the "2022-23 Non-Negotiables"). (ECF 63, Ex. B). The 2022-23 Non-Negotiables contained a Preferred/Chosen Names Procedure ("2022-23 PCNP"). (ECF 63, Ex. B). The 2022-23 PCNP required District staff to honor all students' requests to be referred to by alternate names or pronouns and stated "[s]taff must respect the privacy of all students regarding such choice." (ECF 63, Ex. B). A staff member— Jessica Polaski—testified that her understanding was that staff members were required to sign the Non-Negotiables or they would be fired. (ECF 66, Ex. 14, p. 22).

During the 2022-23 school year, on September 8, 2022, District teacher Ben Audevart referred to the Student by preferred name in an email to the Student. (ECF 66, Ex. 1). In this email exchange, Ben Audevart also provided a link to resources for LGBTQ+ youth on the Human Rights Campaign website and a link for the Trevor Project. (ECF 66, Ex. 1). This communication was not made pursuant to any policy or direction by the School District or administration.[1]

On August 14, 2023, the District's Special Services Department adopted a revised version of the 2022-23 Non-Negotiables ("2023-24 Non-Negotiables"). (ECF 63, Ex. D). The 2023-24 Non-Negotiables contained a revised version of the PCNP ("2023-

---

[1] Rather, the District Policy Manual Code GBH, Section G provides that "[s]taff members shall not exceed their level of training or expertise by attempting to counsel, assess, diagnose, or treat a student's personal problem relating to sexual behavior, substance abuse, mental or physical health and/or family relationships but, instead, shall refer the student to the appropriate professional or agency for assistance. (ECF 66, Ex. 11, No. 12).

3

PCNP"). The 2023-24 PCNP still required District staff to honor all students' requests to

be referred to by alternate names or pronouns. (ECF 63, Ex. D). The 2023-24 PCNP stated:

> Wherever possible, staff should involve parents/guardians in the implementation of
> these guidelines to support the student's health, safety and wellbeing. If the student
> has not informed their parent/guardian of their chosen name or pronoun, the student
> should be referred to the student's counselor who will partner with the student to
> encourage and support the student to discuss their chosen name or pronoun with
> their parent/guardian, unless the counselor or other staff member, in consultation
> with the District's Superintendent, Human Resources Director, and legal counsel
> determines that such disclosure would be detrimental to the student's health or
> safety. When requesting a change to their preferred name and/or pronoun, students
> should be informed that **in the absence of a determination that the student's
> health or safety is at risk, the District is legally required to share all information
> about the student's educational status, including chosen names and/or
> pronouns, with the student's parent/guardian upon request.** Because the
> procedure is content neutral, **staff must not proactively contact parents regarding
> a student's chosen name and/or pronoun**. The District's policy is to respect a
> student's preference – not to either encourage or discourage any student from
> forming a preference as to chosen names or pronouns, which could be deemed
> discrimination based on sex as set forth above.

(ECF 63, Ex. D) (emphasis added). The 2023-24 PCNP also stated:

> Staff members who are uncertain as to how to implement this procedure or are **for
> any reason** unable to implement the procedure in relation to specific, identified
> circumstance should address their concerns with the Human Resources Director.
> **The District will make every effort to reasonably accommodate staff members
> where possible**.

(ECF 63, Ex. D) (emphasis added).

As a teacher, Ms. Willey did not use students' preferred names or pronouns during her

employment for the District.[2] (ECF 63, Ex. A, p. 40). Ms. Willey also has never lied to any

---

[2] Attempts by Plaintiff to dispute material facts set forth by Defendants misrepresent the record. As an example,
Plaintiffs attempts to dispute the material fact set forth by Defendants that "Ms. Willey has never used a student's
alternate name or pronoun during her employment for the District" by citing to Ms. Willey's deposition. In the cited
testimony, when Ms. Willey was asked how she responded to two of her students asking to be referred to by a
pronoun other than their birth pronouns, Ms. Willey responded "I didn't do it." (ECF 66, Ex. 7, p. 32, ln. 9). The

4

parent regarding a student's name or pronouns. (ECF 63, Ex. A, p. 58-59). Ms. Willey testified she was never disciplined or retaliated against for not using pronouns.[3] (ECF 63, Ex. A, p. 81).

## LEGAL STANDARD

Summary judgment is appropriate where a movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2016). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal quotations and citations omitted). For there to be a 'genuine' dispute of fact, there must be more than a mere scintilla of evidence,'" and summary judgment is properly granted "if the evidence is merely colorable or is not significantly probative." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022) (citing *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020)). Parties may establish the existence or nonexistence of a material disputed fact through: 1) submission of "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or 2) demonstration "that the materials cited do not establish the absence

---

Court is at a loss as to how Plaintiffs can interpret her own testimony that she did not refer to her students by preferred pronouns as evidence that she did use a student's alternate name or pronoun. Further, Ms. Willey repeatedly testified she did not refer to her students who requested to be referred to by preferred pronouns by anything other than their birth pronouns. (ECF 63, Ex. A, p. 40, ln. 9-17; p. 57 ln. 17-25).

[3] On June 2, 2023, Mrs. Willey received a Letter of Warning for the content of her conversation and walking out of a May 31, 2023, meeting with colleagues concerning co-taught classes and pull-out services for students receiving special services. (ECF 69, Ex. A to Defendants' Reply).

5

or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

On a motion for summary judgment, "we examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence." *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 971, n.3 (10th Cir. 2018). "And while we draw all reasonable inferences in favor of the non-moving party, "an inference is unreasonable if it requires 'a degree of *speculation* and conjecture that renders [the factfinder's] findings *a guess or mere possibility*.'" *GeoMetWatch Corp.*, 38 F.4t at 1200 (citing *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (alteration in original) (emphases added) (quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008))).

The moving party carries the initial "burden of establishing the nonexistence of a genuine dispute of material fact." *Tolman v. Stryker Corp.,* 108 F. Supp. 3d 1160, 1162 (D. Wyo. 2015), *aff'd* 640 F. App'x 818 (10th Cir. 2016). If the movant does so, the nonmovant may not rest upon its pleadings but "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

## DISCUSSION

### 1. Sean Willey

As this Court previously noted, Sean Willey lacks standing as to claims regarding the Student. Article III standing requires an invasion of "a *legally protected interest* which is

6

(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). Sean Willey has failed to identify a legally protected interest. Sean Willey is the Student's stepfather, and it is undisputed that he has never had legal custody of the Student.[4] Without legal custody or even a biological claim, Sean Willey has no legal parental interest in the Student and thus lacks Article III and prudential standing. *See Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 17-18 (2004) (California custody order deprived father of right to sue as next friend and thus father lacked prudential standing to pursue alleged establishment clause violation on behalf of his elementary school daughter who was required to recite the pledge of allegiance every school morning).

Plaintiffs additionally state in the Amended Complaint that they are parents of "four other children who attend District schools." (ECF 26, ¶ 13). If Sean Willey has a legal interest in those children and could establish an injury in fact that is fairly traceable to the challenged action and likely to be redressed by a favorable decision, perhaps he would have standing in this case. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 180-81 (2000). However, the Amended Complaint is not verified, and Plaintiffs offer no evidence of these four other children's attendance at schools in the District. Thus, Sean Willey lacks standing in this case, and the Court dismisses Claims One and Two as raised by Sean Willey.

---

[4] Plaintiffs state that, while Sean Willey has never had legal custody of the Student, the Student has been "Sealed" into the Sean and Ashley Willey family by the Church of Jesus Christ of Latter-Day Saints. (ECF 66, p. 3). Plaintiffs have set forth no case where a "Seal" from the Church of Jesus Christ of Latter-Day Saints or any other religious organization has been recognized as creating legal rights.

7

### 2.  Under Color of State Law for Claims One and Two

Before considering the contentious constitutional issues that arise under the facts of this case, as all claims are raised under 42 U.S.C. § 1983, the Court must determine whether the alleged unconstitutional act was taken "under color of state law." "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). That the alleged unconstitutional act was taken "under color of state law" is a "jurisdictional prerequisite for a § 1983 action." *Id.* at 42. Defendants contend that "to the extent A.S. was ever referred to by alternate names or pronouns it was not at the direction of any Defendant" because there was no policy or procedure in place at that time, thus not under color of state law. (ECF 63, p. 6).[5]

In order to impose municipal liability, the constitutional violation must be the result of action taken "pursuant to official municipal policy." *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978). "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 770 (10th Cir. 2013). If a plaintiff alleges an official policy or custom, they must

---

[5] Defendant only contends Plaintiff's first and second claims for relief (those asserting constitutional rights as a parent of the Student) fail as a matter of law because no policies were enacted during the period the Student was referred to by preferred pronouns. Plaintiff's third claim for relief asserts her constitutional rights were violated as a teacher during the period when written policies were in place.

8

also allege "that the municipality was deliberately indifferent to the obvious consequences

of the policy ... [and] that the policy caused the plaintiff's constitutional injury." *Lee v.*

*Poudre Sch. Dist. R-1,* No. 24-1254, 2025 WL 1163920, at \*8 (10th Cir. Apr. 22, 2025).

The "official policy" requirement is meant to ensure "municipal liability is limited to action

for which the municipality is actually responsible." *Schneider,* 717 F.3d at 770.

Plaintiff disputes the absence of a policy in the 2021-22 school year. Plaintiff argues

that, during the 2021-22, school year, "Defendants implemented an unwritten, de facto

policy/procedure requiring staff to use student requested chosen names or pronouns. (ECF

66, p. 4). Three staff members did testify to referring to the Student by preferred name and

pronouns during the 2021-2022 school year. (ECF 66, Ex. 2, p. 18) (ECF 66, Ex. 3, p. 13)

(ECF 66, Ex. 4, p. 19).[6] However, when asked "why" they referred to the Student by

preferred pronouns, the staff either stated the Student asked them to do so or they heard

other students doing so. (ECF 66, Ex. 2, p. 18) (ECF 66, Ex. 3, p. 16) (ECF 66, Ex. 4, p.

19). One staff member explicitly stated there was no policy or requirement during the 2021-

2022 school year to use preferred names or pronouns. (ECF 66, Ex. 3, p. 17). An informal

custom only constitutes "official policy" to create municipal liability if it "amount[s] to a

widespread practice that, although not authorized by written law or express municipal

policy, is so permanent and well settled as to constitute a custom or usage with the force

of law." *Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010). Three staff

members referring to the Student by preferred name and pronouns is not so widespread or

---

[6] Plaintiff cites to a fourth deposition of Derek Allison (ECF 66, Ex. 5), but the portions of the deposition included provide no context as to which school year is being discussed. Rather, the deposition discusses the Non-Negotiables and thus implies the events discussed occurred after August 15, 2022.

well settled to be considered "official policy" of the District. Further, as the three staff members represented they did so by individual choice without a District policy in place, Plaintiff failed to set forth any facts to demonstrate Defendants were "the moving force behind [the] alleged constitutional injury." *Lee v. Poudre Sch. Dist.*, 2025 WL 1163920, at *9.

Yet, whether an "official policy" existed during the 2021-2022 school year is not dispositive of Plaintiff's first two claims as Plaintiff also set forth facts that the Student was referred to by preferred name during the 2022-2023 school year. It is undisputed that the District had an official policy in place during the 2022-2023 school year (2022-23 PNCP), and, in an email dated September 15, 2022, a District teacher Ben Audevart referred to the Student by preferred name. (ECF 66, Ex. 1). Thus, on at least one occasion, the Student was referred to by preferred name while the District had an official policy governing the use of preferred names and pronouns in place.

In addition to an official policy of using students' preferred names and pronouns during the 2022-23 school year, Plaintiff also contends there was an "official policy" which required staff to *conceal* students' use of preferred names and pronouns from parents. Assuming "concealment" is any instance of school staff not informing a parent of their child's use of preferred name or pronouns, then concealment could occur under the policies as written or beyond the written policies. If concealment occurred due to a staff member "respect[ing] the privacy of all students regarding such choice," then the concealment occurred explicitly under the written 2022-23 Non-Negotiables and creates municipal

10

liability.[7] If concealment occurred for another reason, then, in order for the District to have municipal liability, Plaintiff needs to show concealment of that kind was so "widespread … permanent and well settled as to constitute a custom or usage with the force of law." *Bryson*, 627 F.3d 788.

Plaintiff has not set forth sufficient facts to establish that, during the 2022-23 school year, concealment for reasons beyond student privacy was so widespread as to constitute a custom. Other than her own testimony, Plaintiff offers testimony of one staff member who interpreted the 2022-23 Non-Negotiables as not allowing staff members to contact parents about their child's use of preferred name or pronouns. (ECF 66, Ex. 14, p. 23). Yet, another staff member testified that he would not honor a request to keep the use of preferred names or pronouns from parents, and student privacy requests do not need to be honored "at the exclusion of sharing information from their parents." (ECF 66, Ex. 5, p. 22). Plaintiff does not establish a widespread custom of concealing information from parents beyond what is authorized by the 2022-23 Non-Negotiables. So, to the extent information was concealed in order to "respect the privacy of all students regarding such choice," that action was taken in accordance with an "official policy" and creates municipal liability for the District. If information was concealed for some other reason, although no alternative reasons were offered, then the District would not be liable for that action as it did not occur under "official policy."

---

[7] There is no evidence in the record before this Court that either Plaintiffs or any other parent was lied to by any School District employee about his or her student requesting to use an alternate pronoun. Neither is there any evidence anyone assisted students in concealing the use of an alternate pronoun from a student's parent(s).

11

Plaintiff additionally raises concerns as to Ben Audevart's e-mail communications with the Student which provided links to resources for LGBTQ+ youth "in violation of [District] Policy Manual Code GBH, Section G." (ECF 66, p. 5). To the extent Ben Audevart provided resources allegedly in violation of the District policy manual, such actions would not be taken in compliance with an official policy.[8] Additionally, Plaintiff sets forth no evidence that providing such resources to students, even if in violation of formal policies, was a widespread custom. Thus, the District is not liable for the actions taken by an individual teacher without the authority of the District. *Lee v. Poudre Sch. Dist.*, 2025 WL 1163920, at \*8 ("We apply such rigorous standards of culpability and causation … to ensure that the municipality is not held liable solely for the actions of its employees.") (quotations omitted).

In sum, any action taken during the 2021-22 school year was not taken in accordance with an official District policy, formal or as widespread custom, and thus the District does not face municipal liability for the actions that occurred in the 2021-22 school year. *See Gates v. Unified School Dist. No. 449 of Leavenworth County, Kan.*, 996 F.2d 1035, 1041-42 (10th Cir. 1993) (setting for requirements to prove existence of policy or custom). However, Plaintiff set forth facts that the Student was also referred to by preferred name during the 2022-23 school year during which the District had in place the 2022-23 Non-Negotiables. Any use of preferred name during the 2022-23 school year was taken pursuant

---

[8] The Court draws no conclusions as to whether Ben Audevart's actions were or were not in violation of District policy. It is not a claim in this lawsuit. But, to the extent Plaintiff contends Ben Audevart acted in violation of District policy when he provided resources to the Student and does not set forth evidence that such actions were well-established custom, the actions cannot be grounds for municipal liability. *See Lee v. Poudre Sch. Dist.*, 2025 WL 1163920, at \*8.

12

to official District policy and thus creates municipal liability for the District. Concealment

for any reason other than the Student's privacy was not taken pursuant to official policy or

widespread custom.

### 3. Due Process

The Fourteenth Amendment Due Process Clause states "[n]o State shall ... deprive any

person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV,

§1. "The Clause also provides heightened protection against government interference with

certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702,

720 (1997). These substantive due process violations occur "where government action has

infringed a 'fundamental' right without a 'compelling' government purpose, as well as

where government action deprives a person of life, liberty, or property in a manner so

arbitrary it 'shocks the conscience.'" *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019)

(quotations and citations omitted); *see Glucksberg*, 521 U.S. at 721-22 (finding due process

violation under fundamental rights analysis); *Cty. Of Sacramento v. Lewis*, 523 U.S. 833,

846 (1998) (finding due process violation under "shocks the conscience" analysis). When

considering substantive due process violations, "we apply the fundamental-rights approach

when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach

when the plaintiff seeks relief for tortious *executive action*." *Halley v. Huckaby*, 902 F.3d

1136, 1153 (10th Cir. 2018). Neither party disagrees that the District policies are legislative

13

action.[9] Thus, the Court will analyze the alleged substantive due process violation under the fundamental-rights approach.

The fundamental-rights approach under *Glucksberg* proceeds in three steps.

> First, the reviewing court must determine whether a fundamental right is at stake either because the Supreme Court or the Tenth Circuit has already determined that it exists or because the right claimed to have been infringed by the government is one that is objectively among those "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" such that it is "fundamental." *Glucksberg*, 521 U.S. at 720–21, 117 S.Ct. 2258. Second, the court must determine whether the claimed right—fundamental or not—has been infringed through either total prohibition or "direct[ ] and substantial[ ]" interference. *Zablocki v. Redhail*, 434 U.S. 374, 387, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Third, if the right infringed is a fundamental right, the court must determine whether the government has met its burden to show that the law or government action interfering with the right is narrowly tailored to achieve a compelling government purpose. *Id.* at 388, 98 S.Ct. 673. If the right is not fundamental, we apply rational basis review. *Reno v. Flores*, 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ("[N]arrow tailoring is required only when fundamental rights are involved.").

*Abdi*, 942 F.3d at 1028.

### a. Fundamental Right

Plaintiff argues Defendants violated her fundamental right to make decisions regarding the upbringing, custody, care, and control of her child by enacting a school policy which required the use of students' preferred names or pronouns, and by using her child's preferred name and pronouns. (ECF 26, p. 25). The issue of whether a parent's right to

---

[9] The distinction between legislative and executive action for substantive due process violations is not clear. Courts that have addressed school pronoun policies and the use of a student's preferred name or pronouns have taken two different approaches based on circuit precedent. *See Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025) (concluding a school protocol requiring staff to use students' preferred names and pronouns was legislative action); *Littlejohn v. Sch. Bd. of Leon Cnty., Florida*, 2025 WL 785143 (11th Cir. Mar. 12, 2025) (concluding the application of a preferred name policy to one person is executive action). While Plaintiff's claims reference both the policy itself and its application to the Student, both parties make their arguments according to the fundamental-rights analysis. The Court will also use the fundamental-rights analysis as there is no "specific act of a governmental officer" primarily at issue. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

14

direct their child's upbringing is affected when their child is referred to by the child's preferred name or pronouns at school has been raised in several jurisdictions with varying outcomes. The 1st Circuit and the 11th Circuit are the only Courts of Appeals that have conclusively addressed the merits of parental rights claims in this scenario—both concluding (through different analyses) that the schools' conduct was not unconstitutional. *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025) (concluding a school protocol requiring staff to use students' preferred names and pronouns was legislative action and did not violate parents' substantive due process right to direct their child's care and upbringing); *Littlejohn v. Sch. Bd. of Leon Cnty., Florida*, 2025 WL 785143 (11th Cir. Mar. 12, 2025) (concluding the application of a preferred name policy to one person is executive action and did not shock the conscience); *see e.g. Protecting Our Children, UA v. Eau Claire Area School District, Wisconsin*, 95 F.4th 501 (7th Cir. 2024) , *cert. denied*, 145 S.Ct. 14 (U.S. Dec. 9, 2024) (dismissing action by parents because lacked standing); *John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622 (4th Cir. 2023), *cert. denied,* 144 S.Ct. 2560 (U.S. May 20, 2024) (dismissing action by parents because lacked standing).

A trio of Supreme Court cases defines the fundamental right of parents to direct the care, custody, and upbringing of one's children. *See Meyer v. Nebraska,* 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57 (2000). In *Meyer v. Nebraska,* the Supreme Court struck down a Nebraska statute forbidding the teaching of the German language before completing eighth grade because it interfered with parents' right to "bring up children" and "control the education of their

own." 262 U.S. at 399, 401. The Supreme Court in *Pierce v. Society of Sisters* struck down

an Oregon statute requiring children to attend public schools because it interfered with the

liberty of parents "to direct the upbringing and education of children." 268 U.S. at 534-

535. Similarly, in *Troxel v. Granville*, the Supreme Court declared a Washington statute

permitting any person to petition for visitation with a child unconstitutional as it infringed

on parents' interest "in the care, custody, and control of their children." 530 U.S. at 72.

This fundamental right of parents has endured as defined in *Meyer* in 1923 (the right to

direct the care, custody, and upbringing of their children), but the Supreme Court and

various other courts continue to consider whether governmental action interferes with that

right. This Court will conduct the same analysis here.

While Plaintiff successfully identifies a fundamental right, the Court must consider

whether the Defendants' conduct did, in fact, infringe on that right. *Abdi*, 942 F.3d at 1028.

Plaintiff alleges Defendants infringed on her parental right by withholding mental health

information about her child from her and promoting her child's social transition without

her knowledge. (ECF 26, ¶ 125). Determining whether Defendant's conduct, in fact,

infringed upon Plaintiff's parental rights requires consideration of the scope and contours

of the fundamental right of parents to direct the care, custody, and upbringing of their

children.

### b. Infringement

In considering the scope of the fundamental right of parents to direct the upbringing of

their children, the Supreme Court has often been faced with determining whether certain

16

actions taken by schools the children attend infringes on those parental rights. When

determining what is in the purview of the state when it comes to a child's education,

> [n]o question is raised concerning the power of the state reasonably regulate all
> schools, to inspect, supervise and examine them, their teachers and pupils; to require
> that all children of proper age attend some school, that teachers shall be of good
> moral character and patriotic disposition, that certain studies plainly essential to
> good citizenship must be taught, and that nothing be taught which is manifestly
> inimical to the public welfare.

*Pierce*, 268 U.S. at 534. However, the use of preferred names or pronouns is distinct from

typical issues of school curriculum and pedagogy that have traditionally remained within

the discretion of schools. *See Swanson v. Guthrie Indep. Sch. Dist. No. I-L,* 135 F.3d 694,

699 (10th Cir. 1998) ("decisions as to how to allocate scarce resources, as well as what

curriculum to offer or require," are the discretion of school authorities); *Bailey v. Virginia

High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012), (parents did not have

constitutional right to control individual components of their son's education, including

participation in sports and other activities); *Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187,

1191 (9th Cir. 2006), *cert. denied,* 549 U.S. 1089 (parents did not have right to prohibit

school from distributing survey which contained questions about sex); *Brown v. Hot, Sexy,

& Safer Prods., Inc.*, 68 F.3d 525, 532 (1ˢᵗ Cir. 1995) (parents did not have right be

informed of AIDS awareness classes); *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir.

2003) (parent had no right to opt child out of sex education classes). The question at issue

here is less about the power of schools and more about whether the use of preferred names

and pronouns, upon a child's request, in school infringes on parental rights as defined by

the Supreme Court. This Court concludes that the use of preferred names and pronouns in

17

school and "withholding" that information from parents can only infringe upon parental rights if a parent first exercises those rights by inquiry.

###### i.   "Withholding" of the Student's Gender Identity

Plaintiff asserts that she is not "alleging a right to receive generalized updates," but rather a right to make "decisions about the children's well-being, *i.e.*, physical and mental health." (ECF 66, p. 7). However, according to Plaintiff's logic, if a parent is not already aware of their child's use of preferred name or pronouns, then in order to make those decisions, the school would have an obligation to proactively inform the parent. Within this right as defined by Plaintiff, Plaintiff cannot prevent placing an affirmative obligation on the school to inform parents of any circumstance that occurs in school that might affect a child's "well-being." Such a finding would expand parental rights beyond their own decision-making rights to place affirmative obligations on other parties that care for their child. The Supreme Court has made clear that the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *See Foote,* 128 F.4th at 354 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 195 (1989)). Not to mention the laundry list of circumstances that could affect a child's "well-being" even in the slightest that would require constant, detailed information sharing from the school, with constitutional consequences.

Understandably, the Supreme Court has expressed a "reluctan[ce] to expand the concept of substantive due process." *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 125 (1992). As the Court recognized that "[b]y extending constitutional protection to an

asserted right or liberty interest, we, to a great extent, place the matter outside the arena of

public debate and legislative action." *Glucksberg*, 521 U.S. at 720. Thus, caution and

restraint must be exercised "lest the liberty protected by the Due Process Clause be subtly

transformed into the policy preferences" of the judiciary. *Id.* (citing *Moore v. City of East

Cleveland, Ohio*, 431 U.S. 494, 502 (1977). While the right of parents to direct their child's

upbringing is a liberty that has long been protected by the Due Process Clause, to conclude

that right creates an obligation on third parties would not be an exercise of caution or

restraint. Several circuits have concluded the same in declining to create a "constitutional

obligation on state actors to contact parents of a minor or to encourage minors to contact

their parents" when they make voluntary decisions. *Anspach v. City of Philadelphia, Dep't

of Public Health*, 503 F.3d 256, 262 (3d. Cir. 2007) (finding a health center was not

constitutionally obligated to contact a minor's parents or encourage the minor to contact

her parents before receiving emergency contraception medication); *Doe v. Irwin,* 615 F.2d

1162, 1168 (6th Cir. 1980); *see Foote,* 128 F.4th at 354-55.

Plaintiff asserts she has a right not to have information regarding her child's gender

identity withheld. The Court agrees. However, the Court does not think the information

can properly be deemed "withheld" to infringe on parental rights unless a parent inquired

into or sought the information and it was intentionally concealed or they were lied to.[10]

---

[10] In *Lee v. Poudre Sch. Dist.*, when discussing the fundamental right asserted by the parents in that matter, the Court noted that "the parents conceded that their parental rights do not *require* the school to disclose information." 2025 WL 1163920, at *7 n.8 (emphasis in original). And, similarly, in her concurrence, Judge McHugh observed "the district's alleged policy of helping students hide sensitive information from their parents implicates the Supreme Court's prior descriptions of parents' fundamental right to control their children's upbringing." *Id.* at *11 n.1 (McHugh, J., concurring).

19

Otherwise, an infinite amount of information would be deemed "withheld" by schools on a daily basis in violation of parental rights. Both *Meyer* and *Pierce* involved situations where the state was either forbidding or requiring some activity in schools. *See Meyer,* 262 U.S. 390; *Pierce,* 268 U.S. 510. In contrast, the District and its staff members merely respected the Student's voluntary choice to be referred to by preferred name and pronouns. Neither the District nor its staff members required the Student go by preferred name or pronouns nor did they "discourage students from discussing their gender identities with their parents." *Lee v. Poudre Sch. Dist.*, 2025 WL 1163920, at *9 (McHugh, J., concurring). At no point did the District or its staff members prohibit Plaintiff from participating in her child's decision. *See Doe*, 615, F.2d at 1168. Now, if a parent inquires into their child's gender identity or use of pronouns at school and a school knowingly conceals or lies to the parent (absent reasonable concerns regarding personal safety), then the school would potentially be interfering with a parent's fundamental right to control their children's upbringing—hence creating a potential constitutional violation. That didn't happen here.

Declining to place an obligation on schools to proactively inform parents of every circumstance which might affect a child's well-being could create a circumstance in which a parent is unaware of something that occurs in their child's life. However, nothing prevents a parent from inquiring into their child's well-being and gender identity at school. Once this inquiry occurs, a parent is exercising their right to direct their child's care and well-being, and any withholding of information by the school could infringe on their parental rights. The Court simply finds that inquiry, and thus an exercise of their parental right, is required before any infringement of that right can occur.

20

As Plaintiff argues, finding that inquiry is required for a parent to assert their parental rights were infringed makes parental rights contingent on a certain level of awareness by parents of the circumstances affecting their child's well-being. (ECF 66, p. 10). However, parental rights have never been found to be absolute or unqualified, but, instead, have routinely faced limitations. See *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (stressed Meyer and Pierce are limited in scope); *Wisconsin v. Yoder*, 406 U.S. 205, 239 (White, J., concurring) ("no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society"); *Prince v. Massachusetts,* 321 U.S. 158, 166-67 (1944) ("neither rights of religion nor rights of parenthood are beyond limitation"); *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). The Court finds that this contingency is preferred to opening the Pandora's box of requiring proactive disclosure by schools of any circumstance or event that could impact a parent's ability to make decisions regarding their child.[11] Especially considering there is no evidence that District staff "coerced" or even encouraged the Student not to tell the Student's own parents about the choice to be referred to by preferred name and pronouns. *See Foote*, 128 F.4th at 353 ("student's decision whether to disclose their gender identity to their parents lacks the "coercive" or "restraining" conduct that other courts have found to restrict parental rights in this context").

---

[11] In this case, prior to being informed by the Student's teachers as to the use of preferred name and pronouns, Plaintiffs were aware that the Student was struggling with gender identity issues. (ECF 66, Ex. 18).

Plaintiff sets forth no facts where the District or any staff member withheld information from her or misinformed her regarding her child's use of preferred name or pronouns. Rather, Plaintiff does not dispute that when Plaintiff inquired into the Student's use of preferred name and pronouns she was informed of the Student's use. (ECF 26, ¶ 31-35). While the 2022-23 PCNP did provide that "[s]taff must respect the privacy of all students regarding such choice," Plaintiff still does not point to an instance where she inquired into the Student's use of preferred name or pronouns and the school "respected the Student's privacy" and did not disclose.[12] Plaintiff implicitly argues that she should have been informed of the Student's use of preferred name and pronouns during Section 504 meetings where they discussed the Student's accommodation plan. (ECF 26, ¶28). However, if a meeting to discuss accommodations for the Student's diagnoses of PTSD and ADHD were to serve as sufficient "inquiry" to obligate the school to inform a parent of their child's use of preferred names or pronouns, then essentially every meeting between a parent and school staff would implicate this obligation. (ECF 66, Ex. 13). Such a finding would, again, create an obligation on schools to proactively inform parents of every circumstance that might affect a child's upbringing. Further, Plaintiff does not set forth facts that she inquired into the Student's use of preferred names or pronouns at these meetings nor that the staff members present intentionally misrepresented the Student's use of preferred name and pronouns (or were even aware). *See Foote*, 128 F.4th at 353.

---

[12] Plaintiff makes a passing, general reference in the Amended Complaint that Defendants' policies are unconstitutional on their face and as applied, but Plaintiff fails to address or even make reference to any facial substantive due process challenge in the briefing. The Court will consider this argument waived.

Thus, Plaintiff's parental rights were not infringed as the school never failed to inform or misinformed Plaintiff after inquiry into the Student's use of preferred name and pronouns. Any instance where the school did not proactively inform Plaintiff that the Student was using preferred name and pronouns, when Plaintiff did not inquire, is not an infringement on Plaintiff's parental rights as it did not prevent Plaintiff from making decisions regarding her child's well-being. *See Zablocki v. Redhail*, 434 U.S. 374, 387 (1978) (infringement occurs through either total prohibition or "direct[ ] and substantial[ ]" interference). Rather, despite the District's use of the Student's preferred name and pronouns, Plaintiff "remained free to exercise [her] traditional care, custody, and control over [her] unemancipated child[]. *Foote*, 128 F.4th at 355 (quoting *Doe*, F.2d at 1168). No action taken by the District or its staff members prevented Plaintiff from doing so.

### ii. Medical Care

Plaintiff additionally believes the information being "withheld" is unique because it affects her child's physical and mental health. (ECF 26, ¶ 119) (ECF 66, p. 7). The right to control the medical treatment of their children, including decisions surrounding mental health care, is generally considered to be part of a parent's fundamental right to make decisions regarding one's child's care. *See Parham v. J.R.*, 442 U.S. 584, 603 (1979) (this right exists absent a finding of neglect or abuse); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003) (the right to control the medical care of a child falls within the sphere of a parent's protected liberty). Plaintiff argues the District is "facilitating a social transition (a mental health intervention)," and thus invading on her right to make medical decisions

for her child. (ECF 66, p. 8). However, simply the use of preferred names or pronouns upon

a student's request cannot reasonably be considered "medical care" or treatment.

Plaintiff describes "social transitioning" as "changes that bring the child's outer

appearance and lived experience into alignment with the child's core gender," such as

"changes in clothing, name, pronouns, and hairstyle." (ECF 26, ¶ 99). Yet, as Plaintiff's

expert concedes, "[s]ocial transition is used as a contrast to medical transition, which refers

to various medical interventions to bring one's physical appearance closer into alignment

with one's asserted gender identity, such as puberty blockers, cross-sex hormone therapy,

and various medical interventions." (ECF 6, Ex. 1, Expert Affidavit of Erica Anderson,

Ph.D.). Plaintiff offers no evidence that the school provided any type of "medical

transition" or even "facilitated" the Student's "social transitioning." Defendants were not

involved in changing the Student's clothing or hairstyle. Plaintiff did not set forth any facts

that staff members even encouraged or suggested the Student engage in such behaviors,

but simply that staff members passively respected the Student's request to be referred to

by preferred name and pronouns.

Cases that have considered parental control of medical care have involved treatments

such as institutionalization at a mental health hospital, *Parham,* 442 U.S. 584; retention of

blood samples from children, *Kanuszewski v. Mich. Dept. of Health and Human Servs.*,

927 F.3d 396 (6th Cir. 2019); and physical examinations and blood tests on children,

*Dubbs,* 336 F.3d 1194. The use of preferred name and pronouns by the District was an act

of respecting the Student's request and "requires no special training, skill, medication, or

technology." *See* Foote, 128 F.4th at 350.

Because Defendants were not providing medical care by referring to the Student by preferred name and pronouns, Plaintiff's only feasible argument is that the withholding of information impeded her right to direct her child's medical care—an aspect of her fundamental right to direct her child's upbringing. However, as explained above, the parental right to direct one's child's upbringing cannot be infringed due to a lack of information sharing regarding the use of preferred names or pronouns unless a parent first inquires with the school.[13]

In sum, while the fundamental right of parents prevents schools from withholding or concealing information from parents regarding their child's well-being upon inquiry, it does not create an obligation on schools to proactively inform parents of every circumstance which might affect a child's well-being. In accordance with this finding, Plaintiff's parental rights were not infringed because, when Plaintiff inquired, she was accurately informed of her child's use of preferred name and pronouns. Plaintiff does not allege any instances where she inquired and was lied to. Furthermore, District staff members' use of the Student's preferred name and pronouns is not medical care and thus does not infringe a parent's right to direct their child's medical care. When Plaintiff, upon inquiry, learned that her child was being referred to at school by preferred name and pronouns with which she disagreed, then Plaintiff had the right to make a different choice regarding the type of education her child receives—e.g., public, private or homeschooling.

---

[13] If the school was, in fact, providing medical care to the Student, then an obligation to proactively share that information would likely exist. But that is not the case here. As explained above, using preferred names and pronouns is not medical care, and the parental fundamental right does not create an obligation on schools to proactively share every event or circumstance that might affects one's child.

See *Pierce*, 268 U.S. at 534-535. At all times and under all circumstances, Plaintiff "remained free to exercise [her] traditional care, custody, and control" over her child. *Foote*, 128 F.4th at 355 (quoting Doe, F.2d at 1168).

### c. Constitutional Scrutiny

As the action by Defendants does not infringe on the fundamental right of parents to direct the upbringing of their children, the Court will apply rational basis review. *Reno v. Flores*, 507 U.S. 292, 305 (1993). Thus, only "a reasonable relation to a legitimate state interest to justify the action" is required to pass constitutional muster. *Glucksberg,* 521 U.S. at 722. The District's policy of using a student's preferred names and pronouns upon request states the District is "committed to promoting an educational environment that is supportive and respectful to all students." (ECF 63, Ex. B). A respectful and nondiscriminatory school environment is a legitimate state interest. Referring to students by preferred names and even declining to proactively inform parents to respect a student's choice are both rationally related to that interest. Thus, the District policies and staff members' actions pass constitutional muster, and the Court grants summary judgment in favor of Defendants on this claim.

### 4. Freedom of Religion

The Free Exercise Clause provides that "Congress shall make no law … prohibiting the free exercise" of religion. U.S. Const. amend. 1. The Free Exercise Clause is applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). A plaintiff bears the initial burden of "showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or

26

'generally applicable.'" *Kennedy v. Bremerton*, 597 U.S. 507, 525 (2022).[14] If a plaintiff makes such a showing, the Court will "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).

Plaintiff raises two Free Exercise of Religion claims. The first, Count Two, claims Defendants violated her right to freely exercise her sincerely held religious beliefs as a parent of the Student. The second, Count Three, claims Defendants violated her right to freely exercise her sincerely held religious beliefs as a teacher at a school in the District. Plaintiff fails to set forth facts that the Defendants' actions violated her constitutional right to freely exercise her religion as either a parent to the Student or a teacher in the District.

### a. Freedom of Religion as a Parent

Plaintiff alleges that Defendants significantly burdened her "sincerely held religious beliefs by preventing her from acting pursuant to her religious belief that it is the parents who have the duty to train their children regarding human sexual identity and the unchangeable natural created order of humans as male and female." (ECF 26, ¶ 136). The Court will not question Plaintiff's "sincerely held religious beliefs," however, Plaintiff fails to set forth facts showing that those sincerely held religious beliefs were in fact burdened by Defendants' actions.

---

[14] "A plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise," but Plaintiff does not make such an allegation. *Kennedy*, 597 U.S. at 525 n.1. Plaintiff does not show any expression of hostility that accompanied the Non-Negotiables.

Addenda 0028

The Supreme Court established what constitutes a burden on religious beliefs and practices in *Lyng v. Northwest Indian Cemetery Protective Association.* 485 U.S 439 (1988). It stated "that incidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute substantial burdens on the exercise of religion. *Id.* at 450-51. Neither the District's PNCP policy nor staff members' use of the Students preferred name and pronouns in school coerces or compels Plaintiff to violate tenets of her religion. Plaintiff remains completely free to "train [her child] regarding human sexual identity and the unchangeable natural created order of humans as male and female." (ECF 26, ¶ 136). This is wholly unlike *Wisconsin v. Yoder*, where Wisconsin's education law required all children to attend school until age 16 which prohibited Amish parents from withdrawing their children from high school in accordance with their religious beliefs. 406 U.S. 205. The Wisconsin law forced Amish parents to keep their children enrolled in high school contrary to their religious beliefs. Not only is Plaintiff free to "train" her child in accordance with her religious beliefs, but she is also free to make a different choice regarding the type of education her child receives. *See Pierce*, 268 U.S. at 534-535.

Plaintiff additionally contends that Defendants' failure to inform her that her child requested to be referred to by preferred name and pronouns burdened her sincerely held religious beliefs because it "depriv[ed] her of the information she needed to counsel" her child. To conclude that the District's failure to proactively inform burdened her religious beliefs as a parent, would create an affirmative obligation on the District to foster the

28

exercise of Plaintiff's religious beliefs. Perhaps the District's failure to proactively inform Plaintiff of her child's choice "ma[d]e it more difficult to practice" her religious beliefs but it "ha[d] no tendency to coerce [Plaintiff] into acting contrary to [her] religious beliefs." *Lyng*, 485 U.S. 450-51. The District's failure to proactively inform Plaintiff did not prevent Plaintiff from practicing her sincerely held religious beliefs.[15]

Plaintiff's allegations, more plainly, are that the District staff members' use, at the Student's request, of preferred name and pronouns were counter to Plaintiff's own religious beliefs. However, a person's constitutional right to freely exercise their own religious beliefs does not require that the state also exercise those same religious beliefs. *Bowen v. Roy,* 476 U.S. 693, 700 (the Free Exercise Clause is "written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government"). To conclude that the District's failure to act in accordance with Plaintiff's religious beliefs is a constitutional violation would turn the First Amendment on its head. *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion"). The First Amendment does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development *or that of his or her family*." *Bowen*, 476 U.S. at 699 (emphasis added). Moreover, one can only imagine the endless problems were the law to require schools to inform a parent of

---

[15] The issue of what constitutes a "burden" on parents' religious exercise in the context of elementary students being instructed on gender and sexuality, contrary to the parents' religious convictions without notice or opportunity for parents to opt their child out, is currently being considered by the United States Supreme Court in *Mahmoud v. Taylor*, 102 F.4th 191 (4th Cir. 2024); Supreme Court Docket No. 24-297 (argued April 22, 2025).

any event or occurrence with their child that might interfere with or burden the parent's sincerely held religious beliefs.

Even if Plaintiff could show that her sincerely held religious beliefs were in fact burdened by the Defendants' actions, the policy that existed while Plaintiff's child was in school in the District is a neutral policy of general applicability. Notably, Plaintiff's constitutional claims for freedom of religion as a parent are only viable during the school years Plaintiff had a child in school in the District. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. at 180-81 (standing requires an injury in fact that is fairly traceable to the challenged action). While the Amended Complaint alleges that Plaintiff had four additional children in school in the District, Plaintiff sets forth no facts to support the existence of the additional children, their attendance at schools in the District, or the school years during which these children attended school in the District. Thus, the only relevant school years applicable to Plaintiff's free exercise claim are the school years the Student attended school in the District—2021-22 and 2022-23. (ECF 66, p. 1). And the only District policy that could have violated Plaintiff's constitutional right to freely exercise her sincerely held religious beliefs as a parent is the 2022-2023 Non-Negotiables.[16] The 2022-2023 PCNP contained within the 2022-23 Non-Negotiables states:

> As you become acquainted with your students, you may encounter students wishing to use a preferred or chosen name. A preferred/chosen name is any name a student chooses to use other than their legal name. For example, a student may wish to shorten their first name (e.g. Steven to Steve) or to be referred to by their middle

---

[16] The Court concluded above that no official policy regarding the use of preferred names or pronouns or "concealment" of a student's choice from parents existed during the 2021-22 school year.

name or a nickname. Sweetwater County School District Number One is committed to promoting an educational environment that is supportive and respectful to all students. Calling a person by their preferred name and pronoun shows respect and contributes to the District's commitment to providing a safe and nondiscriminatory educational environment. Accordingly, staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice.

Violations of this procedure may constitute discrimination based on sex, and may result in discipline. Students who experience problems or discrimination related to their preferred/chosen name or pronoun shall be referred to the Title IX Coordinator for resources and assistance. This procedure does not address changes to educational records to reflect legal name changes. Any requests to amend educational records shall be referred to the Director of Human Resources.

(ECF 63, Ex. B).

A law is not generally applicable if it (1) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or (2) "provid[es] a mechanism for individualized exemptions." *Fulton* v. *Philadelphia*, 593 U.S. 522, 533-34 (2021). The 2022-23 PCNP does not provide a mechanism for individualized exemptions, nor does it distinguish between religious and secular conduct. The 2022-23 PCNP requires all District personnel use a student's preferred name or pronoun in communications. The 2022-23 PCNP is facially neutral and generally applicable. "Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) (citing *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)). "Thus, a law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Id.* As stated in the policy, the District enacted the

31

policy to promote "an education environment that is supportive and respectful to all students," and prevent discrimination in the education environment. (ECF 63, Ex. B). A respectful and nondiscriminatory educational environment is a legitimate government interest. The policy requirement that District personnel use a student's preferred name and pronouns when requested is rationally related to that end.

Not only has Plaintiff failed to show that the 2022-23 PCNP or use of the Student's preferred name and pronouns in school burdened her sincerely held religious beliefs, but, even if she did, the PCNP in place while the Student attended school in the District is a neutral rule of general applicability. Neither the 2022-23 PNCP, District staff members' use of the Student's preferred name and pronouns in school, nor the failure to proactively inform Plaintiff of the Student's use of preferred name and pronouns violated Plaintiff's First Amendment right to freely exercise her religious beliefs.

### b. Freedom of Religion as a Teacher

Plaintiff additionally alleges that her sincerely held religious beliefs related to gender identity, parental involvement in decision-making, and truth-telling prohibit her from complying with the District's PNCPs as a teacher. And, as Plaintiff asserts, Defendant explicitly told her she cannot abide by her sincerely held religious beliefs and must comply with the policies. Plaintiff's freedom of religion as exercised as a teacher in the District involves a different "burden" than her claim as a parent. Plaintiff asserts the Defendants are interfering with her right to free exercise in her role as teacher by requiring she comply

32

with the policy in violation of her religious beliefs and by failing to provide a reasonable accommodation to allow her to continue teaching under the policy.[17]

As with her First Amendment claim as a parent, Plaintiff must first establish that her religious beliefs as a teacher were burdened by the PNCPs and Defendants' actions. Plaintiff and Defendants dispute whether or not Plaintiff has faced discipline for refusing to comply with the policy[18] (and whether or not Plaintiff has ever had to comply with the policy). Defendant asserts that Plaintiff has never had to use a student's requested preferred pronouns nor had to lie to a parent, so her religious beliefs cannot have been burdened. Plaintiff testified to those facts. (ECF 71, Ex. A, p. 40, 58-59). However, even if Plaintiff has not complied with the policy or has been disciplined for failing to do so, the threat of discipline can be enough "to coerce [Plaintiff] into acting contrary to [her] religious beliefs." *Lyng*, 485 U.S. 450-51. As a teacher in the District, the PNCPs force Plaintiff to either use students' preferred names and pronouns in violation of her religious beliefs or potentially lose her job as a teacher in the District. (ECF 66, Ex. 14, p. 22) (a staff member understood that if you failed to sign or agree to the Non-Negotiables that you would be

---

[17] The Court will consider Plaintiff's allegations that Defendants failed to provide a religious accommodation as an aspect of the "burden" placed on her ability to freely exercise her sincere religious beliefs rather than its own failure to accommodate claim. A failure to provide religious accommodations in the workplace violates Title VII of the Civil Rights Act of 1964, however Plaintiff did not bring a Title VII claim in this action, nor did she show that she had filed a discrimination charge with the Equal Employment Opportunity Commission as required before commencing a Title VII action in court. 42 U.S.C. § 2000e-5(e)(1), (f)(1).

[18] Plaintiff's focus on potential adverse employment actions taken against her—co-teaching or not being selected for different positions—suggesting that her First Amendment claim is a claim of retaliation for the free exercise of religion. However, Plaintiff never identifies her First Amendment claim as a retaliation claim, nor does she analyze the elements of a First Amendment retaliation claim in any of her briefs. Nonetheless, even if the Court were to consider Plaintiff's claim as a First Amendment retaliation claim, Plaintiff fails to allege or set forth any facts that exercising her religious beliefs was "a substantial or motivating factor" behind the co-teaching or not being selected for different positions. *Walton v Powell*, 821 F.3d 1204, 1211 (10th Cir. 2016) (the protected activity must be a substantial or motivating factor behind an adverse employment action for a First Amendment retaliation claim to survive).

fired). Thus, Plaintiff has sufficiently shown, as a teacher, that her religious beliefs were burdened by the PNCPs.

The crux of the dispute over Plaintiff's First Amendment claims is whether the PNCPs are neutral laws of general applicability or whether they receive strict scrutiny. As discussed above, the 2022-23 PNCP is a neutral law of general applicability and is rationally related to a legitimate government interest in creating a respectful and nondiscriminatory educational environment. However, the alleged violation of Plaintiff's First Amendment rights as a teacher in the District, as opposed to a parent of a student in the District, also encompass the 2023-24 school year and policy as she was employed by the District during both of those school years.

The District amended its Non-Negotiables leading into the 2023-24 school year and created a more expansive PNCP. (ECF 63, Ex. D). The 2023-24 PNCP again required that staff use a student's preferred name or pronouns in all communications, but also stated:

> The procedure applies equally to all students regardless of their gender or sexual orientation. It is specific to student's preferred/chosen names and pronouns and is intended to further the district's goal of fostering a respectful and inclusive learning environment. Wherever possible, staff should involve parents/guardians in the implementation of these guidelines to support the student's health, safety and wellbeing. If the student has not informed their parent/guardian of their chosen name or pronoun, the student should be referred to the student's counselor who will partner with the student to encourage and support the student to discuss their chosen name or pronoun with their parent/guardian, unless the counselor or other staff member, in consultation with the District's Superintendent, Human Resources Director, and legal counsel determines that such disclosure would be detrimental to the student's health or safety. When requesting a change to their preferred name and/or pronoun, students should be informed that in the absence of a determination that the student's health or safety is at risk, the District is legally required to share all information about the student's educational status, including chosen names and/or pronouns, with the student's parent/guardian upon request. Because the procedure is content neutral, staff must not proactively contact parents regarding a

34

> student's chosen name and/or pronoun. The District's policy is to respect a student's
> preference – not to either encourage or discourage any student from forming a
> preference as to chosen names or pronouns, which could be deemed discrimination
> based on sex as set forth above.
>
> Staff members who are uncertain as to how to implement this procedure or are for
> any reason unable to implement the procedure in relation to specific, identified
> circumstance should address their concerns with the Human Resources Director.
> The District will make every effort to reasonably accommodate staff members
> where possible.

(ECF 63, Ex. D).

Plaintiff asserts that the 2023-24 PNCP is not neutral or generally applicable because

the last paragraph provides for accommodations. The Supreme Court has consistently held

that a law that "provid[es] a mechanism for individualized exemptions" is not generally

applicable. *Fulton*, 593 U.S. 533; *Kennedy*, 597 U.S. at 526; *Lukumi*, 508 U.S. at 537.

However, a mechanism for exemptions is only "individualized" if it opens the door to

"individualized government assessment of the reasons for the relevant conduct." *Smith*,

494 U.S. at 884; *see Lukumi*, 508 U.S. at 537-38 (finding a determination of what is

"unnecessary" requires individual judgment and singles out religious practice for

discriminatory treatment). The 2023-24 PNCP provides reasonable accommodations "for

any reason." (ECF 63, Ex. D). Defendants argue these accommodations are not

"individualized exemptions," because they require no individualized government

assessment, but, rather, are offered to anyone who asks. The Court agrees.

"The Supreme Court has never explained with specificity what constitutes a 'system'

of individualized exceptions." *Grace United Methodist Church*, 451 F.3d at 650 (citations

omitted). However, the Tenth Circuit has found that "[t]o ensure that individuals do not

suffer unfair treatment on the basis of religious animus, subjective assessment systems that

'invite consideration of the particular circumstances' behind an applicant's actions ...

trigger strict scrutiny." *Id.* at 651 (quoting *Smith*, 494 U.S. at 884). When creating the

"individualized exemptions" carve-out, the Supreme Court in *Smith* considered laws which

afforded accommodations for "good cause" or "personal reasons," to conclude such

individualized government assessments require compelling justification. 494 U.S. at 884.

The 2023-24 PNCP provides reasonable accommodations "for any reason," without

qualification. Defendants contend that a staff member simply has to ask for a reasonable

accommodation and no subjective assessment of the "reason" for the accommodation is

conducted—as the text of the 2023-24 PNCP reads. (ECF 69, p. 8). Plaintiff has not offered

any evidence that, under the 2023-24 PNCP, "for any reason" was pretextual, that

subjective decision-making was involved, or even that anyone has been denied a reasonable

accommodation when requested.

Plaintiff provides an email from the Director of Special Services where the Director

implicitly stated Plaintiff must abide by District policies despite any "personal and

religious beliefs." (ECF 66, Ex. 21). If this email was in response to a request for an

accommodation based on religious beliefs by Plaintiff, then this communication could

perhaps be evidence that "for any reason" was merely pretextual and the District was

conducting individualized assessments. However, this email was sent on August 15,

2022—the day the 2022-23 PNCP, which does not provide for any accommodations, was

enacted. Plaintiff does not set forth any evidence that accommodations were not offered

"for any reason" by the District during the 2023-24 school year. Rather, although it is

unclear during which school year, Plaintiff testified that she had a conversation with Kris

36

Cundall, the principal of the junior high school, about a religious accommodation and Kris Cundall allowed Plaintiff to tell her students she had to go by what was in Powerschool. (ECF 66, Ex. 23) (ECF 71, p. 39). Thus, Plaintiff sets forth no evidence that the 2023-24 provided for anything other than exemptions "for any reason" rather than individualized exemptions that requires government consideration of the particular reasons. There is no devaluing of religious reasons because exemptions may be made "for any reason." *See Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4[th] 1251, 1277-78 (10th Cir. 2024) (policy not "generally applicable" because it granted secular exemptions on more favorable terms than religious exemptions). A policy which provides exemptions "for any reason" without any subjective government assessment remains a neutral law of general applicability. *See Smith,* 494 U.S. at 884 (a mechanism for exemptions which requires "individualized government assessments" is not generally applicable).

As both PNCPs applicable to Plaintiff as a teacher are neutral laws of general applicability, they "do not raise free exercise concerns" and "need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Grace United Methodist Church*, 451 F.3d at 649 (citing *Smith*, 494 U.S. 872, 879 (1990)). The 2023-24 PNCP is rationally related to the same legitimate government interest in promoting a respectful and nondiscriminatory educational environment as the 2022-23 PNCP. Thus, both survive Plaintiff's constitutional challenge.

### ORDER AND CONCLUSION

For those reasons set forth above, Plaintiff Sean Willey lacks standing to pursue the claims asserted against Defendants and must be dismissed. However, Mrs. Willey as a

parent of the Student and employee of the District, has standing to pursue the claims alleged. It is well established that parents have a fundamental right to control their children's upbringing. In order to exercise that right, upon inquiry parents must be given access to information concerning their children's education and, absent reasonable concern for the child's safety, that information cannot be intentionally withheld or knowingly misrepresented. The undisputed facts establish that Defendants did not withhold or knowingly misrepresent any information regarding the Student from or to Plaintiff, and thus did not interfere with this right. Neither did Defendants' conduct burden Plaintiff's First Amendment right to freely exercise her religious beliefs as a parent or unconstitutionally interfere with her right to freely exercise her religious beliefs as a teacher.

**THEREFORE, IT IS HEREBY ORDERED** that Plaintiff Sean Willey is dismissed from the action.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgement (ECF 63) is **GRANTED**. Summary judgment is granted in Defendants' favor and against Plaintiff Ashley Willey on all remaining claims—Counts I, II and III.

**IT IS FINALLY ORDERED** that all pending motions are denied as moot. The Clerk of Court will please enter a final judgment terminating this case and all settings.

Dated this <u>28th</u> day of April, 2025.

Scott W. Skavdahl
United States District Judge

38

**FILED**



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

1:55 pm, 4/28/25

**Margaret Botkins
Clerk of Court**

| | |
|---|---|
| ASHLEY WILLEY and SEAN WILLEY | |
| Plaintiff | |
| vs | Case Number: 23-CV-69-SWS |
| SWEETWATER COUNTY SCHOOL DISTRICT #1 BOARD OF TRUSTEES; KELLY MCGOVERN; NICOLE BOLTON KAYCI ARNOLDI, BRYANT BLAKE, | |
| Defendant | |

## JUDGMENT IN A CIVIL ACTION

This matter comes before the Court on Defendants Sweetwater County School District #1 Board of Trustees, Kayci Arnoldi, Bryant Blake, Nicole Bolton and Kelly McGovern's Motion for Summary Judgment (ECF No. 63). Pursuant to the Order entered April 28, 2025, incorporated by reference herein, GRANTING Defendants Motion for Summary Judgment, IT IS HEREBY ORDERED AND ADJUDGED that a Judgment is hereby entered in favor of Defendants and against Plaintiff Ashley Willey on all remaining claims and the matter is terminated.

Dated this 28th day of April, 2025.

Margaret Botkins
Clerk of Court

By Crystal Toner
Deputy Clerk