UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| **ASHLEY WILLEY & SEAN WILLEY** | |
| **Plaintiffs-Appellants**, | |
| v. | Appellate Case No. 25-8027 |
| **SWEETWATER COUNTY SCHOOL DISTRICT No. 1 BOARD OF TRUSTEES; KELLY MCGOVERN,** Superintendent of Sweetwater County School District No. 1; **NICOLE BOLTON,** Assistant Superintendent & Human Resources Director of Sweetwater County School District No.1; **KAYCI ARNOLDI,** Director of Student Services of Sweetwater County School District No. 1; **BRYANT BLAKE,** Principal of Black Butte High School, | |
| **Defendants-Appellees.** | |

**On Appeal from the United States District Court for the District of Wyoming**
**The Honorable Scott W. Skavdahl, District Court Judge**
**District Court Case Number 23-cv-69-S**

**ANSWER BRIEF OF APPELLEES BOARD OF TRUSTEES FOR SWEETWATER COUNTY SCHOOL DISTRICT No. 1, *et al.***

Respectfully submitted,

LAMBDIN & CHANEY, LLP
L. Kathleen Chaney, Esq., #6-3211
Eric D. Hevenor, Esq. 6-4435
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone: (303) 799-8889
Facsimile: (303) 799-3700
ATTORNEYS FOR APPELLEES

**ORAL ARGUMENT IS NOT REQUESTED**

# TABLE OF CONTENTS

## Contents

Table of Contents ............................................................................... iii

Table Of Authorities .............................................................................v

Glossary............................................................................................ ix

Jurisdictional Statement .......................................................................1

Statement of Issues For Review ............................................................1

Statement of the Case..........................................................................2

    I.   Factual Background:.....................................................................2

    II.   Procedural Background:.................................................................7

Summary of the Argument..................................................................10

Standard of Review ...........................................................................13

Argument.........................................................................................15

    I.   The Willeys Failed to Establish Factual or Legal Support of Their First and Second Claims for Relief. Therefore, Summary Judgment Was Warranted.......15

        i.   The Willeys Cannot Establish Their Constitutional Rights Were Violated Under the Color of State Law. ........................................................16

        ii.   The Willeys Failed to Establish an Infringement on Their Right of Free Exercise of Religion...................................................................23

    II.   Even if the Willeys Had Established Facts in Support of Their First and Second Claims, Those Claims Fail as a Matter of Law......................................24

        i.   The Mahmoud Decision is Factually Distinguishable From the Facts Underlying the Present Appeal ....................................................24

        ii.   The 2022-23 PNCP Was Adopted Based on Controlling Law. .............30

        iii.   The Mahmoud Decision Does Not Alter Determination of the Willeys' Claims. ..................................................................................33

III.    Ms. Willey Cannot Establish That Her Religious Beliefs Were Infringed in the Employment Setting.........................................................................42

Conclusion ......................................................................................................48

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT...............................51

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................52

CERTIFICATE OF DIGITAL SUBMISSION ......................................................53

CERTIFICATE OF SERVICE ..............................................................................54

# TABLE OF AUTHORITIES

## Cases

*Abila v. Funk*, 220 F. Supp. 3d 1121, 1158 (D.N.M. 2016) .....................................14

*Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)................ 13, 24

*Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 49 (1999) .........................................15

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).....................................14

*Bailey v. Virginia High Sch. League, Inc*., 488 F. App'x 714, 716 (4th Cir. 2012) 33

*Bass v. T-Mobile USA, Inc.,* 726 F. Supp. 3d 749, 758 (E.D. Mich. 2024).............44

*Bostock v. Clayton Cnty., Georgia*, 207 L. Ed. 2d 218, 140 S. Ct. 1731, 1740 (2020) ......................................................................................................................30

*Bowen v. Roy*, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986)....................34

*Brown v. Hot, Sexy & Safer Prods., Inc*., 68 F.3d 525, 533 (1st Cir. 1995) ...........33

*Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010)............................21

*C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005) .......................16

*Carmen v. San Francisco Unified Sch. Dist*., 237 F.3d 1026, 1029 (9th Cir. 2001) ...............................................................................................................................19

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). ................................................................................... 13, 14, 22

*Chung v. Washington Interscholastic Activities Ass'n*, 538 F. Supp. 3d 1170, 1181 (W.D. Wash. 2021) ...............................................................................................43

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)....................................................................42

*Cooper v. Aaron*, 358 U.S. 1 (1958) ........................................................................43

*Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *6 (6th Cir. Aug. 26, 2025)..................................................................... 35, 41

*Does 1-11 v. Bd. of Regents of Univ. of Colorado,* 100 F.4th 1251, 1268 (10th Cir. 2024) .....................................................................................................................38

*Downs v. Board of Ed. of Kansas City*, 336 F.2d 988 (1964) .................................43

*Eller v. Prince George's Cnty. Pub. Sch*., 580 F. Supp. 3d 154 (D. Md. 2022)......31

*Est. of Hurtado by & through Hurtado v. Smith*, 119 F.4th 1233, 1236 (10th Cir. 2024) ..................................................................................................... 11, 18

*Farkas v. Texas Instrument, Inc*., 375 F.2d 629, 632 (5th Cir. 1967) ....................32

*First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S. Ct. 1575, 1592, 20 L. Ed. 2d 569 (1968)...........................................................................20

*Foote v. Ludlow Sch. Comm.,* 128 F.4th 336, 352 (1st Cir. 2025) .................. 16, 33

*Fulton v. City of Philadelphia*, 593 U.S. 522, 141 S. Ct. 1868, 1877, 210 L.Ed.2d 137 (2021) .................................................................................................42

*Groff v. DeJoy*, 600 U.S. 447, 473, 143 S. Ct. 2279, 2297, 216 L. Ed. 2d 1041 (2023) ................................................................................................ 45, 46

*In re Neely*, 2017 WY 25, ¶ 48, 390 P.3d 728, 744 (Wyo. 2017) ..........................32

*Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc*., 847 F.2d 186, 195 (5th Cir. 1988)...........................................................................................20

*Johnson v. State Hearing Examiner's Office*, 838 P.2d 158, 165 (Wyo. 1992) ......32

*Kennedy v. Bremerton,* 597 U.S. 507, 525 (2022)............................................. 23, 42

*Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023) ................................................11

*Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232 (11th Cir. 2025) .... 16, 33

*Lyng v. Northwest Indian Cemetery Protective Assn*., 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) ....................................................................34

*Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025) ............... 24, 26, 27, 28, 29, 33, 34, 40

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*., 584 U.S. 617, 138 S. Ct. 1719, 1732, 201 L.Ed.2d 35 (2018)........................................................42

*McVay v. W. Plains Serv. Corp*., 823 F.2d 1395, 1398 (10th Cir. 1987) ...............19

*Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) .16

*Nick's Garage, Inc. v. Progressive Cas. Ins.,* 875 F.3d 107, 115-16 (2d Cir.2017) ...................................................................................................................22

*Oaster v. Robertson,* 173 F. Supp. 3d 1150, 1167 (D. Colo. 2016) .......................13

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617, 119 S. Ct. 2176, 2195, 144 L. Ed. 2d 540 (1999)........................................................................................31

*Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1074 (D.N.M. 2021)........................14

*Parker v. Hurley*, 514 F.3d 87, 101 (1st Cir. 2008)................................................33

*Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ........................................................................................................16

*Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)................................................15

*R–G Denver, Ltd. v. First City Holdings of Colorado, Inc*., 789 F.2d 1469, 1471 (10th Cir.1986)..........................................................................................19

vi

*Santosky v. Kramer*, 455 U.S. 745, 753–754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ................................................................................................16

*Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) ...............................11

*Snyder v. Beam Techs., Inc.*, 147 F.4th 1246, 1253 (10th Cir. 2025).....................11

*Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) ......15

*Swanson v. Guthrie Indep. Sch. Dist. No. 1-L*, 135 F.3d 694, 699 (10th Cir. 1998) ................................................................................................33

*Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993) .................................14

*Wisconsin v. Yoder*, 406 U.S. 205, 232–233, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ................................................................................................16

*Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)............34

## Statutes

20 U.S.C. §1681 *et seq*.................................................................... 31, 41

42 U.S.C. § 1983 ...................................................................................7, 15

## Other Authorities

Executive Order 13988 ....................................................................... 31, 43

Executive Order 14021 ....................................................................... 31, 43

## Rules

10th Cir. R. 25.5..............................................................................53

Fed. R. App. P. 32(a)(5)...................................................................52

Fed. R. App. P. 32(a)(6)...................................................................52

Fed. R. App. P. 32(a)(7)(B) .............................................................52

Fed. R. App. P. 32(a)(7)(B)(iii) .......................................................52

Fed. R. App. P. 34 ...........................................................................51

Federal Rule of Civil Procedure 56 ........................................................13

## Regulations

29 C.F.R. § 1605.2 ..........................................................................47

86 Fed. Reg. at 32,637 .........................................................................31

## Constitutional Provisions

Article I, § 3 of the Wyoming Constitution .............................................................32

Fourteenth Amendment ...........................................................................................16

**STATEMENT OF PRIOR OR RELATED APPEALS**

There are no prior or related appeals.

# GLOSSARY

**PNCP** -    The preferred/chosen names procedure contained within the District's Special Services 2022-23 and 2023-24 Non-Negotiables that set forth the expectations for District personnel.

**FAC** – The Appellants/Plaintiffs First Amended Complaint in the underlying District Court Action.

## JURISDICTIONAL STATEMENT

The District does not object to the Willeys' statement of jurisdiction and agrees that this Court has jurisdiction over this appeal.

## STATEMENT OF ISSUES FOR REVIEW

1.    The District Court appropriately held that no genuine dispute of material fact existed in light of the Willeys failure to present evidence that there was an official policy regarding the use of preferred names or pronouns or "concealment" of a student's choice from parents during the 2021-22 school year, and that no such use or concealment occurred during the 2022-23 school year when an official policy did exist. Therefore, the Willeys cannot demonstrate their fundamental constitutional rights have been violated.

2.    The District Court correctly determined that the 2022-23 and 2023-24 PNCPs were content neutral rules of general applicability such that Ms. Willey failed to establish an infringement on her fundamental Constitutional rights as a teacher[1].

---

[1] The Willeys propose a third issue for review that is functionally identical to their first proposed issue. The District believes only two issues are properly before the Court.

## STATEMENT OF THE CASE

### I.      Factual Background:

Appellant Ashley Willey is a mother to student, A.S. (the "Student"), who attended Black Butte High School within the District for the 2021-22 and 2022-23 school years. (FAC ¶ 12; App. Vol. I at 0152.)   During the 2021-22 school year, the District had no policy or procedure – official or unofficial – that governed the use of a student's chosen name or pronoun by District staff. (App. Vol. 3 at 457, 464-65, 564, 596, fn.16.)  During the 2021-22 school year, the Student requested of at least two District teachers, Chelsea Lund and Jennifer Copeland, that she be referred to by an alternate nickname. (App. Vol. 3, 0455, 0464) (each testifying that the reason they called the Student by the chosen nickname was because she asked them to.) Another teacher, Clif Clifton, testified that he used the alternate nickname when referring to the Student because he "heard and saw other students doing it." (App. Vol. 3 at 0461) It is unclear whether any District staff ever referred to the Student by alternate pronouns, though the District concedes it is possible they did so. Regardless, any such references to the Student during the 2021-22 school year, whether through nicknames or pronouns, were done without the District's knowledge and were not pursuant to any District policy or procedure.

On or about March 29, 2022, Ms. Willey attended a district-wide training where she communicated with District teachers Jennifer Copeland and Chris Clifton.

(FAC ¶¶ 31-35; App. Vol. I, 0155). Neither Ms. Copeland nor Mr. Clifton have a specific recollection of the conversation, but they have no reason to dispute it transpired much as Ms. Willey describes in her First Amended Complaint. The allegations are that at the training Ms. Willey asked the teachers if they knew her daughter. *Id.* Upon showing them a picture of the Student, the teachers responded that they knew her by an alternate name starting with "C." *Id.* Thus, no dispute exists that the first time Ms. Willey inquired whether teachers so much as knew her daughter, the teachers volunteered the information that they knew her by an alternate name. No evidence exists that at any point Ms. Willey was lied to or information regarding the Student's use of alternate names at school was concealed. Ms. Willey's "discovery" of this information was by no means inadvertent. By her own admission, the information was provided to her directly and voluntarily.

On the evening of March 29, 2022, Ms. Willey sent an email to several of the Student's teachers and school administrators demanding that they cease using alternate names and/or pronouns when referring to the Student. (App. Vol. I, 0197) No evidence exists that the District had knowledge of any of its staff using alternate names or pronouns when referring to the Student after March 29, 2022.

During the 2022-23 school year, the Student reached out to her former Junior High teacher, Ben Audevart, through email. Mr. Audevart would not have been made aware of Ms. Willey's March 29, 2022 email as he did not teach at Black Butte

High School at that time. Mr. Audevart's correspondence with the Student, at least arguably, violated District Policy Manual Code GBH, Section G which provides that "staff members shall not exceed their level of training or expertise by attempting to counsel, assess, diagnose, or treat a student's personal problem relating to sexual behavior, substance abuse, mental or physical health and/or family relationships but, instead, shall refer the student to the appropriate professional or agency for assistance." (App. Vol. III, 0507-10)  Mr. Audevart's communications and potential violation of District policy were unknown to the District until the emails came to light during discovery in the underlying matter.

On August 15, 2022, the District's Special Services Department adopted the SCSD#1 Special Services Non-Negotiables which is a document setting forth the department's expectations of its staff for the upcoming school year. (App. Vol. II, 0366-69)  The 2022-23 Non-Negotiables contained a Preferred/Chosen Names Procedure (the "2022-23 PNCP").  The 2022-23 PNCP required staff to honor all student requests to be referred to by alternate names or pronouns. Ms. Willey expressed to Assistant Superintendent and Human Resources Director, Nicole Bolton, that she disagreed with the procedure in general terms. (App. Vol. II, 0399.) Ms. Bolton advised Ms. Willey to speak to her direct supervisor, Kris Cundall. *Id.* Ms. Cundall informed Ms. Willey that if she were faced with a situation where a student requested she use an alternate name or pronoun that she could "tell the

student that [she] needed to go by what was in Powerschool." *Id.* The name used in Powerschool matches the name on the student's birth certificate. Thus, when Ms. Willey expressed general disagreement with the PNCP she was offered an alternative course of action that would not conflict with her religious beliefs. No evidence exists that Ms. Willey ever requested the District grant a specific accommodation for her religious beliefs or was faced with a situation where those beliefs were potentially in conflict with the PNCP during the 2022-23 school year.

On August 14, 2023, the District's Special Services Department adopted a revised version of the SCSD#1 Special Services Non-Negotiables to further clarify several requirements including those of the 2023-24 PNCP. (App. Vol. II, 0374-78). The 2023-24 Non-Negotiables contained a revised version of the PNCP that expressly stated that parents were to be informed of a student's decision regarding chosen names and/or pronouns upon request. *Id.* The 2023-24 Procedure expressly provided for reasonable accommodation for any personnel who could not follow the Procedure for any reason. *Id.* Ms. Willey never requested religious accommodation under the 2023-24 PNCP.

Ms. Willey never used a student's alternate name or pronoun during her employment for the District. (App. Vol. II, 0358, 0361-63). Ms. Willey has never been subject to any form of discipline by the District for failing to use a student's preferred name or pronouns. *Id.*

5

In summary, no evidence exists that the Student was ever referred to by alternate names or pronouns pursuant to any District policy or procedure. No evidence exists that the Student's use of alternate names or pronouns was ever withheld or concealed from the Willeys. The only evidence in the record is that the first time Ms. Willey so much as asked if teachers at the high school knew the Student, they volunteered the information regarding her choice of name. No evidence exists that, with the District's knowledge, any District staff referred to the Student by an alternate name or pronoun after Ms. Willey's March 29, 2022 request not to do so. The only evidence of such a reference comes from an email exchange between the Student and her former junior high teacher that the Willeys concede violated District policy.

Further, no evidence exists that Ms. Willey was ever required to use alternate names or pronouns for any student, that she was disciplined for not doing so, or ever requested a specific religious accommodation for her beliefs when or if the situation arose. The only evidence in the record is that when Ms. Willey expressed disagreement with the PNCPs, her direct supervisor provided her with an alternative course of action that comports with her alleged religious beliefs. Based on those undisputed facts, the District cannot have infringed upon Ms. Willey's religious freedom.

## II.   Procedural Background:

The Willeys filed the underlying action on April 20, 2023, alleging violations of their constitutional rights under 42 U.S.C. § 1983. (App. Vol. I, 0020). The following day the Willeys moved for a preliminary injunction blocking the District from implementing the 2022-23 PNCP among other items. The District Court partially granted the Willeys' request for a preliminary injunction to the extent the District, in the absence of reasonable concern of physical harm or abuse, required its staff to either not respond or lie to a parent's inquiry regarding their child. The District, having never imposed such a requirement, was unaffected by the injunction.

On June 29, 2023, the District filed a motion to dismiss Plaintiff's Complaint. Contrary to the Willeys' statement of procedural history in their Opening Brief, the District Court never ruled on the substance of the District's motion to dismiss. *See* Opening Brief, pp. 16-17.  Rather than respond to the District's Motion, the Willeys filed their First Amended Complaint ("FAC") on July 20, 2023.  The District Court then denied the District's first motion to dismiss as moot.

The District filed a second motion to dismiss the FAC on August 17, 2023. The District Court granted the motion, in part, on December 18, 2023.  Following the Court's Order, the Willeys were not permitted to proceed with any claims for declaratory and injunctive relief with respect to their claims based on infringement of their parental rights (Claims One and Two) but could only seek nominal and

7

compensatory relief.  The Court dismissed the Willeys' fourth claim for relief in its entirety.  Ms. Willey's third claim for relief for an alleged violation of Ms. Willey's free exercise right as a teacher in the District was allowed to go forward.

Following extensive discovery, the District moved for summary judgment on March 24, 2025. (App. Vol. II, 0332-0352) The District Court entered its Order Granting Defendants' Summary Judgment Motion on April 28, 2025. (App. Vol. III, 0567-0604)  The District Court repeatedly held that the Willeys failed to support their assertions with evidence sufficient to establish a genuine dispute of material fact, including:

- No evidence established that the Student's communications with Ben Audevart were made pursuant to any policy or direction by the School District or administration. (App. Vol. III, 0569).

- Ms. Willey's dispute of material facts misrepresented the record. In particular, Ms. Willey's denial of the Defendants' claim that "she never used a student's alternate name or pronoun" was directly contradicted by her own deposition testimony. (App. Vol. III, 0570, fn. 2)

- The Willeys failed to set forth any facts in support of their claim that an informal policy regarding the use of alternate names and/or pronouns existed during the 2021-22 school year. (App. Vol. III, 0576, 0596, fn. 16)

- The Willeys failed to set forth sufficient facts to demonstrate that during the 2022-23 school year, concealment of any student's use of alternate names or pronouns was so widespread as to constitute a custom. (App. Vol. III, 0577)

- No evidence was before the Court that the Willeys, or any other parent, was lied to by any District employee about his or her student's use of an alternate name or pronoun, or that such use was ever concealed. (App. Vol. III, 0577, fn. 7)

- No dispute exists that when Ms. Willey inquired regarding the Student she was informed of the Student's use of an alternate name and/or pronouns. (App. Vol. III, 0588)

- The Willeys produced no evidence that the District provided any kind of medical or social transitioning to the Student. (App. Vol. III, 0590) Indeed, they produced no facts demonstrating that District staff even encouraged or suggested the Student engage in such behaviors. *Id.*

- The Willeys failed to set forth facts showing that their sincerely held religious beliefs were burdened by the District's actions. (App. Vol. III, 0593)

- Ms. Willey failed to present any facts to support a claim that exercising her religious beliefs was a substantial or motivating factor behind co-

teaching requirements and not being hired for other positions within the District. (App. Vol. III, 0599, fn. 18)

The District Court appropriately held that no genuine disputes of material fact existed to prevent entry of summary judgment. The Willeys simply failed to present evidence in support of their claims.

## SUMMARY OF THE ARGUMENT

Fundamentally, the Willeys sought relief from actions the District did not undertake, from policies that never existed, to support religious expression that was never infringed. The District Court correctly held that the Willeys failed to present any evidence that anyone was lied to by any District employee about his or her student's use of an alternate name or pronoun, or that such use was ever concealed. Similarly, the District Court held that Willeys failed to present evidence that during the 2021-22 school year there was an official District policy governing such conduct, which was the only period in which the Student may have been referred to by alternate names and/or pronouns by District staff.

Nevertheless, the Willeys expend considerable verbiage in their Opening Brief arguing about an alleged 2021 Policy they claim consisted of a Preferred Names Policy and Parent Concealment Policy. *Opening Brief, Glossary,* p. vii. The Willeys fail to present any evidence of the existence of such a "policy." They simply refer to the unsupported allegations of the FAC as if their own evidence-free claims

10

should be treated as facts. However, it is well-settled that mere allegations unsupported by further evidence are insufficient to survive a motion for summary judgment. *Snyder v. Beam Techs., Inc.*, 147 F.4th 1246, 1253 (10th Cir. 2025) (citing *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Est. of Hurtado by & through Hurtado v. Smith*, 119 F.4th 1233, 1236 (10th Cir. 2024) (quoting *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006)). The District Court properly granted summary judgment because the Willeys failed to produce any evidence to support their claims.

In fact, the District Court held that the Willeys actively misstated Ms. Willey's own deposition testimony. (App. Vol. III, 0570, fn. 2.) Ms. Willey denied the District's stated undisputed material fact that she had never used a student's alternate name or pronoun. However, Ms. Willey's own deposition testimony unequivocally established that fact and she offered no factual or legal basis for denying the content of her own testimony. The undisputed material facts are that Ms. Willey never used alternate names or pronouns for any student, was never disciplined in any fashion for not doing so, never requested a specific accommodation for her religious beliefs, and was provided a reasonable alternative that comported with her beliefs. Based on those undisputed facts it is impossible to establish an infringement on her religious freedom.

11

The Willeys' failures to support their claims with facts sufficient to establish a *prima facie* case of constitutional infringement is dispositive of the legal aspects of their claims. Although no legal basis exists to impose an affirmative duty on the District to have reported every aspect of the Student's personal decisions to the Willeys, even if this Court were to hold such a duty exists it could not legally salvage the Willeys' claims. No District staff lied or concealed information from the Willeys. Nor was there a District "policy of concealment" as the Willeys argue. The lack of evidence of a District policy or procedure forecloses the possibility of finding the Willeys claims arise "under the color of state law" as is required to prove a Section 1983 claim. Similarly, even if this Court were to find that either the 2022-23 or 2023-24 PNCPs violated some aspect of the law, the fact that Ms. Willey never sought a religious accommodation for a situation she admits never occurred is dispositive of her claims.

It is not the role of this Court, or any American court, to issue advisory opinions regarding school district policies or procedures. The role of this Court is to determine whether the District Court properly granted summary judgment as to the Willeys' claims against the District. The Willeys cannot establish that genuine disputes of material fact existed when, as the District Court repeatedly held, they failed to produce any evidence in support of their alleged "facts." Therefore, the

District Court's *Order Granting Defendants' Summary Judgment Motion* should be affirmed.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56. The moving party must initially demonstrate the absence of evidence supporting the nonmovant's case. If the movant does not bear the burden of persuasion at trial, they may meet this burden by pointing out the lack of evidence for an essential element of the nonmovant's claim. *Oaster v. Robertson,* 173 F. Supp. 3d 1150, 1167 (D. Colo. 2016). Once the movant satisfies this burden, the nonmovant must go beyond the allegations in their pleadings and provide admissible evidence showing a genuine issue for trial. *Id.*

The Supreme Court in *Celotex Corp. v. Catrett* held that summary judgment is mandated against a party who fails to make a sufficient showing to establish the existence of an essential element of their case on which they bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Similarly, the Tenth Circuit in *Adler v. Wal-Mart Stores, Inc*. emphasized that the nonmovant must set forth specific facts demonstrating a genuine issue of material fact, rather than relying on general arguments or unsupported assertions. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) ("If a

party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial.") (citing *Celotex,* 477 U.S. at 322)

Courts in the Tenth Circuit have repeatedly affirmed that a plaintiff cannot avoid summary judgment by relying on conclusory opinions, speculation, or unsupported allegations. In *Ortiz v. New Mexico*, the court stated that a party cannot rest on ignorance of facts or mere hope that evidence will emerge at trial. Instead, genuine factual issues must exist that can reasonably be resolved in favor of either party. *Ortiz v. New Mexico*, 550 F. Supp. 3d 1020, 1074 (D.N.M. 2021). In *Abila v. Funk,* the court held that unsupported allegations or speculation are insufficient to defeat summary judgment. *Abila v. Funk*, 220 F. Supp. 3d 1121, 1158 (D.N.M. 2016) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

To be a "genuine" factual dispute, there must be more than a mere scintilla of evidence. To avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993) (citing *Anderson*, 477 U.S. at 248.) Summary judgment may be granted if the evidence is merely colorable or is not significantly probative. *Id.*

14

## ARGUMENT

All of the Willeys claims arise under 42 U.S.C. § 1983. To recover under Section 1983, a plaintiff must establish two essential elements: (1) that he or she was deprived of a right secured by the Constitution or federal law; and (2) that the deprivation occurred under the color of state law. *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 49 (1999). *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). The state action element in Section 1983 "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs.*, 526 U.S. at 50. When addressing whether a private party acted under color of law, the court, "starts with the presumption that private conduct does not constitute governmental action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999).

**I.     The Willeys Failed to Establish Factual or Legal Support of Their First and Second Claims for Relief. Therefore, Summary Judgment Was Warranted.**

In their first and second claims for relief, the Willeys alleged claims under Section 1983 for: (1) violation of their fundamental parental right to direct the upbringing of their children; and (2) violation of their free exercise rights as parents. The Willeys failed, and continue to fail, to present evidence sufficient to demonstrate their constitutional rights were violated at all, much less under the color of state law. The cases cited by the Willeys are distinguishable from the scant facts related to the present action. Therefore, summary judgment should be affirmed.

15

> i. *The Willeys Cannot Establish Their Constitutional Rights Were Violated Under the Color of State Law.*

The right of parents to direct the upbringing of their children is well established and arises under the Due Process Clause of the Fourteenth Amendment. *See, e.g., Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Wisconsin v. Yoder*, 406 U.S. 205, 232–233, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Santosky v. Kramer*, 455 U.S. 745, 753–754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this right is "neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005).

No legal precedent holds that parents are entitled to preemptive notice of a high-school aged student's preferred name or pronouns. In fact, multiple courts have held that such issues of public education are committed to the control of state and local authorities. *See, e.g. Foote v. Ludlow Sch. Comm.,* 128 F.4th 336, 352 (1st Cir. 2025); *see also Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232 (11th Cir. 2025). In both *Foote* and *Littlejohn* school authorities adopted express policies to conceal a student's decision to transition gender from their parents despite direct requests from parents not to do so. Both *Foote* and *Littlejohn* remain good law and are persuasive precedent to be considered by this Court.

16

However, both *Foote* and *Littlejohn* are distinguishable from the facts of the present action. First and foremost because there is not and never has been a District policy directing staff to lie to parents, conceal information from parents, or otherwise withhold information from parents.

In their Opening Brief, the Willeys make more than fifteen references to "concealment" or the "Parent Concealment Policy." In particular, the Willeys argue that an "unwritten" policy of parental concealment existed in the 2021-22 school year because that is the only year they can establish that the Student was referred to by an alternate name by a handful of teachers. *See Opening Brief,* p. vii (defining the "2021 Policy" as an unwritten "Preferred Names Policy and Parent Concealment Policy").

The Willeys include three full pages of their Statement of the Case describing the alleged "secret transitioning under the 2021 Policy." *Id.* pp. 4-7. As a preliminary matter, no reason exists to believe that a student using an alternate nickname at school is somehow evidence of a practice or policy of "secret transitioning." Some students just don't like their names. Regardless, every reference the Willeys make to purported "facts" establishing the existence of such a policy are references to the FAC – their own First Amended Complaint. Many of the unsubstantiated and unsupported allegations of the FAC are based on unverified hearsay statements the Student allegedly made to the Willeys that could never be admissible as evidence.

17

Others are little more than speculation regarding the District's supposed intent or plan in enacting a 2021 Policy that never existed. Such unsubstantiated allegations carry no probative weight in summary judgment proceedings. *Hurtado*, 119 F.4th at 1236.

The undisputed facts in the record are that three teachers recall referring to the Student by an alternate name during the 2021-22 school year: (1) Chelsea Lund; (2) Jennifer Copeland; and (3) Chris Clifton.  Both Ms. Lund and Ms. Copeland testified that they used the alternate name because the Student asked them to. (App. Vol. 3, 0455, 0464.)  Mr. Clifton testified that he used the alternate name because he "heard and saw other students doing it." (App. Vol. III at 0461.)  Mr. Clifton never had a one-on-one conversation with the Student and did not have her as a student in any of his classes. (App. Vol. III, at 0460, 0462.)  When asked, all three teachers testified that there was no policy or procedure in place that required them to use alternate names or pronouns during the 2021-22 school year. (App. Vol. III, 0564, 0465, 0462.)

In its Motion for Summary Judgment, the District set forth the undisputed fact that prior to August 15, 2022, the District did not have any policies or procedures that governed the use of students' chosen names or pronouns. (App. Vol. II, 0336, ¶ 9)  The Willeys disputed that fact by citing the depositions of Chelsea Lund, Chris Clifton, Jennifer Copeland, and Derek Allison, as well as Ms. Willey's own

Declaration. (App. Vol. III, 0430, ¶ 9.)  The testimony of the named teachers is summarized above and does not support the Willeys' alleged dispute of fact.  Teacher Derek Allison testified only regarding his understanding of the 2022-23 PNCP which he stated "does not require me to withhold [information regarding pronouns] from parents." (App. Vol. III, 468.)  Ms. Willey's Declaration makes no reference to any time prior to August 15, 2022, which would have been after the 2021-22 school year. Thus, the District Court correctly determined that on the record before it the Willeys failed to present evidence of a 2021 Policy and failed to present evidence that any parent had ever been lied to or had information regarding their student's use of alternate names or pronouns concealed from them, i.e. there was no 2021 Policy.

The Willeys argue for the first time on appeal that Kelly McGovern, Nicole Bolton, and Principal Bryant Blake explicitly confirmed the existence of a 2021 Policy. That argument was not raised with the District Court and is not supported in the Opening Brief by anything other than references to the allegations of the FAC. Such unsupported, conclusory allegations will not suffice to establish an issue of fact. *McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1398 (10th Cir. 1987) (citing *R–G Denver, Ltd. v. First City Holdings of Colorado, Inc.*, 789 F.2d 1469, 1471 (10th Cir.1986)).  The Court need not "comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  To survive summary judgment, a party may

19

not rest on the allegations of their complaint but must set forth specific facts showing there is a genuine issue for trial. *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S. Ct. 1575, 1592, 20 L. Ed. 2d 569 (1968).  When responding to the District's Motion for Summary Judgment, the Willeys failed to present any facts – general or specific – sufficient to create a genuine dispute of material fact.

The only evidence in the record of a supposed 2021 Policy are the statements of the three teachers set forth above wherein they explained the reason for referring to the Student by alternate names as essentially being common courtesy and denied there existed any official policy or custom requiring the use of names or pronouns. That testimony on its own is sufficient to establish the absence of a dispute of material fact regarding the alleged 2021-22 Policy.  It simply did not exist.  Yet the Court need not rely solely on the teachers' testimony when the Willeys own allegations prove no such Policy existed.

Although the Willeys' unsupported allegations are insufficient to establish a genuine dispute of facts sufficient to avoid summary judgment, where the defendant does not challenge the allegations they can establish the absence of a dispute.  *Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc*., 847 F.2d 186, 195 (5th Cir. 1988). In the FAC, the Willeys allege that Ms. Willey attended a March 29, 2022 district-wide training where she spoke with two teachers she subsequently identified as Jennifer Copeland and Chris Clifton.  When asked whether the teachers knew Ms.

20

Willey's daughter, Ms. Copeland recognized the name and stated that "She's a sweet girl." (App. Vol. I, 0155, ¶ 32.)  Mr. Clifton, who did not have the Student in any of his classes, inquired as to whether the Student had a last name beginning with "B." *Id.* ¶ 33. Ms. Willey then showed the teachers a picture of the Student and they confirmed that she used an alternate name starting with a "C" at school. *Id.* ¶ 34.

The undisputed facts are that when asked about the Student's identity, both Ms. Copeland and Mr. Clifton volunteered the information regarding the Student's chosen name. As they are two of the only three persons the Willeys have identified as having ever used an alternate name for the Student, the fact that they made no effort to lie to Ms. Willey or otherwise conceal the Student's use of a chosen name is definitive proof that no unwritten policy of concealment existed during the 2021-22 school year.  Through the teachers' testimony and actions the District has demonstrated that no such policy existed.

As the District Court held in granting summary judgment, an informal custom only constitutes "official policy" to create municipal liability if it "amount[s] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010).  Not only have the Willeys failed to produce any evidence of the supposed "2021 Policy" but the actual evidence also demonstrates that the meager handful of

teachers who ever used an alternate name for the Student did so for personal reasons, deny an official policy existed, and volunteered information to Ms. Willey the first time the issue was ever raised.   The Willeys failure to produce any evidence of the alleged 2021 Policy requires summary judgment be affirmed in favor of the District. *Celotex*, 477 U.S. at 322)

With respect to the 2022-23 PNCP, the Willeys failed to produce evidence that any District staff referred to the Student by alternate names and/or pronouns pursuant to the PNCP.   The Willeys' sole allegation arising during 2022-23 is that the Student's former Junior High teacher, Ben Audevart, communicated with the Student by email in a manner that violated District Policy Code GBH, Section G – Staff and Student Relations. *Opening Brief,* pp. 15-16.   Based on the Willeys' argument that Mr. Audevart's communications with the Student were *against* District Policy, it is impossible to attribute those communications to the District or the individual Defendant/Appellees.  *See Nick's Garage, Inc. v. Progressive Cas. Ins.,* 875 F.3d 107, 115-16 (2d Cir.2017) (a party can satisfy the showing required by Rule 56(a) by pointing to the plaintiff's admission.)  The undisputed fact is that the District has an express written Policy that bars the communications the Willeys find objectionable.  The Willeys have no evidence (nor is there any) that the District knew of Mr. Audevart's communications with the Student.  Those communications cannot

22

be found to have occurred under the color of state law when they were expressly in violation of District Policy.

It is further undisputed that the Student left the District following the 2022-23 school year. The District cannot have interfered with any constitutional right of the Willeys in relation to the Student after she ceased attending school in the District. Therefore, the Willeys cannot demonstrate that any infringement of their rights occurred under color of state law.

ii.   *The Willeys Failed to Establish an Infringement on Their Right of Free Exercise of Religion*

The Willeys' second claim for relief necessarily fails for the same reasons as their first. In the absence of evidence that their rights were infringed under the color of state law their Section 1983 claim cannot stand. To survive summary judgment the Willeys bear the initial burden of "showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton,* 597 U.S. 507, 525 (2022). There never was a 2021 Policy. The 2022-23 PNCP was both neutral and generally applicable, but more specifically the Willeys cannot show that it burdened their sincere religious practice. What possible burden could have existed from the 2022-23 PNCP when the Willeys cannot demonstrate that anyone ever applied it to the Student? In the absence of evidence that anyone ever utilized the 2022-23 PNCP to

23

refer to the Student by an alternate name or pronoun, all issues concerning all other elements of the claim and any defenses become immaterial.") *Adler*, 144 F.3d 670.

## II. Even if the Willeys Had Established Facts in Support of Their First and Second Claims, Those Claims Fail as a Matter of Law.

The Willeys Opening Brief relies almost exclusively on a paraphrasing of the Supreme Court's recent decision in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). *Mahmoud* is distinguishable both factually and legally from the present appeal and does not impact the analysis of the District Court's order granting summary judgment. Other than the fact both *Mahmoud* and the present action involve schools they could not be more dissimilar.

### i. The Mahmoud Decision is Factually Distinguishable From the Facts Underlying the Present Appeal

In *Mahmoud* the Montgomery County school board chose to introduce LGBTQ+ storybooks into the curriculum. Thus, the Board took affirmative actions to teach students and alter minds. *Id.* at 2342. In the present action, the District took no curricular steps whatsoever and performed no affirmative acts to educate or inform students in relation to the PNCP. During the 2021-22 school year the Willeys allege the District did literally nothing as the basis for their claim is the District's inaction in allegedly failing to notify them of the Student's use of an alternate name. During the 2022-23 school year the District adopted a PNCP which required District staff not actively oppose a student's own personal choice of name. Those are not

actions directed toward students or otherwise capable of altering impressionable young minds.

The Montgomery County Board adopted "Guidelines for Respecting Religious Diversity" that claimed a commitment to "reasonable accommodations for the religious beliefs and practices of its students. *Id.* at 2343. Here, the 2022-23 PNCP is not a religious procedure in any fashion.

In *Mahmoud,* the Board was found liable for "abject refusal to heed widespread and impassioned pleas for accommodation." *Id.* The Board made an active decision to adopt books into the curriculum that they felt better reflected the families in its community. *Id.* They specifically chose the books based on questions such as "Is heteronormativity reinforced or disrupted?" *Id.* Thus, the books at issue in *Mahmoud* were expressly chosen to disrupt heteronormative beliefs. *Id.* The Board specifically informed staff of its "expectation that teachers use the LGBTQ-Inclusive Books as part of instruction" and contemplated that the instruction would involve classroom discussion. *Id.* at 2345. In short, the Montgomery Board had a specific educational agenda to present ideas to students that ran counter to the religious beliefs of many families that it served.

In the present appeal, the District had no agenda and made no effort to change young minds. Quite the opposite. In 2021-22, the District had no procedure at all.

In 2022-23, the District's procedure through the PNCP[2] was to honor whatever choice the student made for themselves – a choice presumably made in conjunction with their family. The District had no expectation that its students would follow the procedure which only governed staff conduct. The District did not even inform students of the procedure. No student would be aware of the procedure at any point and no student would be impacted by the procedure unless they opted in by requesting to be referred to by an alternate name or pronoun.

In *Mahmoud*, shortly after launching the new curriculum, school teachers and staff were contacted by parents who expressed concerns with the content. *Id.* at 2345. In the present action, no evidence exists that any parent whose student was impacted by the 2022-23 PNCP ever contacted the District[3]. The Montgomery Board in *Mahmoud* initially agreed to contact parents when the LGBTQ+ inclusive books would be taught and allowed students to be excused from instruction involving the

---

[2] The Student did not attend school in the 2023-24 school year. Therefore, the 2023-24 PNCP could not be a basis for finding an infringement of the Willeys constitutional rights in reference to their first and second claims and is not discussed in this section. The 2023-24 PNCP does relate to Ms. Willey's claim of religious infringement related to employment and will be addressed below.

[3] The Willeys will undoubtedly argue that parents expressed concerns regarding the 2022-23 PNCP at a September 12, 2022 Board of Trustees meeting. As clarified above, no evidence exists that the Student was referred to by alternate names or pronouns pursuant to the PNCP. No evidence exists that any of the persons who raised concerns at the September 12, 2022 meeting had students affected by the PNCP or that they were parents of students at all.

books. *Id.* at 2346.  The District had no need to notify parents or excuse students from the PNCP because students were not aware of the PNCP's existence and it had no instructive purpose.  It was solely an internal guideline for how teachers and staff would conduct themselves.

The Montgomery Board rescinded parents' ability to opt their students out of the LBGTQ+ instruction and issued a statement declaring that "[s]tudents and families may not opt out of engaging" with the books in the curriculum. *Id.* at 2346. Again, in the present action no evidence exists that any student was ever referred to by alternate names or pronouns under the PNCP in a manner that was against theirs or their parents' wishes. No evidence exists that any parent requested their student be opted out of the PNCP, likely because it only applied to staff conduct and could never impact a student who did not expressly request to be referred to by an alternate name or pronoun.  The PNCP was always an exclusively "opt in" procedure.

In *Mahmoud,* more than 1,000 parents signed a petition requesting the opt out rights be restored, i.e. they requested a reasonable accommodation of their religious beliefs. *Mahmoud,* 145 S.Ct. at 2346.  As noted above, no District student or parent ever requested an accommodation directly in relation to the PNCP.  However, it is undisputed that on March 29, 2022, Ms. Willey sent an email to a handful of the Student's teachers requesting/demanding they refrain from referring to the Student by alternate names or pronouns.  The Willeys have produced no evidence that anyone

other than Ben Audevart, who did so in violation of District Policy, ever used alternate names or pronouns in relation to the Student after March 29, 2022. Thus, a distinct difference exists between the actions of the Board in *Mahmoud* and those of the District in the present action. The District has never refused a request for a reasonable accommodation of any student or parent's religious beliefs.

Notably, despite refusing to allow opt outs from its LBGTQ+ curriculum, the Montgomery Board continued to permit children to opt out of other activities. *Id.* at 2347. The *Mahmoud* Court held that "[t]his robust "system of exceptions" undermines the Board's contention that the provision of opt outs to religious parents would be infeasible or unworkable. *Id.* at 2362. The *Mahmoud* Court held only that the Montgomery Board needed to provide an opportunity for parents to opt out of the LGBTQ+ curriculum. *Id.* at 2363. The Court did not hold that the curriculum itself established a constitutional violation. In fact, the Court expressly stated that "[w]e express no view on the educational value of the Board's proposed curriculum, other than to state that it places an unconstitutional burden on the parents' religious exercise if it is imposed with no opportunity for opt outs. Providing such an opportunity would give the parents no substantive control over the curriculum itself." *Id.*

The *Mahmoud* decision does not require Montgomery schools to change their curriculum. It does not allow parents to alter the curriculum. The constitutional

violation found in *Mahmoud* wasn't the use of LGBTQ+ books.  Nor was the Montgomery Board found to be at fault for failing to affirmatively speculate as to parents' religious convictions and preemptively notify them of potential concerns. The *Mahmoud* Court did not take issue with the fact that the Montgomery Board initiated the curriculum without first allowing parents control over the curriculum. The constitutional violation occurred only *after* parents made "widespread and impassioned pleas" for opt outs and were refused while the school system already had a robust system of opt outs from other curricula in place.

By refusing to allow opt outs of only this specific curriculum, the Montgomery Board expressly singled out the religious objections of parents to their students' inclusion in the LBGTQ+ curriculum for denial. The evidence showed that the Board chose the books in question to "disrupt" heteronormativity and the "power hierarchies that uphold the dominant culture." *Id.* at 2343.  When parents objected that doing so would conflict with their religious convictions, the Montgomery Board terminated the option to opt out of the curriculum, and only that curriculum. The express purpose of the curriculum at that juncture was indoctrination. The facts of *Mahmoud* addressed a specific, acute objection to religious practice and teachings that created a "substantial burden" on the parents' religious rights that was subject to strict scrutiny.  The Montgomery Board directly placed its own moral code in direct conflict with the religious beliefs of the families it served.

By contrast, the 2022-23 PNCP is a decidedly secular document that is not specific to gender or pronouns.  It is a content neutral, wholly internal document that requires staff to respect student's choice of names. That would be true whether that be a boy named John asking to be called Jack, or a girl named Samantha asking to be called Jack. In the former circumstance the PNCP does not implicate gender or religion in any fashion. However, if the District were to allow the former without question but require the teacher to immediately call Samantha's parents the only reason for doing so would be Samantha's biological sex.  The District would be treating Samantha differently for no reason other than that she was born female.  That is the literal definition of discrimination under the controlling law at that time.  Adopting the PNCP was not only legally permitted, it was also legally required.

### ii.     *The 2022-23 PNCP Was Adopted Based on Controlling Law.*

In 2020, the United States Supreme Court decided in *Bostock v. Clayton Cnty., Georgia*, 207 L. Ed. 2d 218, 140 S. Ct. 1731, 1740 (2020) that discrimination based on sexual preference or gender identity is discrimination "because of sex" that violates Title VII. Id. 1741-42. The *Bostock* Court stated, "it is impossible to discriminate against a person for being ... transgender without discriminating against that individual based on sex." *Id.* at 1741. The *Bostock* Court did not limit its holding to Title VII, or the employment context, or otherwise. "Impossible" applies to all situations and scenarios. For example, continuously misgendering a transgendered

teacher, in addition to threats and name calling, constituted harassment based on sex. *See Eller v. Prince George's Cnty. Pub. Sch*., 580 F. Supp. 3d 154 (D. Md. 2022).

Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §1681 *et seq.* prohibits discrimination on the basis of sex in educational settings. In June 2021, the United States Department of Education published its interpretation applying the *Bostock* decision to Title IX. See 86 Fed. Reg. at 32,637. That interpretation is consistent with Supreme Court precedent. *See, e.g., Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617, 119 S. Ct. 2176, 2195, 144 L. Ed. 2d 540 (1999) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX of the Education Amendments of 1972.")

Additionally, the then-President of the United States issued Executive Orders 13988 "*Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation*" and 14021 "*Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity*[4]" expressly forbidding discrimination based on gender identity or sexual orientation. Executive Orders are to be "accorded the force and effect given to a

---

[4] The District is aware that the referenced executive orders have since been rescinded. However, they were controlling at all times relevant and the District was no more free to ignore their mandates than they are to ignore those that have replaced them.

31

statute enacted by Congress." *Farkas v. Texas Instrument, Inc*., 375 F.2d 629, 632 (5th Cir. 1967).

Article I, § 3 of the Wyoming Constitution prohibits discrimination based on "any circumstance or condition whatsoever other than individual competency, or unworthiness duly ascertained by a court of competent jurisdiction. The Wyoming Constitution goes even further than the United States Constitution in prohibiting discrimination in any form: "Considering the state constitution's particular call for equal protection, the call to recognize basic rights, and notion that these particular protections are merely illustrative, the Wyoming Constitution is construed to protect people against legal discrimination more robustly than does the federal constitution." *In re Neely*, 2017 WY 25, ¶ 48, 390 P.3d 728, 744 (Wyo. 2017) (citing *Johnson v. State Hearing Examiner's Office*, 838 P.2d 158, 165 (Wyo. 1992)).

It is against this legal backdrop that the District adopted the 2022-23 PNCP. Under any level of legal scrutiny, the District's mandatory compliance with state and federal law is a substantial and significant reason for taking the actions it did.  In fact, the *Bostock* and *Olmstead* cases cited herein are still binding precedent even following the Supreme Court's decision in *Mahmoud.*

       *iii.    The Mahmoud Decision Does Not Alter Determination of the Willeys' Claims.*

When granting summary judgment, the District Court referenced the persuasive precedent of *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025) and *Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232 (11th Cir. 2025). The District Court's decision did not rely on either *Foote* or *Littlejohn*, though both are instructive. In *Foote*, the court determined that the state cannot <u>prevent</u> parents from choosing a specific educational program. *Id.* (emphasis in original) (citing *Parker v. Hurley*, 514 F.3d 87, 101 (1st Cir. 2008) (quoting *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533 (1st Cir. 1995)). It is likely that *Mahmoud* never references the *Foote* decision because they are not in conflict. The *Mahmoud* Court expressly held that its decision gave parents no substantive control over the curriculum itself. *Mahmoud,* 145 S.Ct. at 2363. *Mahmoud* does not alter long-standing precedent that parents do not have the right to direct the educational decisions of the school. *Foote,* 128 F.4th at 352; *see also Littlejohn,* 132 F.4th at 1245; *Swanson v. Guthrie Indep. Sch. Dist. No. 1-L*, 135 F.3d 694, 699 (10th Cir. 1998); *Bailey v. Virginia High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012).

The *Mahmoud* Court likened the directly adversarial, coercive conduct of the Montgomery Board to a state's program of compulsory education that undermined the beliefs of Amish students and their families. *Mahmoud*, 145 S. Ct. at 2361 (citing

*Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)).  The

defining characteristic of both *Mahmoud* and *Yoder* is compulsory educational

content that expressly and intentionally undermines religious belief.  That is entirely

separate from an internal procedure that governs only the conduct of teachers.

Contrary to the Willeys' arguments, the 2022-23 PNCP is on all fours with

*Bowen v. Roy*, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), and *Lyng v.*

*Northwest Indian Cemetery Protective Assn*., 485 U.S. 439, 108 S.Ct. 1319, 99

L.Ed.2d 534 (1988).  In *Bowen,* a father objected to the government's application of

a Social Security number to his child.  In *Lyng,* Native Americans objected to the

construction of a road on federal land. In both cases, the Supreme Court held that

the Free Exercise Clause does not require the government to conduct its own internal

affairs in ways that comport with the religious beliefs of particular citizens. The

decisions govern internal procedures, such as requiring staff to honor student

decisions about their use of names.

The *Mahmoud* Court held that those cases had no application because the facts

therein implicated "direct, coercive interactions between the State and its young

residents." *Mahmoud*, 145 S. Ct. at 2357.  The *Mahmoud* Court expressly referenced

the power of public schools to impose rules and standards on students and to

discipline them for misconduct. *Id.* The *Mahmoud* Court distinguished the holdings

of *Bowen* and *Lyng* which addressed the "internal affairs" of government entities

34

from its facts that concerned the direct and knowing educational training of students in opposition to their parents clearly identified religious convictions.  The 2022-23 PNCP was a directive for staff that is a "internal affair" as in *Bowen* and *Lyng* and not a curricular decision  as in *Mahmoud.*

There are no coercive interactions between the District and young minds that are either contemplated or possible under the PNCP.  Even a student who requested a teacher use his or her chosen name would never learn of the existence of the procedure. They would know only that the teacher honored their request.  There is no curricular or educational component of the PNCP.  It is strictly directed at staff conduct.

That exact distinction was recognized by the Sixth Circuit in *Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *6 (6th Cir. Aug. 26, 2025).  The *Doe* Court noted that under *Mahmoud*, as directed by that Court, the "substantial interference" inquiry is "fact-intensive" and depends on "the specific religious beliefs and practices asserted," "the specific nature of the educational requirement or curricular feature at issue[,]" including the age of the child, and "the specific context in which the instruction or materials ... are presented." *Id.* citing *Mahmoud,* at 2352.  The *Doe* Court held that a bathroom policy wherein a transgendered student, as well as any student who chose to use it, was permitted to use a gender-neutral bathroom while separate bathrooms for boys and

girls were maintained was "neither compulsory nor instructional." *Id.* at *7. Therefore, the substantial interference inquiry of *Mahmoud* was not met and rational basis scrutiny applied.

The Willeys argue that the District's actions substantially interfere with the religious development of the parents' children and therefore strict scrutiny, as applied in *Mahmoud* and *Yoder* applies. The Willeys ignore that there is no curricular aspect to the PNCP. As the District Court held, no evidence exists that the District encouraged or even suggested any student change their name, use alternate pronouns, or otherwise "socially transition." (App. Vol. III, 0590). It is impossible for the PNCP, which governs only the conduct of District staff, to ever have a compulsory or instructional element. Before the District employee could honor a student's request to use an alternate name, the student would have to have made a choice independently from any District procedure or policy. It is the Willeys' chosen course of action, i.e. refusing to honor the student's choice and immediately calling their parents, that would be coercive under those facts.

Further, in order to act as the Willeys argue it should the District could no longer remain neutral, but would have to adopt a particular religious viewpoint that certain students using nicknames, but not others, was cause to involve their parents. The District Court correctly held that doing so would turn the First Amendment on its head.

36

The Willeys object to the District Court's finding that some form of inquiry is required before the District can be deemed to have violated their constitutional rights. The District Court appropriately questioned how the District could withhold that which has not been requested? The law places no affirmative duty on schools or school districts to inform parents of every detail of their child's day.

In their Opening Brief, the Willeys fail to address the holdings of *Foote* and *Littlejohn* wherein courts held that schools have no duty to inform parents of their children's choices regarding gender identity and could lawfully withhold such information even if requested by the parent. The Willeys fail to cite a single case in the history of American jurisprudence that requires schools to assume an affirmative duty to inform parents of any decision a student makes that might possibly run counter to some unstated and unidentified religious beliefs. The Willeys rely exclusively upon the holding of *Mahmoud* for their contention that such an affirmative duty exists. Yet in *Mahmoud* the parents vociferously requested the ability to opt out of curriculum of which they were already very much aware and the school district refused. *Mahmoud* has no application to an internal District policy governing the conduct of teachers. The Willeys fail to cite any reasonable basis for triggering an alleged parental notification requirement beyond presumably requiring the District adopt and enforce their own personal value system. The law has no such requirement. Nor can it.

37

The unspoken subtext of the Willeys' arguments is that the District should automatically find certain students' use of names or pronouns objectionable, should recognize without being told that the request to use an alternate name is somehow in violation of parental religious beliefs of which the District could not be aware, and that students should effectively be punished for the request by being treated differently from their peers. There is no triggering mechanism for parental notification beyond the Willeys inchoate belief that the District should make assumptions in this circumstance. In the absence of a specific request, why should the District have assumed either: a) that the Willeys would be unaware of their daughter's use of alternate names or pronouns; or b) that the Student's use of alternate names at school violated the Willeys' sincerely held religious beliefs? Why should the District assume the Willeys have religious beliefs at all? [5]

It would unquestionably be a First Amendment violation for the District to preemptively inquire as to all parents' religious beliefs and proclivities at the start of every school year. *See Does 1-11 v. Bd. of Regents of Univ. of Colorado,* 100 F.4th 1251, 1268 (10th Cir. 2024) (holding that a government policy that requires an intrusive inquiry into the validity of religious beliefs violates the Establishment

---

[5] One expects that certain parents would, in fact, find a phone call from the school informing them their child asked to use alternate names and/or pronouns to be distinctly bigoted and violative of *their* personal and religious beliefs.

Clause regardless of any purported government interest.) The Willeys' arguments, if successful, place the District in an untenable position. The District cannot inquire into the nature and sincerity of persons' beliefs without violating the Establishment Clause yet must proactively ensure and enforce compliance with the religious beliefs of parents without knowledge of what those beliefs might be. The District Court properly held that imposing such a burden was unworkable. State entities cannot become the monitors and enforcers of privately held religious convictions.

If the District could be liable in the present appeal without having prior knowledge of the Willeys' belief system, the only way to avoid future liability would be to treat every parent in the district as if they shared the Willeys' beliefs. The result would necessarily require imposing the Willeys' religious convictions on everyone. That would be tantamount to establishing a state religion which the Constitution does not allow.

The Willeys are dismissive of the burden a parental notification requirement would create for the District, but the reality is that the District would have to treat every parent as a deeply religious followers of a particular set of beliefs in order to prevent future liability. That is the burden the District Court properly weighed when determining that some form of notice or inquiry is required before the District would be required to provide information to parents. The Willeys have produced no evidence that the District was aware, or should have been aware, of their personal

39

religious beliefs during the 2021-22 school year when three teachers used an alternate name to refer to the Student. Even if the District had been aware that the Student was being referred to by some people by an alternate name, it did not have notice of the Willeys' desire to be informed of that choice and cannot be liable as a matter of law. Nothing in *Mahmoud* establishes the Willeys' argued-for duty of preemptive parental notification.

The facts alleged by the Willeys, even if taken at face value,[6] do not satisfy the "fact-intensive" substantial interference inquiry envisioned by *Mahmoud*. *Id.* 145 S.Ct. at 1232. Without relation to any District procedure or policy, a few of the Student's teachers briefly honored her request to use an alternate name. That is a far cry from forcing every Amish child in the state of Wisconsin to attend public school or withdrawing an opt out policy from LBGTQ+ curriculum despite parents "widespread and impassioned" pleas to allow such opt outs. The Willeys cite no legal precedent, including *Mahmoud*, that requires schools to proactively inform parents of decisions students (not the school) make during the school day that might potentially conflict with those parents' unidentified religious beliefs. To find such a duty would be to make public schools the enforcers of religious values – something the First Amendment plainly does not allow.

---

[6] The District does not believe the Willeys allegations should be taken at face value, but makes this statement solely for the sake of argument.

The facts establish that there was no 2021 Policy and that the 2022-23 PNCP did not impact the Willeys or the Student.  However, should the Court find that a District procedure or policy is at issue, it should be evaluated under rational basis review.  The 2022-23 PNCP is a facially neutral procedure of general applicability. The District Court held that under rational basis review, the District had a legitimate government interest in creating a respectful and nondiscriminatory educational environment.  While the District agrees, it also clearly had another legitimate governmental interest sufficient to survive rational basis review – compliance with the law.

The *Doe* Court held that the Bethel Local School Board of Education had a "legitimate purpose of complying with Title IX as it was then interpreted" that was sufficient to satisfy rational basis review.  *Doe*, 2025 WL 2453836, at *9. As set forth above, at the time the 2022-23 PNCP was adopted the Department of Education and the President of the United States through a pair of Executive Orders, required school districts to apply the *Bostock* decision to issues of gender identity.  The District risked losing Title IX funding if it did not comply with that interpretation of the law. Losing Title IX funding would negatively impact every student in the District and is a legitimate governmental interest sufficient to meet rational basis review.

Neither the facts nor the law support Appellants' arguments.  The District Court correctly granted summary judgment as to the Willeys first and second claims

41

for relief. This Court should affirm the District Court's grant of summary judgment and dismiss the Willeys' appeal.

### III. Ms. Willey Cannot Establish That Her Religious Beliefs Were Infringed in the Employment Setting.

To establish an infringement upon the free exercise of religion a plaintiff bears the initial burden of showing that the limitation on their sincere religious practice is pursuant to a statute that is (1) not neutral because the "object" of the policy is to suppress religious exercise, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); (2) not generally applicable because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton v. City of Philadelphia*, 593 U.S. 522, 141 S. Ct. 1868, 1877, 210 L.Ed.2d 137 (2021); or (3) accompanied by "official expressions of hostility to religion," *Kennedy*, 142 S. Ct. at 2422 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n.*, 584 U.S. 617, 138 S. Ct. 1719, 1732, 201 L.Ed.2d 35 (2018)). Fundamentally, a free exercise claim must establish that persons were treated differently because of their religious beliefs than those not sharing in those beliefs. Even where a burden on religious practice is found, a neutral law of general applicability will be upheld if it serves a legitimate governmental interest under

rational basis review. *Chung v. Washington Interscholastic Activities Ass'n*, 538 F. Supp. 3d 1170, 1181 (W.D. Wash. 2021).

As set forth above, the District had a legitimate interest in complying with the law under Title IX and Title VII.  An important issue the Willeys arguments ignore is that students have a constitutional right to attend school in a setting free from discrimination. *Downs v. Board of Ed. of Kansas City*, 336 F.2d 988 (1964); *Cooper v. Aaron*, 358 U.S. 1 (1958).  Executive Orders 13988 and 14021 conditioned the receipt of Title IX funds upon guarantees of non-discrimination against students and teachers' gender identity.  Thus, the 2022-23 and 2023-24 PNCPs were not adopted to burden religion.  They were adopted to comply with the Constitution as interpreted by the federal government at the time. The fact that the PNCPs were not directed at any particular religious practice means that they are procedures of neutral applicability subject to rational basis review.

Again, the Willeys argue for an unworkable situation where the District could only meet its constitutional obligation to not discriminate against students based on gender identity by allegedly discriminating against Ms. Willey and those who share her beliefs.  Fortunately, the law does not and has never required such a Hobson's Choice.  The law does not require employers blindly acquiesce to all claimed religious practices of their employees or provide blanket exemptions from their policies or procedures for any employee upon request.  Under such a system, no

employee could ever be disciplined because the employee could claim any offending behavior was rooted in their sincere religious practice. *See Bass v. T-Mobile USA, Inc.*, 726 F. Supp. 3d 749, 758 (E.D. Mich. 2024) (holding that it is not the role of employers or courts to question the religious validity of sincerely held beliefs.) Further, under such a system any employee's religious convictions would necessarily be elevated over the constitutional rights of others. For example, some people follow the religious belief of the "Curse of Ham" otherwise known as the "Hamitic Hypothesis[7]" (the belief that the Black race is the product of a curse by god upon all descendants of Noah's son Ham). If the Willeys' blanket system of automatic accommodations for every claimed religious belief were enacted, a teacher who adhered to that belief system and holding sincere religious beliefs that Black students should sit in the back of the classroom and not be allowed to speak in class could not face discipline or censure by the school. Such a result is not required under the law.

Although focused on one extreme, the example clarifies that it is not enough for an employee to claim a religious belief or have the expression of that belief

---

[7] Lest the Court think this particular example is overly strained or suggestive of "fringe" beliefs, it is worth noting that the Church of Jesus Christ of Latter Day Saints (the church attended by the Willeys) did not officially disavow teaching of the Hamitic Hypothesis until 1978. Numerous fundamentalist sects within the church still adhere to the teaching.

44

burdened.  The law also requires proof that a *reasonable* accommodation of the employee's belief was available and was denied.  Ms. Willey failed to make such a showing.

All that the law requires when workplace demands burden religious practice is that a reasonable accommodation be made for those practices if it does not create an undue hardship for the business.  *See Groff v. DeJoy*, 600 U.S. 447, 473, 143 S. Ct. 2279, 2297, 216 L. Ed. 2d 1041 (2023). Therefore, in order to establish an infringement upon her religious practice sufficient to survive summary judgment, Ms. Willey must demonstrate that her religious practice was burdened *and* that she was denied a reasonable accommodation that did not create an undue hardship for the business.

The District Court held that even the threat of potential discipline under the PNCPs was sufficient to establish Ms. Willey's *prima facie* element of a burden on her religious practice. (App. Vol. III, 0600).  However, contrary to the Willeys arguments, the District Court did not find a genuine dispute of material fact existed as to whether she faced actual discipline for refusing to comply with the PNCP. *Id.* at 0599.  Instead, the Court held that Ms. Willey had not alleged a Title VII claim or ever identified her First Amendment claim as a retaliation claim. (App. Vol. III, 0599, fns. 17-18).  Ms. Willey had not analyzed her First Amendment claim as a retaliation claim and had not set forth any facts that exercising her religious beliefs

was the motivating factor behind any alleged "discipline." *Id.* Thus, there was no genuine dispute of material fact and summary judgment was appropriate.

The undisputed facts, established by Ms. Willey's deposition testimony, are that upon first learning of the 2022-23 PNCP, Ms. Willey told the District's Human Resources Director, Nicole Bolton, that she disagreed with the procedure in general terms. (App. Vol. II, 0399.) Ms. Bolton advised Ms. Willey to speak to her direct supervisor, Kris Cundall. *Id.* Ms. Cundall informed Ms. Willey that if she were faced with a situation where a student requested she use an alternate name or pronoun that she could "tell the student that [she] needed to go by what was in Powerschool." *Id.* The name used in Powerschool matches the name on the student's birth certificate. Thus, when Ms. Willey expressed general disagreement with the PNCP she was offered a reasonable accommodation that would not conflict with her religious beliefs. The District satisfied the requirements of the law.

The District revised the PNCP for the 2023-24 school year to clarify that it did not require staff to lie to anyone and to explicitly offer accommodations "for any reason." The Willeys argue even that is insufficient but the law does not require every request be accommodated. It requires accommodations in every circumstance that do not create an undue hardship for the business. *See Groff,* 600 U.S. at 473. The law does not allow employers to evaluate the subjective worthiness of the reason

46

for the accommodation request, but it does require a context-specific evaluation of the burden the accommodation would create. *Id.*

The *Groff* Court held that consideration of undue hardship would generally require consideration of options such as voluntary shift swapping. *Groff,* 600 U.S. at 473. "Reasonable accommodation without undue hardship as required by section 701(j) of title VII of the Civil Rights Act of 1964" contemplates voluntary shift swapping or flexible scheduling as means of reasonably accommodating an employee request. 29 C.F.R. § 1605.2. Could Ms. Willey's alleged concerns have been accommodated through shift swapping or flexible scheduling? It is impossible to know because she failed to present evidence that she ever requested a specific accommodation. As the District Court correctly held, Ms. Willey did not produce any evidence that under the 2023-24 PNCP the language "for any reason" was pretextual, that subjective decision-making was involved, or that anyone had ever been denied such an accommodation. The 2023-24 PNCP was content neutral and of general applicability. It offered accommodation to anyone for any reason. Ms. Willley's religious practice cannot have been burdened under the 2023-24 PNCP as it allegedly was under the 2022-23 PNCP because she could not have reasonably perceived a threat of discipline under the procedure.

Once again, summary judgment in the underlying District Court action is not based on an advisory opinion or referendum as to the validity of the 2022-23 or

2023-24 PNCPs.  Obviously, as is the case here, if the PNCPs meet the requirements of the law then no violation of Ms. Willey's constitutional rights can be found. However, even if some aspect of the PNCPs is found to be lacking, Ms. Willey still has the burden of establishing that her religious expression was infringed due to being coerced into taking some action that violated her sincerely held beliefs.  She cannot do so when she admits she informed the District she had no intention of following the PNCPs, the District offered her the reasonable accommodation of using student's names as set forth in Powerschool, she never requested a specific accommodation for any particular circumstance, she never actually used a student's chosen name or pronoun, and she was never disciplined by the District.

Ms. Willey failed to present evidence of an actual burden on her religious expression that arose from either a rule that was specifically directed toward quashing that expression, or a content-neutral rule for which the District had no legitimate purpose and for which she was refused accommodation.  Therefore, the District Court properly granted summary judgment and that judgment should be affirmed by this Court as to Ms. Willey's third claim for relief.

## CONCLUSION

No genuine dispute of material fact exists as to any of the Willeys' claims. Indeed, the Willeys failed to produce evidence sufficient to support their claims.  The

Willeys failed to produce evidence of a 2021 Policy, or that the Student was ever referred to by an alternate name or pronoun pursuant to the 2022-23 PNCP.

The Willeys failed to produce evidence that the District knew or should have known of their religious convictions, or that the District took any action that caused the Willeys to violate their right to religious expression.

Even if they had produced such evidence, the Willeys cannot establish that the District knew any of its staff referred to the Student by alternate names or pronouns, or that the District had an affirmative duty to notify them of that use had it been made aware of the same. No court has ever required state actors – particularly in the absence of a request - to proactively police and enforce privately held religious beliefs on behalf of third parties. The District Court correctly held that doing so would turn the First Amendment on its head.

Ms. Willey failed to establish that the 2022-23 and 2023-24 PNCPs were not content neutral laws of general applicability subject to rational basis review. Nor did Ms. Willey establish facts sufficient to find that the District failed to reasonably accommodate her religious beliefs. The opposite is true. Ms. Willey testified that her immediate supervisor told her she could refer to students by the names found in Powerschool, i.e. the names on their birth certificates. Therefore, the only evidence in the record is that the District reasonably accommodated Ms. Willey's beliefs.

49

Because the 2022-23 and 2023-24 PNCPs were content neutral and of general applicability, the District satisfied rational basis review because it had a legitimate governmental interest in complying with controlling law that prevented discrimination against students based on gender identity.

WHEREFORE, the District Court properly granted summary judgment in favor of the District. The District respectfully requests this Court affirm and uphold the District Court's *Order Granting Defendants' Summary Judgment Motion.*

Respectfully submitted

<u>/s/ L. Kathleen Chaney</u>
L. Kathleen Chaney, Esq., #6-3211
Eric D. Hevenor, Esq., #6-4435
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone: (303) 799-8889
Facsimile: (303) 799-3700
*Attorneys for Appellee*

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Oral argument is not requested or required under Fed. R. App. P. 34(2)(a)-(c) because: (1) the appeal is frivolous; (2) the dispositive issues have been authoritatively decided;  and (3) the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. *See Chung v. Washington Interscholastic Activities Ass'n*, 538 F. Supp. 3d 1170, 1175 (W.D. Wash. 2021) ("When a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in a refusal to grant oral argument." (quoting *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998)).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[x] this brief contains 12,524 words, inclusive of the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[x] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 font size and Times New Roman font.

Date: September 22, 2025.

/s/ L. Kathleen Chaney
L. Kathleen Chaney, Esq., #6-3211
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone: (303) 799-8889

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender Antivirus with security intelligence version dated September 22, 2025, and according to the program are free of viruses.

/s/ L. Kathleen Chaney
L. Kathleen Chaney, Esq., #6-3211
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone: (303) 799-8889

# CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September 2025 a true and correct copy of the foregoing was filed with the Clerk of the Court using CM/ECF system and also served on the following:

Ernest G. Trakas (MO) #33813
Mary E. McAlister* (VA) #76057
Vernadette R. Broyles* (GA) #593026
 CHILD & PARENTAL RIGHTS
CAMPAIGN
5805 State Bridge Road, Suite 310
Johns Creek, GA 30097
*Attorneys for Appellant*

By:    /s/ *L. Kathleen Chaney*
         L. Kathleen Chaney, Esq., #6-3211
         Eric D. Hevenor, Esq., #6-4435
         4949 S. Syracuse Street, Suite 600

         Denver, Colorado 80237
         Telephone: (303) 799-8889
         Facsimile: (303) 799-3700
         *Attorneys for Appellee*