| | |
|---|---|
| **ASHLEY WILLEY & SEAN WILLEY**<br><br>   **Plaintiffs-Appellants**,<br><br>v.<br><br>**SWEETWATER COUNTY SCHOOL DISTRICT No. 1 BOARD OF TRUSTEES; KELLY MCGOVERN,** Superintendent of Sweetwater County School District No. 1; **NICOLE BOLTON,** Assistant Superintendent & Human Resources Director of Sweetwater County School District No.1; **KAYCI ARNOLDI,** Director of Student Services of Sweetwater County School District No. 1; **BRYANT BLAKE,** Principal of Black Butte High School,<br><br>   **Defendants-Appellees.** | Appellate Case No. 25-8027 |

**On Appeal from the United States District Court for the District of Wyoming**
**The Honorable Scott W. Skavdahl, District Court Judge**
**District Court Case Number 23-cv-69-S**

**SUPPLEMENTAL BRIEF OF APPELLEES BOARD OF TRUSTEES FOR SWEETWATER COUNTY SCHOOL DISTRICT No. 1,** *et al.* **– RE:** *MIRABELLI V. BONTA* **[ECF. 56]**

Respectfully submitted,

LAMBDIN & CHANEY, LLP
L. Kathleen Chaney, Esq., #6-3211
Eric D. Hevenor, Esq. 6-4435
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone: (303) 799-8889
Facsimile: (303) 799-3700
ATTORNEYS FOR APPELLEES

1

Defendants/Appellees hereby submit this Supplemental Brief pursuant to the Court's March 10, 2026 Order [ECF. 56].

## STATEMENT OF ISSUES FOR REVIEW

1. What is the precedential value of *Mirabelli v. Bonta*, 607 U.S. – , (2026), given that it is a ruling from an interim application to vacate a stay issued by the circuit court?

2. How does *Mirabelli* affect the type of scrutiny that applies to plaintiff's Free Exercise claims?

3. Does *Mirabelli* require school districts to affirmatively inform parents about their children's gender identity preference communicated to school officials, or is it limited to situations where school policy bars the disclosure of any gender identity-related information to effectively cut out the parents from participating in decisions regarding their children's gender identity? *Mirabelli*, 2026 WL 575049, at *3. Does the answer to this question differ between claims brought under the Free Exercise Clause and claims brought under substantive due process? Does the analysis change if a parent has previously directed the school to use the child's legal name and related pronouns?

4. How are the facts in the record in this case similar to, or different from, the facts in *Mirabelli*, and how does that impact the application of *Mirabelli*?

2

The Court posed for questions for the parties to answer, ordered 1 through 4. However, the most significant and relevant inquiry is the fourth one, i.e. how do the facts of the present action differ from *Mirabelli*? Therefore, Defendants/Appellees Sweetwater County School District No. 1, *et al.* (hereinafter collectively "the District") will address the factual dissimilarities between the present action and the *Mirabelli* holding first which informs and illuminates the Court's remaining questions.

**ARGUMENT**

I.  **How are the facts in the record in this case similar to, or different from, the facts in *Mirabelli*, and how does that impact the application of *Mirabelli*?**

The facts underlying the *Mirabelli* decision are in stark contrast to the facts of the present action. *Mirabelli* addressed California policies, including guidance documents issued by state officials, that permitted disclosure of a student's gender transitioning at school only if the student consented. *Mirabelli v. Bonta*, 146 S. Ct. 797, 800-801 (2026). One set of parent plaintiffs, the Poes, had a student who attempted suicide and despite the parents' request for notification if the student identified as transgender at school were not informed of the student's subsequent choice to so identify. *Id.* at 801. Another set of plaintiff parents, the Does, confronted their daughter's principal about the student's transitioning and were told that state

law required that information be withheld from them regardless of their request. *Id.* Thus, *Mirabelli* involves clear state action (the California policies at issue), through which the express wishes of parents were overruled. In short, in *Mirabelli* the state of California elevated its own policy considerations over those of the students' parents rights.

As the *Mirabelli* Court held, the California policies and the schools' enforcement of the same ignore the clear directive of *Mahmoud v. Taylor*, 606 U. S. 522 (2025). *See Mirabelli*, 146 S. Ct. at 802. The facts underlying *Mirabelli* and *Mahmoud* essentially mirror one another. *Mahmoud* involved a Montgomery County, Florida requirement that schools include LBGTQ+ reading materials and lesson plans into the curriculum despite parental objection and without allowing the parents to withdraw their students from the curriculum. Thus, in both *Mirabelli* and *Mahmoud* the parents were rendered helpless while the state substituted its policies for the parents right to raise their children as they see fit.

The facts of the present action could not be more distinct from those holdings. There exists no evidence in the present action that the Willeys' child was ever referred to by alternate names or pronouns pursuant to state policy or procedure. In the nearly three years since the Willeys filed the underlying case they have failed to produce any evidence whatsoever that their student was transitioning gender or doing so with the District's knowledge. At most, the Willeys have established that

4

during the 2021-22 school year three District teachers referred to the student by an alternate nickname or nicknames. (App. Vol. 3 at 455, 461, 464-65). All the evidence in the record demonstrates that during the 2021-22 school year the District had no policy or procedure – official or unofficial – that governed the use of a student's chosen name or pronoun. (App. Vol. 3 at 457, 464-65, 564, 596, fn.16.) Therefore, contrary to the facts underlying *Mirabelli*, there is no evidence that the allegedly objectionable behavior – assisting the student in gender transitioning – occurred at all, and to the extent the use of alternate nicknames could conceivably be deemed objectionable there is no evidence it occurred under the color of state law.

Further, on March 29, 2022, Ashley Willey sent an email to several teachers and school administrators demanding that they cease using alternate names and/or pronouns when referring to the student. (App. Vol. I, 0197). Most glaringly disparate from the facts of *Mirabelli* and *Mahmoud* is that Ms. Willey's request was honored. No evidence exists that the District had knowledge of any of its staff using alternate names or pronouns when referring to the student after March 29, 2022. Thus, far from the situation presented by *Mirabelli* and *Mahmoud* where parental requests were overruled and ignored by state policy, the District honored Ms. Willey's request. The Willeys cannot establish the violation of their constitutional right to parent when their parental decisions were followed by District personnel.

Further, in stark contrast to *Mirabelli* where the school actively withheld information regarding their students' attempts at gender transitioning while at school, it is undisputed that the first time Ms. Willey inquired of anyone within the District regarding her student's use of alternate names she was told the truth. (FAC ¶¶ 31-35; App. Vol. I, 0155).   As the District Court expressly held, no information was ever withheld or concealed.:

> There is no evidence in the record before this Court that either Plaintiffs or any other parent was lied to by any School District employee about his or her student requesting to use an alternate pronoun. Neither is there any evidence anyone assisted students in concealing the use of an alternate pronoun from a student's parent(s).

(Appx. Vol. III., p. 0577, fn. 7)

In summary, there is no evidence the Willeys' student made efforts to transition gender with the District's knowledge, no evidence any District employee ever used alternate pronouns when referring to the student, no evidence that alternate nicknames were used in relation to the student pursuant to any District policy or procedure, no evidence the Willeys were ever lied to or information concealed from them, and no evidence any District employee disregarded the parental wishes of the Willeys.  The facts of *Mirabelli* are inapposite.

Similarly, with respect to Ms. Willey's employment related free exercise claim the undisputed facts are that: (1) Ms. Willey was never required to follow the District's preferred names/pronouns procedure ("PNCP"); (2) no situation ever arose

6

where Ms. Willey's beliefs were placed in conflict with the procedure; (3) Ms. Willey was never subjected to discipline for failure to follow the procedure; and (4) to the extent it could be argued that Ms. Willey requested an accommodation for her beliefs, that request was granted. (App. Vol. II, 0358, 0361-63, 399.) Free exercise does not require school policy or procedure necessarily conform to all employees' religious beliefs. Due to the conflicting nature of the beliefs of the world's 10,000+ distinct religions[1] such a requirement would be impossible to meet. By accommodating Ms. Willey's beliefs, not forcing her to act counter to her beliefs, and not disciplining her for refusal to follow District procedure, the District complied with the law and cannot have infringed upon Ms. Willey's religious freedom. That is factually distinct from the situation in either *Mirabelli* or *Mahmoud* where the plaintiffs were subjected to state policy without recourse.

II.   **What is the precedential value of *Mirabelli v. Bonta*, 607 U.S. – , (2026), given that it is a ruling from an interim application to vacate a stay issued by the circuit court?**

None. Certainly the *Mirabelli* decision cannot have precedential value as to the present action because it is factually distinct. Precedent requires application of the law to similar facts. Here, there is no evidence that the District interfered with

---

[1] Wasserman, P. (2024, January 12). *World population by religion: A global tapestry of faith*. Population Education. https://populationeducation.org/world-population-by-religion-a-global-tapestry-of-faith

or overruled the Willeys' religious beliefs or requests for accommodation, if any. That is entirely separate from the legal position of the plaintiffs in *Mirabelli.*

Ultimately, summary judgment was granted against the Willeys because they failed to present evidence in support of their claims. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671-72 (10th Cir. 1998) (holding that a party moving for summary judgment may make "a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law," including by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.") No changes to legal precedent, even were they applicable to the present action, can alter the fact that the Willeys lack evidence to support their claims.

Finally, decisions made on the Supreme Court's emergency docket are known to be of limited precedential value. In *Merrill v. Milligan*, 142 S. Ct. 879 (2022), Justice Kavanaugh emphasized that orders regarding stays made through the Court's emergency docket are not decisions on the merits and are taken to allow courts to "decide the merits in an orderly fashion." Justice Kavanaugh emphasized the point, stating, "To reiterate: the Court's stay order is not a decision on the merits."

In *Mirabelli,* Justice Barrett similarly emphasized in her concurrence that the Court considered the merits "not to conclusively resolve them" which undermined the dissent's concern that disposition of the application would be taken as a

"'conclusive merits judgment.'" *Id.* at 805. The purpose of lifting the stay is only to prevent the likelihood of irreparable harm and not to decide the case on its merits. *Id.*

It is worth noting that the 9th Circuit Court of Appeals who issued the stay "expressed doubts about the District Court's decision on the merits." *Mirabelli*, 146 S. Ct. 802. It is possible, if not likely, that the 9th Circuit in forming its opinion had the benefit of more complete briefing and oral argument that the Supreme Court lacked when entering an order on its emergency docket. Whether the 9th Circuit or the Supreme Court's assessment of the likelihoods is correct cannot be known. The final outcome of *Mirabelli* remains undecided and, therefore, its precedential value limited – even if its factual underpinnings were relevant to the present action.

**III. Does *Mirabelli* require school districts to affirmatively inform parents about their children's gender identity preference communicated to school officials, or is it limited to situations where school policy bars the disclosure of any gender identity-related information to effectively cut out the parents from participating in decisions regarding their children's gender identity?**

Because the *Mirabelli* decision is not a determination of the merits and has no precedential value it requires nothing at all from anyone other than the litigants to that case. However, to the extent one can "read the tea leaves" underpinning the *Mirabelli* Court's determination of the likely outcomes, its reference to *Mahmoud* is illuminating. As stated above, in both *Mirabelli* and *Mahmoud* state policy was

9

allowed to supersede express parental wishes and parents were left without recourse. In both cases the parents had taken a clear and unmistakable position regarding their students' upbringing that was overridden by state policy.

For example, in *Mirabelli* the injunction the Supreme Court allowed to proceed without the 9th Circuit's stay: (1) prevents schools from misleading parents about their children's gender presentation at school and their social transitioning efforts; (2) requires schools to follow parents' directions regarding their children's names and pronouns; and (3) requires the defendants to include a notice to parents of the rights protected by the injunction. *Mirabelli,* 146 S.Ct at 801. Thus, the injunction does not find that respecting or utilizing students' chosen names or pronouns is itself unconstitutional, nor does it place an affirmative duty on schools to inform parents regarding students in-school conduct. The conduct that is enjoined is only where the school or the state substitute their own policy considerations for the stated wishes of parents by misleading them or failing to follow their directives.

Similarly, in *Mahmoud,* the school board was found liable for "abject refusal to heed widespread and impassioned pleas for accommodation." *Mahmoud,* 145 S. Ct. at 2343. The *Mahmoud* Court did not hold that including LGBTQ+ materials in the curriculum was itself unconstitutional or otherwise violative of parental rights. It was the failure to accommodate parental concerns by allowing opt outs from the curriculum that created the constitutional violation.

10

No court has found an affirmative duty for schools to act as Big Brother and report students to parents for holding personal beliefs. Doing so would place an unworkable burden on schools and establish a legal quagmire beyond reconciliation. No school decision can conform to all of the world's 10,000+ religions. For example, the Messiah Foundation International believes the world will end in 2026. *See https://en.wikipedia.org/wiki/Messiah_Foundation_International.* Does a school discredit their particular version of god and violate the right of parents to raise their children as they see fit by teaching the existence of future events such as the 2028 Olympics? There is simply no way to teach about the future without at least impliedly stating that followers of Messiah Foundation International are wrong which necessarily impacts their children's religious upbringing. Can a school teach about a spherical earth without running afoul of the flat earth beliefs of the Black Hebrew Israelite religion? Indeed, most flat earth adherents consider themselves "very religious[2]." Are those religious adherents not entitled to the same constitutional rights as Lutherans or Mormons? Do schools have an affirmative duty to preemptively notify all parents of all intended lesson plans under *Mirabelli* and *Mahmoud,* or do they simply have a passive duty to allow parents to opt out of

---

[2] See Nguyen, Hoang, *Most Flat Earthers Consider Themselves Very Religious,* April 2, 2018, https://en.wikipedia.org/wiki/Messiah_Foundation_International, last accessed March 22, 2026.

educational choices and policies of which they have religious disputes?  Reasonably, it can only be the latter.  Neither *Mirabelli* nor *Mahmoud* create affirmative burdens to conform educational policy to parental religious beliefs.  Doing so is impossible.

The Court asked whether the analysis is different when considered as a free exercise claim or substantive due process and the answer is decidedly "no."  Whether under a free exercise or substantive due process analysis the issue raised by *Mirabelli* is one of direct interference with a constitutional right by overruling parental decision making.  When analyzing the free exercise claims of parents in *Mirabelli* the Court held that parents had a likelihood of success on the merits because the California policies at issue substantially interfered with the right of parents to guide the religious development of their children. *Mirabelli*, 146 S. Ct. at 802 (citing *Mahmoud*, 606 U.S., at 559, 145 S.Ct. 2332).  That substantial interference arose because the schools were actively misleading parents regarding their children's school-related conduct and refusing to provide requested accommodations.  The same was true in *Mahmoud.*

The *Mirabelli* Court held parents had a likelihood of success on their substantive due process claim because parents—not the State—have primary authority with respect to "the upbringing and education of children" which includes "the right not to be shut out of participation in decisions regarding their children's mental health." *Mirabelli*, 146 S. Ct. at 803.  By misleading parents and substituting

12

school policy for parental decision making the schools at issue in *Mirabelli* denied fundamental parental rights that do not implicate or suggest an affirmative duty to inform parents of student choices regarding nicknames.

In fact, the present action presents a clear example of the risks inherent in opening the Pandora's Box of possibilities establishing such an affirmative duty would engender. Here, there is no evidence that the student in question identified as transgender at all. Of the three teachers who testified they referred to the student by alternate nicknames – of their own accord and not pursuant to any District policy or procedure – none recalled having used alternate pronouns for the student. Does the nickname use alone create some form of affirmative duty as the Willeys claim? One can imagine a scenario where the school might subject itself to potential legal action by calling a parent to inform them their child was presenting as transgender at school because he or she used a gender-neutral moniker such as "Juniper" only to find out that was a family nickname that did not implicate gender whatsoever. Schools should not be required to guess at students gender identities based on scant information. Should the school then inquire of all students who use preferred nicknames whether they identify as transgendered? Presumably that would have right to privacy implications and would also seem facially dscriminatory.

What if a student is simply nonbinary and not transgender? Would that create an affirmative duty to call the student's parents? How about if the student is just

gay?  Or suspected of being gay?  That would certainly be an issue of identity. Should it not trigger the same duty as suspicions regarding gender identity? Where does the boundary of such a duty end?

What if a White student were to date a Black student?  Should parents be immediately informed?  What if the school suspects the students in that relationship are sexually active?  In 2026 the idea that a school has an affirmative duty to inform parents of interracial dating might seem racist on its face, but did it seem equally so in 1956? Has the law changed in the interim?  If the standard for a substantive due process analysis is whether something is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" it is unlikely interracial dating would pass such a test. *See Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215, 231, 142 S. Ct. 2228, 2242, 213 L. Ed. 2d 545 (2022).  Analyzing that same question from the perspective of a parental free exercise claim immediately calls to mind White Christian nationalists who believe in the "Great Replacement Theory" and/or followers of Nation of Islam all of whom would undoubtedly think their child participating in interracial dating was an issue of "identity."  Should schools, following *Mirabelli*, assume an affirmative duty to inform of miscegenation under a substantive due process or free exercise analysis? If not, why is gender identity potentially treated differently than being nonbinary, gay, or dating outside one's race when they all implicate issues of identity?

14

The point being that the duty imposed upon schools by this, or any, court cannot be an affirmative duty to investigate students privately held thoughts by inquiring as to their gender identity, sexual preferences, racial beliefs, or sexual activity. Nor should the Court impose an affirmative duty to speculate upon or chase down every subjective or religious belief a parent may or may not have. That would, as the District Court held, "turn the First Amendment on its head." (App. Vol. III, 0595).

The burden upheld in *Mirabelli* and *Mahmoud* is no different than it has always been, i.e. schools cannot actively mislead parents or overrule their parental decisions. Where, as here, all the evidence in the record establishes that the District honored the Willeys requests, whether with respect to their child or in relation to Ms. Willey's objections about following the chosen names/pronouns procedure, there cannot be a free exercise or substantive due process violation. The District never interfered with or violated the Willeys constitutional rights.

All the law requires is that state actors accommodate religious beliefs wherever possible, such as by simply not misleading parents who request information or by providing opt outs from potentially objectionable policies or curriculum. That distinction is critical when considering the level of legal scrutiny that applies to these issues.

15

**IV. How does Mirabelli affect the type of scrutiny that applies to plaintiff's Free Exercise claims?**

As explained above, both *Mirabelli* and *Mahmoud* addressed compulsory educational policies that parents could not avoid even upon request. Under a free exercise analysis that created a substantial burden upon the parents' ability to guide the religious development of their children. Understandably so. The parents in *Mirabelli* requested nothing more than they not be lied to and that the school respect their choices about how to raise their children. Yet the schools refused to honor that request, citing state law and policy. The substantial burden placed on the parents' right to guide their children's upbringing correctly triggered a strict scrutiny analysis. Similarly, the school's policy of misleading these parents – and only these parents – regarding their student's conduct is not a rule of general applicability and strict scrutiny would apply under a substantive due process analysis.

Here, the Willeys have failed to establish their child presented as transgendered or was referred to using alternate pronouns at all. Further, the Willeys have only established that their child was referred to by alternate nicknames during the 2020-21 school year which was prior to the existence of any District policy or procedure. Therefore, the level of scrutiny applied to their claims is irrelevant because they cannot establish the fundamental element of action taken "under the color of state law."

16

To the extent that a level of constitutional scrutiny would apply, it remains rational basis scrutiny. The substantial burden test established in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) and followed in *Mahmoud* required compulsory state procedures that necessarily interfered with religious practice. In *Yoder* the compulsory procedure was the requirement that all students continue to receive state education past the eighth grade. Although it was a rule of neutral applicability, the rule unfairly burdened the religious practice of persons of the Amish faith by taking students of working age away from their faith-based duties. Notably, *Yoder* did not strike down the compulsory education entirely, it only allowed exemptions for Amish families with sincerely held religious beliefs. *See State v. Shaver*, 294 N.W.2d 883, 899 (N.D. 1980). Similarly, the *Mahmoud* Court did not find the LBGTQ+ curriculum to be unconstitutional, they held only that it was an unconstitutional burden upon the rights of the parents who were not permitted to opt out of the curriculum. It was the compulsory nature of the burden that triggered strict scrutiny.

Here, even had the Willeys produced evidence that their child had been referred to be alternate pronouns, they cannot establish a substantial burden on their religious practice because there is no compulsory action. The use of alternate nicknames in reference to the Willeys' child was not pursuant to any state rule, requirement, policy, or procedure. Even had the chosen names/pronouns procedure

17

existed during the 2020-21 school year, it did not compel students to act in any particular way or to follow any particular curriculum. In fact, it was a strictly internal procedure that governed only the conduct of teachers. No student would even have been aware of the procedure's existence. It did not create compulsory requirements or otherwise interfere with anyone's religious practice.

Further, contrary to the compulsory educational policies in *Yoder* and *Mahmoud,* the District honored the Willeys request that the student not be referred to by alternate names or pronouns after March 29, 2022 (the date of the request). There is no evidence that any District personnel, pursuant to any District policy or procedure, ever referred to the student by alternate names or pronouns after that date. Thus, the District's conduct is exactly what the Court required in *Mahmoud.* The District allowed the Willeys to guide the student's religious upbringing without interference – as it would with any student. That is a rule of general and neutral applicability subject to rational basis review[3]. *Chung v. Washington Interscholastic Activities Ass'n*, 538 F. Supp. 3d 1170, 1181 (W.D. Wash. 2021).

With respect to Ms. Willey's free exercise claim related to employment, that is similarly subject to rational basis review. Ms. Willey was not singled out in any fashion for her beliefs and the PNCP has no religious connotation or application

---

[3] Because the Willeys cannot establish any interference with their right to guide their child's religious upbringing their claims would fail under any level of scrutiny.

18

whatsoever. As set forth in the District's Response Brief [ECF 30] and its Supplemental Brief [ECF 55], Ms. Willey testified that she was never required to follow the District's PNCP; no situation ever arose where Ms. Willey's beliefs were placed in conflict with the procedure; she was never subjected to discipline for failure to follow the procedure; and to the extent it could be argued that Ms. Willey requested an accommodation for her beliefs, that request was granted. (App. Vol. II, 0358, 0361-63, 399.)  Under those facts it is impossible to find a substantial burden – or any burden – upon Ms. Willey's free exercise of religion. In the absence of such a burden, the District Court correctly held:

> As both PNCPs applicable to Plaintiff as a teacher are neutral laws of general applicability, they "do not raise free exercise concerns" and "need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Grace United Methodist Church*, 451 F.3d at 649 (citing *Smith*, 494 U.S. 872, 879 (1990)). The 2023-24 PNCP is rationally related to the same legitimate government interest in promoting a respectful and nondiscriminatory educational environment as the 2022-23 PNCP. Thus, both survive Plaintiffs constitutional challenge.

> (App. Vol. III, p. 0603)

Nothing in *Mirabelli* alters that analysis.  Rational basis review applies.

## CONCLUSION

The holding of *Mirabelli v. Bonta* strengthens the District's arguments by further establishing the distinction between the passive, non-compulsory actions

alleged by the Willeys from the plainly compulsory – and truly coercive – conduct at issue in *Mirabelli* and *Mahmoud.*

All of the Willeys' claims arise under 42 U.S.C. § 1983, which requires proof of the Willeys were: (1) deprived of a right secured by the Constitution or federal law; and (2) the deprivation occurred under the color of state law. *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 49 (1999); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). The Willeys failed to present evidence that they have ever been deprived of a right secured under the Constitution or that any such deprivation occurred under color of state law. Their claims fail for lack of evidence regardless of the application of *Mirabelli* or otherwise. Yet *Mirabelli* is distinguishable in every respect.

There is no evidence the Willeys were ever misled which is entirely distinguishable from the parents in *Mirabelli.* There is no evidence the Willeys child was ever referred to by alternate names or pronouns pursuant to District policy or procedure which differs from the California policies at issue in *Mirabelli.* There is no evidence Ms. Willey was ever required to follow the PNCP or was disciplined for failing to do so, unlike the teacher plaintiffs in *Mirabelli.* Therefore, *Mirabelli* does not alter the Court's analysis of the Willeys claims and summary judgment should be affirmed.

Respectfully submitted

*/s/ L. Kathleen Chaney*
L. Kathleen Chaney, Esq., #6-3211
Eric D. Hevenor, Esq., #6-4435
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone: (303) 799-8889
Facsimile: (303) 799-3700
*Attorneys for Appellee*

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender Antivirus with security intelligence version dated March 23, 2026, and according to the program are free of viruses.

/s/ L. Kathleen Chaney
L. Kathleen Chaney, Esq., #6-3211
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone: (303) 799-8889

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of March 2026 a true and correct copy of the foregoing was filed with the Clerk of the Court using CM/ECF system and also served on the following:

Ernest G. Trakas (MO) #33813
Mary E. McAlister* (VA) #76057
Vernadette R. Broyles* (GA) #593026
 CHILD & PARENTAL RIGHTS
CAMPAIGN
5805 State Bridge Road, Suite 310
Johns Creek, GA 30097
*Attorneys for Appellant*

By:    /s/ *L. Kathleen Chaney*
L. Kathleen Chaney, Esq., #6-3211
Eric D. Hevenor, Esq., #6-4435
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone: (303) 799-8889
Facsimile: (303) 799-3700
*Attorneys for Appellee*